Anthony LaMARCA, Martin Saunders, and Edwin Johnson, individually and on behalf of all others similarly situated, and David Aldred, Steve H. Bronson, Jr., Eddie Cobb, Ron Durrance, Wayne Epprecht, Michael Gordon, and Billy Joe Harper, individually, Plaintiffs,

v.

R.V. TURNER, individually in his former official capacity as Superintendent of Glades Correctional Institution, Chester Lambdin, in his official capacity as Superintendent of Glades Correctional Institution, and the State of Florida, Defendants.

No. 82–8196–Civ.

United States District Court, S.D. Florida.

June 4, 1987.

David M. Lipman and Robert E. Weisberg, of Lipman & Weisberg, Miami, Fla., and William Amlong of Hall & Amlong, Fort Lauderdale, Fla., for plaintiffs.

Walter M. Meginniss, Asst. Atty. Gen., Tallahassee, Fla., and Michael B. Davis, of Davis, Critton, Hoy & Diamond, West Palm Beach, Fla., for defendants.

## ORDER ON REPORT AND RECOMMENDATION OF MAGISTRATE

PAINE, District Judge.

This cause comes before the court on the report and recommendation of the Magistrate (DE 128), defendants' amended response and objections (DE 155), and plaintiffs' reply (DE 170). The court has studied these submissions and has reviewed the voluminous transcripts, exhibits, and other materials in the case file as well as the relevant authorities. Now being fully advised, the court renders the following memorandum and order.

## I.

### BACKGROUND

This class action for damages and injunctive relief was brought by inmates who claim that their federal constitutional rights were violated when they were gang raped or otherwise assaulted while incar-

cerated at the Glades Correctional Institution (GCI), a state prison in Belle Glade, Florida. The procedural history of the case is set out at length by the Magistrate. Briefly, this litigation was commenced on May 14, 1982 with the handwritten pro se complaint of Anthony LaMarca, who alleged that he was subjected to ongoing physical violence and harassment by other GCI inmates because he refused to participate in homosexual activity and that prison officials failed to act to alleviate the situation (DE 1). As the lawsuit continued, counsel was obtained and the complaint was amended several times (DE 23, 62, 93, 129, 131). On April 13, 1984, the undersigned district judge ordered that for purposes of injunctive relief the case proceed as a class action defined as those persons within the Florida prison system who are or will be incarcerated at GCI (DE 47).

The third amended complaint contains claims for damages by ten inmates. Named plaintiffs LaMarca, Saunders and Johnson also seek equitable remedies on behalf of the class. Defendant Turner is sued in his individual capacity as former superintendent of GCI. Defendant Lambdin, the current superintendent, is sued solely in his official capacity for purposes of injunctive and equitable relief (DE 129). The State of Florida is a defendant for purposes of attorneys' fees and expenses.

The district court referred the case to United States Magistrate Peter Nimkoff for a report and recommendation pursuant to Magistrate Rule 1(f) of the Local Rules of the Southern District of Florida. The Magistrate conducted two weeks of evidentiary hearings, reviewed deposition testimony and numerous exhibits, and heard oral argument. The Magistrate then filed a 135–page report and recommendation containing findings of fact and conclusions of law (DE 128) which found Turner liable to the ten named plaintiffs in the aggregate amount of $201,500 and recommended the creation of two committees to assist the court in formulating specific injunctive relief.

Defendants filed extensive objections to the Magistrate's report in accordance with Local Magistrate Rule 4(b) (DE 155). Defendants dispute the Magistrate's failure to grant a continuance, to grant a jury trial, and to recuse himself from the proceedings, and also lodge numerous objections to specific findings of fact and conclusions of law. Plaintiffs submitted an equally extensive reply (DE 170).

## II.

### STANDARD OF REVIEW

■ The court's review of the Magistrate's findings and recommendations is governed by a de novo standard:

> A District Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate. The District Judge, however, need conduct a new hearing only in his discretion or where required by law, and may consider the record developed before the Magistrate, making his own determination on the basis of that record. The District Judge may also receive further evidence, recall witnesses, or recommit the matter to the Magistrate with instructions.

Magistrate Rule 4(b), Local Rules of the Southern District of Florida; *accord* 28 U.S.C. § 636(b)(1) (1982).

The Supreme Court has held that, in providing for a de novo "determination" rather than a de novo hearing, "Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a Magistrate's proposed findings and recommendations." *United States v. Raddatz*, 447 U.S. 667, 676, 100 S.Ct. 2406, 2413, 65 L.Ed.2d 424 (1980). The former Fifth Circuit has held that, in situations involving the constitutional rights of a *criminal defendant*, a district court should not enter an order inconsistent with the Magistrate's credibility determinations without personally hearing the live testimony of the witnesses whose testimony is determinative. *Louis v. Blackburn*, 630 F.2d 1105, 1109 (5th

Cir.1980).[1]  Although the *Louis* court expressly limited its holding to criminal cases, *see id.* n. 3, the exercise of sound judicial discretion compels this court to extend substantial deference to the Magistrate's credibility choices absent counterveiling considerations.  In a criminal case which preceded *Louis*, the Fifth Circuit stated:

> In our view it would be a rare case in which a district judge could resolve credibility choices contrary to the recommendations of the magistrate without himself having had an opportunity to see and hear the witnesses testify.  Certainly, in such a rare case there should be found in the transcript an articulable basis for rejecting the magistrate's original resolution of credibility and that basis should be articulated by the district judge.

*United States v. Marshall,* 609 F.2d 152, 155 (5th Cir.1980).

### III.

### FAILURE TO GRANT JURY TRIAL

■  Defendants first object to the Magistrate's failure to grant a jury trial.  The Magistrate found that defendants waived that right by failing to make a demand within ten days of November 2, 1983, when they filed an answer to the first amended complaint (DE 23, 41).  Defendants first demanded a jury trial on November 8, 1985, over two years later, in response to the second amended complaint (DE 62, 69, 83).  Following the Magistrate's denial of a jury trial (DE 105), defendants filed an emergency appeal with the district court (DE 104), which the undersigned denied (DE 112).

Defendants again argue that the second and third amended complaints introduced new issues into the lawsuit which merited a jury trial and that therefore their demand was timely.  As the Magistrate correctly concluded, the right to jury trial is waived by a failure to make a demand within ten days of the "last pleading directed to such issue."  Fed.R.Civ.P. 38(b).  If the original pleadings effectively waive jury trial, the right cannot be revived by amending the original pleadings.  *Walton v. Eaton Corp.,* 563 F.2d 66, 71 (3d Cir.1977).  A jury trial may be demanded, however, for any "new issues" in the amended pleadings.  Amendments not introducing new issues do not give rise to a demand for jury trial.  *Guajardo v. Estelle,* 580 F.2d 748, 753 (5th Cir.1978).[2]

What constitutes a "new issue" is the bone of contention.  The court's review of the law on this subject has yielded less than clear results.  The former Fifth Circuit has said that "[t]he term 'new issues' has been interpreted to mean new issues of fact and not new theories of recovery."  *Id.* at 753.  Notwithstanding, not every new fact question has been held to give rise to a jury trial.  For example, in *Lanza v. Drexel & Co.,* 479 F.2d 1277 (2d Cir.1973) (en banc), a securities case, the court held that a claim for punitive damages and an allegation of willfulness were not new issues within the meaning of Rule 38:

> The willfulness and falsity as of a particular date *merely clarified "the same general issues" raised in the original complaint. Moore v. United States,* 196 F.2d 906, 908 (5th Cir.1952).  Kircher had been put on notice of *the underlying facts and basic legal theory*—fraud—upon which plaintiffs sought relief, and *the character of the suit* was in no way changed by the amendments.

*Id.* at 1310 (emphasis added).  One district court has articulated the following standard:

> The test to be employed by a court in ruling on a motion to strike a jury demand is whether the "new issues" alleged in the amendments *"touch ... the same general issues"* raised by the original pleadings, *Roth v. Hyer,* 142 F.2d

---

1.  Decisions of the former Fifth Circuit filed prior to October 1, 1981 constitute binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

2.  Although Fed.R.Civ.P. 39(b) permits a court in its discretion to grant a jury trial after the period for a timely demand has run, defendants insist that they were entitled to a jury trial as of right and that therefore a Rule 39(b) analysis is inappropriate (DE 155, at 5).

227, 228 (5th Cir.1944), or whether the issues contained in the amended complaints *"were in any material way different* from those presented by the original [complaint]." *Connecticut General Life Insurance Co. v. Breslin,* 332 F.2d 928, 931 (5th Cir.1964).

*Reading & Bates Construction Co. v. Baker Energy Resources Corp.,* 96 F.R.D. 564, 565 (S.D.Tex.1983) (emphasis added).

In this case, the second and third amended complaints introduced claims for damages by seven new plaintiffs. As defendants contend, each of these claims requires proof as to whether the alleged incidents occurred, whether the evidence establishes a causal connection with defendants' conduct, and whether damages have been sustained. All of these questions raise "new" factual issues in the plainest sense of the word.

The peculiar circumstances of this case, however, suggest a contrary result. First, the record of the evidentiary hearings conducted by the Magistrate provides the court with 20/20 hindsight on the nature and materiality of the new factual issues. Second, a class action posture *requires* that the plaintiffs raise common questions of fact. *See* Fed.R.Civ.P. 23(a). Of particular relevance is the testimony of the named plaintiffs and of Dr. Richard M. Swanson, plaintiffs' expert witness in the field of correctional psychology. Considered as a whole, this evidence shows that plaintiffs' claims possess a factual congruity of sickening proportion. Their stories are strikingly similar, reflecting common experiences of harassment, threats, attack, official indifference, and resulting damage. The similarity of the factual questions is particularly apparent in the court's analysis of the causal connection between Turner's acts or omissions and plaintiffs' claims. *See infra* at 681–682.

Thus, the issues raised by the seven new plaintiffs in the second amended complaint "touch ... the same general issues" raised in the first amended complaint, *Roth v. Hyer,* 142 F.2d 227, 228 (5th Cir.1944), and are not materially different from the original issues, *see Connecticut General Life Insurance Co. v. Breslin,* 332 F.2d 928, 931 (5th Cir.1964); *see also Reading & Bates,* 96 F.R.D. at 565. The first amended complaint put defendants "on notice of the underlying facts and basic legal theory ... upon which plaintiffs sought relief, and the character of the suit was in no way changed by the amendments." *Lanza,* 479 F.2d at 1310. Having failed timely to demand a jury trial in response to the first amended complaint, defendants effectively waived their right to such a trial, and their objection is overruled.

## IV.

### FAILURE TO GRANT CONTINUANCE

Defendants next object to the Magistrate's failure to grant a continuance of the evidentiary hearings. This court has previously denied defendants' emergency appeal of the Magistrate's ruling (DE 104, 112).

Orders concerning the conduct of a trial, such as continuances, "are peculiarly within the jurisdiction of the trial court" and "will not be disturbed except upon a showing of abuse of discretion, and then only upon a showing that such abuse of discretion resulted in substantial harm to the parties seeking relief." *Edward Leasing Corp. v. Uhlig & Associates, Inc.,* 785 F.2d 877, 881–82 (11th Cir.1986).

Defendants principally assert that they were not prepared to defend against the damage claims because circumstances forced them to depose the seven new plaintiffs as well as plaintiffs' expert witnesses at the last minute. Further, defendants contend that these depositions revealed the names of new witnesses with knowledge of plaintiffs' claims but defendants had no opportunity to depose them.

The court is not persuaded that these circumstances justified a continuance. Defendants had already been granted one continuance from November 4, 1985 to a special setting on December 2, 1985. In that order the Magistrate pointed out that defendants had had notice of the claims of the seven new plaintiffs at least since September 1 (DE 80). While it is true that

discovery continued after the evidentiary hearings had begun, such a schedule does not appear to have dampened the energy and enthusiasm of competent counsel for both sides. Defendants were able to depose the seven new plaintiffs on November 13–15. Defendants do not explain, however, why this accelerated discovery schedule precluded them from deposing the newly-revealed witnesses before or after the commencement of trial on December 2, particularly considering that these new witnesses appear to be prisoners in defendants' custody. Defendants' assertion that they were unprepared to try this case, moreover, is belied by their effective cross-examination of plaintiffs' witnesses. Most important, defendants have demonstrated no actual prejudice. Accordingly, defendants' objection to the Magistrate's failure to continue the trial is overruled.

## V.

## FAILURE OF MAGISTRATE TO ENTER RECUSAL

■ During the testimony of Dr. Swanson, defendants first became aware that the Magistrate had visited GCI in the early stages of this litigation. Judge Nimkoff told counsel that in 1982 he had conducted an informal hearing of LaMarca's claim, as was often his custom in prisoner cases. Also present at that unrecorded proceeding were Joe Belitsky of the Attorney General's Office, representing the State, and GCI Assistant Superintendent Arline. LaMarca related to the court his concern for other inmates who had been abused. Belitsky and Arline assured the Magistrate that a full investigation would take place. No such inquiry ever occurred, and Turner testified that he was unaware that these assurances were made to the court (DE 128, at 30–31). At trial defendants requested Judge Nimkoff to recuse himself, but the Magistrate denied that he would become a witness in the suit and accordingly refused the request.

A judicial officer is required to disqualify himself in a proceeding in which he has personal knowledge of disputed evidentiary facts concerning the proceeding. ABA Code of Judicial Conduct Canon 3(C)(1)(a) and (d)(iv); 28 U.S.C. § 455 (1982). Defendants argue that the Magistrate relied upon these events as evidence establishing either Turner's knowledge of alleged conditions at GCI or his failure to act on those conditions after he he was put on notice.

As defendants point out, the 1982 proceedings conducted at GCI were nonrecord, and no witness testified concerning the Magistrate's recollection of the events. Notwithstanding, knowledge acquired by a judge while he performs judicial duties does not constitute grounds for disqualification. *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966). Where it is alleged that a judge has personal knowledge of disputed evidentiary facts concerning a proceeding such that he should recuse himself pursuant to 28 U.S.C. § 455, the information or knowledge must stem from an *extrajudicial* source to warrant disqualification. *United States v. Coven*, 662 F.2d 162, 168 (2d Cir.1981), *cert. denied*, 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 176 (1982). Judge Nimkoff's 1982 visit to GCI was undisputedly conducted as part of the instant proceeding and occurred in the presence of counsel for the State. *See United States v. State of Washington*, 459 F.Supp. 1020, 1093–97 (W.D.Wash.1978), *aff'd*, 645 F.2d 749 (9th Cir.1981). Defendants, moreover, conceivably could have called Belitsky or Arline to testify to their memory of the proceeding.

Defendants finally argue that the Magistrate was inclined to rely on the 1982 hearing as evidence tending to establish notice to Turner or Turner's failure to act. The transcripts disclose that the Magistrate asked questions of several witnesses regarding that hearing. In his report and recommendation, however, the Magistrate states that those events serve "merely to underscore Plaintiffs' position that GCI, under the Turner administration, was an institution not under the control of that Defendant" (DE 128, at 31). Thus, the Magistrate did not accord those events with dispositive weight. *Cf. State of Washington*, 459 F.Supp. at 1095. In any

event, disregarding the account of the 1982 hearing, the record contains more than enough evidence to support the Magistrate's findings and conclusions regarding Turner's control of GCI. The objection is overruled.

## VI.

## OBJECTIONS TO FINDINGS OF FACT

The court next will address in turn each of defendants' objections to the Magistrate's findings of fact and will analyze their significance to the overall disposition of the case. The numbers preceding each paragraph correspond to the paragraph numbering in the report and recommendation.

¶ 31. As plaintiffs concede, defendants' objection should be sustained. Turner was superintendent of GCI from mid–1976 to his retirement on July 31, 1984.

¶ 32. The racial breakdown of the GCI inmate population in 1985 is somewhat relevant to the issue of injunctive relief. The Magistrate's finding that approximately sixty percent of the population was Black and the remainder White or Hispanic is generally supported by the evidence which concededly was not the most competent proof. Although the documentary evidence contains no support for the conclusion that the figure for Whites included Hispanics, there was testimony to that effect. Objection overruled.

¶ 33. Although defendants are correct that Music estimated the Hispanic population at seven percent (Music, DE 160, at 133), the evidence supports the inference that that percentage may have been higher at times. Defendants also contest the definition of "close custody" prisoners; however, the Magistrate did not define the term. Objection sustained in part and overruled in part; the Magistrate's finding is modified accordingly.

¶ 36. Defendants protest the Magistrate's overall characterization of factors present at GCI such as "wholesale manufacture of prison wine," "regular screenings of sexually explicit videotapes," and "maintenance of an ill-assorted guard corps whose members the inmates perceived as regularly trafficking in contraband, extortion and neglect." Defendants admit that instances of these factors appear in the record but far less frequently than the Magistrate implied. The record supports findings that prison wine was prevalent at GCI, that sexually-explicit films were shown, and that many of the guards were perceived as corrupt or at least neglectful. Although the Magistrate's language is somewhat hyperbolic, the objection is overruled.

¶ 38–39. Defendants argue that the Magistrate implied that Turner was aware of *all* of the conditions at GCI relating to plaintiffs' claims and that two letters Turner wrote to Louie L. Wainwright, secretary of the Florida Department of Corrections (DOC), constitute admissions of GCI's unsafeness. It is apparent from the letters in evidence, however, that Turner's comments must be viewed in the context of his reporting a staffing shortage to his superior. Objection overruled.

Defendants make much of the relevance to this litigation of the accreditation of prisons and GCI in particular by the American Correctional Association. The Magistrate found that the GCI accreditation had "virtually no significance" to this lawsuit because accredited prisons have been found unconstitutional by courts. Having considered the GCI accreditation along with the remainder of the evidence, the undersigned district court finds it of marginal relevance in this case. Objection overruled.

¶ 40. On January 30, 1980, the Palm Beach County Grand Jury issued a presentment regarding conditions at GCI (pltf.ex. 4). Although the investigation was apparently provoked by shortages in meat supply, other security issues were addressed. Defendants' objection to the report's admissibility in evidence on the ground of hearsay is overruled pursuant to Fed.R.Evid. 803(8)(C) and is also overruled on the basis of relevance because the report is germane at least to the question of notice to Turner.

Defendants again complain about the Magistrate's use of the phrase "a free flow of contraband." The grand jury heard testimony of lax security at GCI as well as "many allegations and accusations of drugs, alcohol, and other contraband, gambling, theft, confiscation, and payoffs among the inmates and personnel of GCI." The report stated that alcohol use and its manufacture was apparently "prevalent." Pltf.ex. 4, at 6. That such contraband was freely flowing at GCI is a reasonable construction of the grand jury's findings, and the objection is overruled.

¶ 42. On August 26–29, 1980, the DOC Office of the Inspector General issued a report on its management review of GCI (pltf.ex. 4). Among other things, the report noted a serious lack of supervision on the compound due to staffing shortages. The Magistrate simply cited this portion of the report and did not seem to hold Turner personally responsible for staff shortages. Accordingly, the objection is overruled.

¶ 44. Defendants dispute the Magistrate's finding of low morale among GCI staff. The district court believes the record contains sufficient evidence to support this finding. This evidence includes an employee questionnaire which reflected that staff members felt that on-job training and the number of available staff were inadequate as well as the various witnesses' perception of staff apathy. Objection overruled.

¶ 45. The Office of the Inspection General issued a second GCI management report approximately three years later, on September 19–21, 1983 (pltf.ex. 6). The management report supports the Magistrate's finding of some laxity in security, which included improper control and supervision of inmate movement from one location to another and inadequate staffing of the perimeter posts (id. at 8–9). Objection overruled.

¶¶ 46–50. The Magistrate found that the use of excessive force by Lieutenant William Barrett when he was acting chief correctional officer at GCI was relevant to Turner's management of GCI. In brief, Barrett was summoned from a local festival in Belle Glade to the prison after a fight broke out in a dormitory. Barrett was accompanied by Sergeant Rickey Hayes and Lieutenant L.A. Peters, GCI's internal inspector. All three had been drinking. Barrett and Hayes had their faces made up like clowns. Although the incident had been largely quelled, Barrett took a loaded shotgun into the compound and used it to beat several inmates in the back of the head.

■ As plaintiffs emphasize, the Barrett incident is relevant not as a showing of improper use of force but as an illustration of Turner's reaction to the situation. The incident report of the Office of the Inspector General states that on the night of the incident Turner advised Barrett to go home and rest and that Turner did not feel the situation warranted notification of a prison inspector (pltf.ex. 9, at 5). Defendants are correct to add that Turner eventually notified the inspector general, who sent a team to GCI within three days of the incident (Swanson, DE 117, at 213–14). Swanson criticized Turner for not immediately suspending Barrett and taking away his gun and badge rather than merely telling him to go home and rest. Significantly, defendants do not object to the Magistrate's finding at ¶ 49 that Barrett remained functioning as a correctional officer for at least a full week after the incident. It is clear that the Magistrate did not attribute undue weight to the Barrett incident. Objection overruled.

The Magistrate also related Swanson's testimony concerning the transcript of Turner's interview with one of Barrett's victims (pltf.ex. 9, subex. 13). The Magistrate quoted Swanson's testimony that the inmate's reporting of wine-drinking among the prisoners did not appear to surprise Turner. Contrary to defendants' assertion, the district court does not believe that the Magistrate found that Turner "failed to register appropriate outrage" at this revelation. The Magistrate simply quoted Swanson's opinion in a footnote and did not comment on it in any way. Objection overruled.

¶¶ 51–52. Defendants also challenge as irrelevant the Magistrate's findings regarding the investigation[3] and eventual dismissal and arrest of GCI correctional officer Clarence Dixon. As defendants note, Turner did testify that, although the investigation was hindered by several obstacles, he ordered it to continue. Turner's persistence, however, does not negate the Magistrate's finding that if Dixon's employment application had been properly screened he probably would not have been hired at all. Objection overruled.

¶ 53. Defendants again protest the Magistrate's use of the phrase "wholesale staff corruption." The Barrett and Dixon reports and the testimony of alleged inmate-enforcer Larry Pryor obviously do not in themselves impugn the integrity of the entire GCI security staff. Barrett, however, was one of GCI's top-ranked security officers. Further, the testimony of the inmate-witnesses discloses the perception of extensive staff corruption. Objection overruled.

¶ 56. The Magistrate agreed with Swanson's conclusion that the GCI staff or administration took little or no effort to control the extensive contraband at the prison. Defendants complain that the Magistrate ignored their evidence of substantial measures to control the flow of contraband during Turner's regime. Both sides have done a heroic job of providing citations to the evidence supporting their respective positions. The district court has considered all the evidence as well as the possible biases of the witnesses. The record as a whole supports the Magistrate's conclusion that little or no effort was taken to control illicit activity at GCI, resulting in readily-available contraband. Objection overruled.

¶¶ 57–58. The Magistrate found that evidence of several incidents involving use of firearms tended to show inadequate staff training. Defendants claim that the Magistrate exaggerated the significance of these occurrences and that the GCI staff was in fact well-trained. The district court finds that the firearms incidents bear somewhat on the issue of staff training. Objection overruled.

¶ 59. Defendants' objection to the finding of low morale among staff is overruled for the reasons stated in *supra* ¶ 44.

The district court agrees with defendants' assertion that Turner is not solely to blame for high staff turnover and vacancies. As plaintiffs and defendants note, the staff turnover and vacancy rates declined in 1982 and continued to decline through 1984. The relevancy of these observations, however, is not critical to the resolution of this case, because six of the ten individual plaintiffs were raped or assaulted after the turnover and vacancy rates had declined in 1983 and 1984. The Magistrate's findings are modified in accordance with the district court's observations in this paragraph.

¶ 61. Defendants take issue with the finding that the individual plaintiffs' claims are directly related to the lack of staff supervision due to Turner's failure to station the officers properly. The objection is overruled for the reasons stated in *infra* ¶¶ 62 and 63.

¶ 62. During the Turner administration, GCI inmates were in the habit of hanging sheets, towels, clothes, and personal lockers from the bunk beds. These obstructions obscured activity in the bunks from the view of the officer stationed in the cage or "wicket" at the front of each dorm. The showers at the back of the dormitories were obscured from the officers' view by these obstructions and also by double-bunking the middle row of beds. Defendants point to testimony that an officer stationed in the wicket could not see into parts of the shower even if these obstacles were removed. This does not change the fact that visibility was greatly improved with the removal of these obstructions in one of the dormitories under one of Turner's successors, Superintendant Randall Music. Objection overruled.

---

3. The investigation occurred in mid–1984 rather than 1974, a probable typographical error in the report and recommendation.

¶ 63. Although the officers were supposed to be on constant patrol of the dorms, the Magistrate found that this did not occur. The Magistrate's finding that routine patrol did not in fact take place is supported by the weight of the evidence, particularly the testimony that gang rapes in the showers or beds endured for fifteen to forty minutes. Objection overruled.

The Magistrate also found that Turner could recall no action taken against an officer for failure to patrol the dormitories. Turner actually testified that such action may have been taken but that he could not recall a specific instance.[4] Objection overruled.

¶ 64. Defendants take issue with the Magistrate's finding that GCI's chief investigator, Lieutenant Peters, testified that GCI had no standard operating procedure for investigating rapes (Peters, DE 162, at 444). Peters later testified to a procedure he had used to investigate a rape (*id.* at 464–65). From this testimony defendants allege that the Magistrate misrepresented the evidence. The court disagrees. Peters stated that no formal procedure in fact existed and later recounted his own methodology. Peters testified, as defendants note, that no procedure existed for line officers to report rapes directly to him, the prison investigator, but that line officers were supposed to pass on the information to their superiors. The individual plaintiffs' stories, which the Magistrate found credible, demonstrate that the passing of rape reports to superior officers did not produce competent or thorough investigations of those reports. Objection overruled.

¶ 65. DOC Inspector General Brierton testified that, in a prison rape investigation, at a minimum, (1) medical evidence should be secured, (2) a full victim statement should be taken, and (3) the matter should be referred to a local prosecutor. These steps were not followed at GCI with respect to the individual plaintiffs. Defendants question whether the individual plaintiffs were actually raped and, if they were, whether the rapes were reported. Again, the Magistrate found credible plaintiffs' accounts of their rapes and the ensuing events. The district court sees no reason to doubt this finding, and the objection is overruled.

¶ 66. Both Turner and Peters specifically testified to only one prosecution for a rape at GCI. Peters remembered that it occurred in 1984. Although it is true that internal GCI statistical reports note five sexual assaults from 1980–84 (pltf.ex. 31), no incident reports regarding these attacks were introduced. The Magistrate's finding is so modified.

¶ 71. The Magistrate found that various factors, considered in combination, should have made it apparent to a prudent administrator that rapes were occurring, and that, considering this knowledge, the failure to promulgate and adhere to the most rudimentary investigative and preventative procedures constitutes a deliberate indifference toward inmate security. The objection is overruled for the reasons stated in *infra* ¶¶ 72 and 73 and elsewhere in this memorandum and order.

¶ 72. The Magistrate found that the background of contraband, violence, and other illegal activity at GCI was compatible with the existence of violent sexual assaults. Defendants' objection that contraband was not free-flowing is overruled for reasons stated previously. Defendants' further objection that there is no connection between contraband and rape is belied by the plaintiffs' testimony evidencing the presence of weapons, drugs, and alcohol when they were raped. Objection overruled.

---

4.    Mr. Lipman: During your tenure, Mr. Turner, were any officers ever suspended or disciplined for failure to walk the areas of the dormitory outside of their wicket during their duty hours?

Mr. Turner: I'm less sure of that one, Mr. Lipman.  There probably could have been some disciplinary action taken concerning officers not properly performing those types of duties.

There certainly could have been, yes, sir.

Mr. Lipman: Can you recite one specific instance where that occurred, sir?

Mr. Turner: No, sir, I cannot.

Turner, DE 164 at 732–22.

¶ 73. The Magistrate found that the disproportionate numbers of White inmates who received protective confinement should have put Turner on notice that these inmates felt in danger in the population. As defendants note, inmates may request protective confinement for reasons unrelated to fears for their safety. The district court makes two observations. First, if protective confinement houses twenty Whites to one Black in a population where Blacks outnumber Whites (pltf.ex. 6), a prudent administrator should at least have inquired why this was the case. Second, the evidence as a whole supports the inference that Whites who requested protective confinement did so out of fear of sexual or other assault. Again, a prudent administrator would have investigated. Objection overruled.

¶ 75. Defendants criticize the Magistrate's finding that conditions in protective confinement were "punitive" because certain physical problems such as lighting, ventilation, and overcrowding were out of Turner's fiscal control. Those conditions, however, comprised only part of the reason that protective confinement was punitive. For example, the cells were infested with waste and vermin, inmates were harassed by inmates in nearby disciplinary confinement and the compound, no exercise was afforded, only three brief showers a week were allowed, and canteen and often library privileges were lost. Objection overruled.

¶ 76. The fact that some inmates elected to remain in protective confinement for months was found to be evidence that those inmates experienced high anxiety in the compound. Overcrowded conditions in confinement supports an inference of a high inmate demand for protection. Defendants state only that other reasons could have contributed to the overcrowding, such as increase in inmate population, the nationwide rise in number of inmates in protective confinement, and inclusion of disciplinary and administrative confinement detainees. The Magistrate's finding is modified accordingly.

¶ 77. An experience repeated over and over in the testimony is the "wolfing" [5] and cat-calling by Black inmates to White inmates upon the arrival of the latter group at GCI. Contrary to defendants' assertion, the Magistrate found only that Swanson testified that the corroboration of this experience by inmates unknown to each other and presently incarcerated in different institutions enhances the probability of its occurrence. Objection overruled.

¶ 78. The Magistrate found other indicia of sexual activity at GCI such as sheets hung from bunk beds, inmates moaning in their beds, and the showing of pornographic movies in a trailer where cries and moans were heard. Defendants object that reasons other than sexual activity existed for these occurrences and that there was no evidence that Turner knew of these phenomena. Such reasoning does not comport with the totality of the evidence including the inmate testimony that cries, moans, and screams were frequently heard emanating from the showers and from bunks concealed by sheets.

Further, defendants' protest that "a superintendent with all of his other responsibilities cannot screen each movie shown in prison" is almost disingenuous. Uncontradicted evidence shows that sexually-explicit videotapes—with graphic depictions of intercourse—were regularly shown in a trailer on the compound, that these movies were unsupervised, and that sounds consistent with human sexual activity could be heard from the trailer. Several witnesses provided more lurid accounts of the scene inside the trailer itself. Plaintiffs' expert witnesses rendered their opinion that such films are inappropriate for a prison audience. Defense witness Brierton acknowledged that a different school of thought exists which holds that adult movies may be appropriate for adult prison audiences. Brierton, however, was adamant that

---

5. "Wolf" is a slang term for a violent, coercive homosexual or for a particularly assaultive inmate.

group events such as movies should *always* be supervised.

Defendants also point to the lack of evidence that Turner saw the hanging sheets, heard the cries, moans, and screams suggestive of sexual activity, or saw or selected the videotapes. A prudent administrator, however, should have been aware of these occurrences,[6] which the evidence shows to have been a prevalent and unmistakeable part of life at GCI. Objection overruled.

¶ 79. The Magistrate found that some rapes were reported and that this should have signalled a problem to a prudent administrator. There is no reason to question the finding that rapes were reported to GCI officers. That these reports never made their way to Turner or to the prison investigator, considering the totality of the evidence, shows not Turner's exculpatory ignorance but rather his liability. Objection overruled.

¶ 81. Objection overruled for the reasons stated in *supra* ¶ 64.

¶ 82. The record contains no evidence that the rapes, which the Magistrate found to have occurred, were even minimally investigated. Defendants' objection is overruled for the reasons set forth in *supra* ¶¶ 64 and 79.

¶ 83. The objection regarding rape prosecutions is overruled for the reasons stated in *supra* ¶ 66. The objection regarding weapons prosecutions is sustained as follows: the last sentence of the Magistrate's finding is deleted and replaced with the following: "There was no evidence that during Turner's administration a State prosecution was initiated for any weapons possessed by any inmate at GCI (Peters)."

¶ 84. The Magistrate found that during Turner's administration inmates bent on violence "roamed the compound with impunity." This finding is supported by the evidence that during Turner's reign inmates were free to wander the compound and dormitories other than the one to which they were assigned. The procedure where-

by inmates need passes to move about the compound was instituted by a successor superintendent, Randall Music (Music, DE 160, at 146). Objection overruled.

The Magistrate further found that Turner refused to seek assistance from federal and state prosecutors and investigators to cope with the crimes committed on the compound. The record, however, contains some evidence of outside prosecutions initiated by Turner. The evidence does fairly show that outside state and federal criminal justice remedies were grossly underutilized during Turner's administration considering the crime-ridden atmosphere at GCI. The Magistrate's finding is modified accordingly.

¶ 86. The Magistrate found that the rapes of plaintiffs Aldred, Saunders, and Harper were reported to prison authorities, and the record contains no articulable reason for the district court to disregard this credibility determination. This finding supports an inference that the rapes were never investigated at least partially due to the lack of an established procedure for reporting rapes to the prison investigator. Objection overruled.

¶ 87. The Magistrate found that Turner also failed to avail himself of or underutilized other possible investigative arms of the government such as the State Attorney General's Office, State Attorney's Office, and the Federal Bureau of Investigation. Whether or not these agencies could have assisted in improving the conditions at GCI, the record does not show that Turner requested assistance from other agencies, on a consistent or persistent basis, in order to alleviate GCI's problems. Defendants also note that there was no evidence that GCI's internal inspectors were unwilling or unable to investigate matters brought to their attention. These assertions ring hollow considering that, because of inadequate reporting procedures, many grave matters were never brought to their attention. Objection overruled.

---

**6.** A former superintendent, Brierton testified that, although he did not personally select the movies, he discovered that inappropriate films were being shown when he stopped by the prison one night to see what the movie was (Brierton, DE 185, at 103).

¶ 89. The district court does not doubt the evidence cited by defendants that sometimes inmates were disciplined for being in an area in which they were not authorized to be. This proof, however, does little to mitigate the testimony which shows that inmate movement about the prison was inadequately controlled. *See, e.g., supra* ¶ 84. Objection overruled.

¶ 92. The objections are overruled for reasons previously addressed.

¶ 93. The Magistrate found that, even though parts of the dormitories were concealed from the view of an officer stationed in the wicket, "Turner never initiated any administrative policy that officers patrol the dormitory on a regular basis" (DE 128, at 45). As defendants note, Turner did testify that posted orders required officers to patrol (Turner, DE 164, at 643). The weight of the evidence, notwithstanding, shows that the guards did not regularly patrol. The Magistrate's finding is so modified.

¶ 94. Succeeding superintendent Music was able to increase visibility by single-bunking the middle row of beds in one of the dormitories. Defendants argue that this modification was not cost-free, because $7,000 was expended for new lockers (Music, DE 160, at 141–42). The district court is unable to determine from the record whether new lockers were an essential element of the single-bunking or simply an added security measure for inmate property. Even if the $7,000 was a necessary expenditure, there is no significant evidence that Turner possessed or tried to obtain funds for that purpose. Objection overruled.

¶ 96–97. The Magistrate compared Turner's practice in managing the transfer out of GCI of problem inmates with that of successors Jones and Music. "Problem inmates" includes both aggressive inmate "wolves" and especially vulnerable inmates. There was evidence that Turner often achieved the difficult goal of transferring problem inmates out of GCI. Successor superintendent Jones transferred out forty to forty-five inmates in less than three months. Music transferred five a month over a six-month period. Defendants point to instances where Turner moved seven inmates on one occasion and twelve on another, although his monthly average of such transfers is not in evidence. There is other compelling proof, however, that Turner was not zealous enough in transferring problem inmates: for example, Peters' admission, found credible by the Magistrate, that Turner did not view "wolves" as problem inmates; the chronicles concerning "wolves" Larry Pryor, Willie Dock, and Levi Fisher (DE 128, at 42–44); and the length of time the vulnerable plaintiffs were effectively forced to endure protective confinement before transfers took place. In the district court's view, the record shows that Turner could have exercised much more diligence in attempting to transfer problem inmates from GCI and that this failure constitutes evidence of deliberate or callous indifference to inmate safety. Objections overruled.

¶¶ 98–100. Defendants challenge the Magistrate's findings regarding inmate-wolves Pryor, Dock, and Fisher with minor discrepancies in the evidence. The Magistrate's findings are ultimately grounded in credibility determinations which the district court sees no reason to disturb. Objection overruled.

¶ 101. The objections are overruled for the reasons set forth at length in *supra* ¶ 78.

¶ 103. The Magistrate's analysis of the relationship between financial feasibility and the constitutional obligations of a prison superintendent comports with the prevailing law in the Eleventh Circuit (see *infra* at 38–39). Objection overruled.

¶ 105. The Magistrate detailed specific measures which were inexpensive or cost-free, which were ignored or rejected by Turner, which were within his control, and which would have minimized or eliminated the likelihood of rapes and other assaults at GCI.

(i) Defendants claim that there was no evidence that Turner failed to discipline staff for failure to patrol the dorms, that staff in fact failed to patrol, or that Turner

was made aware of any such failure. To the contrary, the district court can discern no significant evidence that the staff did patrol the dorms or that Turner disciplined staff for not patrolling. Further, there is no evidence explaining why Turner was *not* aware of this failure. Objection overruled.

(ii) The record reflects extensive contraband at GCI which was often provided or at least tolerated by Turner's staff, prevalent extortion activities by inmates which were not redressed by officers who were made aware of it, several instances of extortion activities by staff, and the tolerance of obvious consensual and nonconsensual sexual activity by inmates. Each of these matters is addressed elsewhere in this memorandum and order and in the report and recommendation. Turner's overall laxity in managing and controlling his staff can be inferred from the prevalence and apparent obviousness of these conditions and from the absence of substantial evidence of disciplinary action directed to staff. Objection overruled.

(iii) The weight of the evidence supports the finding that during the Turner administration it was common practice for inmates to hang sheets and other objects from their bunks, thereby obstructing visibility in the dormitories. The inference is inescapable that a prudent administrator *would* have been aware of this problem. Objection overruled.

(iv) The district court has previously addressed the lack of adequate procedures for the reporting and investigation of rapes (supra ¶¶ 64–66). Objection overruled.

(v) Defendants' arguments have been rejected elsewhere (*supra* ¶¶ 37, 66), and the objections are overruled.

(vi) These assertions also have been rejected previously (*supra* ¶ 84). The objection is overruled.

(vii) The court has already addressed Turner's lack of zeal at transferring problem inmates (*supra* ¶¶ 96–100). Objection overruled.

¶ 108. Swanson utilized various methodologies to evaluate plaintiffs' accounts of their rapes. Defendants' objection appears to be a semantical one and is overruled.

¶ 109. The Magistrate found the expert opinion testimony of Dr. Caddy to be credible, and the district court does not question this finding. Objection overruled.

¶ 111. The Magistrate's credibility finding will not be overturned. Objection overruled.

¶ 118. The Magistrate's essential finding that the atmosphere of undeterred violence at GCI was conducive to acts of rape is supported by the weight of the evidence. Objection overruled.

¶ 121. The record does not support defendants' assertion that rectal examinations were actually used at GCI upon the reporting of a rape. Objection overruled.

¶¶ 122–195. The gravamen of defendants' objections turn on credibility determinations which the district court finds no reason to disturb. The objections are overruled.

¶¶ 196–199. The district court finds persuasive and supported by the evidence the Magistrate's observations on the overall integrity of plaintiffs' case. Objection overruled.

## VII.

## OBJECTIONS TO CONCLUSIONS OF LAW

Defendants' objections to the Magistrate's conclusions of law reflect a general agreement with the prevailing legal standards but dispute the application of the facts to those standards. In particular, defendants argue with the Magistrate's conclusion that plaintiffs have put forth sufficient proof of violation of their civil rights.

■ As the Magistrate concluded, the following legal standards apply. A prisoner has a right to be protected from the constant threat of violence and from sexual assault. When prison officials have failed to control or segregate prisoners who endanger the physical safety of other prisoners, resulting in a high level of violence, it constitutes cruel and unusual punishment.

*Jones v. Diamond,* 636 F.2d 1364, 1373–74 (5th Cir.) (en banc), *cert. dismissed,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981); *see also Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (eighth amendment ban on cruel and unusual punishment made applicable to states by fourteenth amendment due process clause).

To hold a prison official liable in a civil rights action under 42 U.S.C. § 1983 (1982) based on cruel and unusual punishment, plaintiffs must show that the official's conduct constitutes an intentional or callous indifference to the prisoner's right to reasonable protection from violence. *Wiliams v. Bennett,* 689 F.2d 1370, 1380–81 (11th Cir.1982), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). Plaintiffs must prove deliberate indifference on the part of the defendant official rather than simple negligence. Section 1983 further requires "proof of an affirmative causal connection between the actions taken by a particular person 'under color of state law' and the constitutional deprivation." *Id.* at 1380. Where the defendants hold supervisory positions, vicarious liability will not suffice. *See Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (municipality not vicariously liable for acts of employees absent proof that execution of official policy inflicts injury). Supervisory defendants may be held liable if they have direct responsibility for the actions of the employees who engage in misconduct. *Rizzo v. Goode,* 423 U.S. 362, 375–76, 96 S.Ct. 598, 606, 46 L.Ed.2d 561 (1976). The Eleventh Circuit has stated that "the inquiry into causation must be a directed one, focusing on the duties and responsibilities of each of the individual defendants whose acts or omissions are alleged to have resulted in a constitutional deprivation." *Williams,* 689 F.2d at 1381.

The district court first examines whether Turner's conduct rose to a level of intentional or callous indifference to the plaintiffs' right to "reasonable protection from violence." *Id.* at 1380. The former Fifth Circuit elaborated on the elements of this requirement of intent in *Gullatte v. Potts,* 654 F.2d 1007, 1012 (5th Cir.1981). A section 1983 plaintiff seeking to sue prison officials must prove *either* that "the official knew or should have known that his action infringed a clearly established constitutional right of the plaintiff," *Douthit v. Jones,* 619 F.2d 527, 534 (5th Cir.1980), regardless of the officials' subjective intent, *Bogard v. Cook,* 586 F.2d 399, 411 (5th Cir.1978), *cert. denied,* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979), *or* that the "official either actually intended to do harm to the plaintiff, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result," *id.* at 412.

The Magistrate found that Turner knew or should have known that his acts or omissions infringed plaintiffs' constitutional right to reasonable safety. Evidence that Turner *knew* of serious security problems included official documents such as Turner's letters to Wainwright, the 1980 grand jury presentment, the management reports of the DOC inspector general, the Barrett and Dixon incidents of staff corruption, and knowledge from various sources of the prevalence of contraband. The Magistrate further found that a prudent administrator *should have known* of widespread extortion activities by inmates often in collusion with officers and widespread rape and physical assaults by inmates on inmates (*see supra* ¶¶ 77–78). The extensive findings of fact cited by the Magistrate provide adequate support for his conclusion that Turner's conduct constituted callous indifference to plaintiffs' right to reasonable protection from violence. Thus, plaintiffs have satisfied the objective test of *Bogard,* that Turner knew or should have known that his actions violated a clearly defined constitutional right, as well as *Bogard's* subjective test, that Turner took an action which was so likely to produce injury that the harm can be characterized as substantially certain to result.

A defendant cannot have the requisite intent for callous indifference if

full compliance with constitutional norms is beyond his control and if he can show that he accomplished what could be accomplished within the limits of his authority. *Williams,* 689 F.2d at 1388. Over defendants' persistent protest that Turner's means were limited, the Magistrate identified administrative measures within Turner's control which imposed little or no financial limitation. These include measures Turner could have taken to identify and remedy his staff's failings at weapons training, the reporting of rapes, assaults, and other illegal activities through the chain of command, patrolling of the dormitories, and ensuring maximum visibility in the dormitories. Turner also could have implemented a standard operating procedure for investigation of rapes and assaults, availed himself of outside agencies in that regard, established inmate movement controls, and intensified his efforts to transfer particularly aggressive or vulnerable inmates from GCI. The fact that succeeding superintendents Jones and Music were able to achieve or at least take preliminary steps toward these goals attests to their feasibility. Thus, the district court is convinced that the means to satisfy constitutional minimums were within Turner's control. Accordingly, the court overrules the objection to the Magistrate's conclusion that plaintiffs failed to prove callous indifference.[7]

Defendants more strenuously object to the Magistrate's conclusion that Turner's actions constituted a legal cause of plaintiffs' constitutional deprivation. The critical causation inquiry is whether Turner "was in a position to take steps that could have averted" the attacks on plaintiffs "but, through callous indifference, failed to do so. Resolution of this issue necessarily entails a very individualized approach, taking into account the duties, discretion, and means" of the defendant. *Id.* at 1384. Defendants essentially maintain that the Magistrate painted with such broad strokes

that he failed to analyze whether the conditions at GCI which were under Turner's control proximately caused the injuries to the particular plaintiffs at the particular times of each occurrence.

■ The district court is not persuaded. The following conditions which were under Turner's control provide direct causal links to plaintiffs' injuries. *First,* every plaintiff was attacked or threatened with a weapon, typically a knife. The evidence establishes the prevalence of such weapons and Turner's failure to take reasonable measures designed to control such contraband. *Second,* the long duration of several of the attacks, the places in which they occurred, and possibly the fact that they occurred in the first place, are functions of Turner's failure to take even minimal steps to ensure that GCI was adequately patrolled (Aldred raped in shower for fifteen to twenty minutes; Durrance led away at knifepoint from place between bunks which was concealed by hanging blanket; Bronson raped with baseball bat on recreation field in broad daylight; Saunders raped in bathroom for twenty-five to thirty minutes; Harper raped in top bunk; Cobb stabbed in front of canteen in fight lasting ten to twelve minutes). *Third,* Turner's failure to implement adequate reporting procedures for rapes and assaults was a legal cause of plaintiffs' psychological and possibly physical damage (Aldred reported rape to several officers with no results; Aldred not given protective confinement; Durrance and Bronson did not report out of fear of consequences; Saunders raped by two inmates who previously had attacked him; Saunders reported rape and received inadequate treatment and no investigation; inmates identified as assailants by LaMarca were not confined for investigation and continued to assault him; classification officer told Johnson to take protective confinement or to get a weapon and fight

---

7. The Magistrate alternatively found section 1983 liability based on Turner's breach of a duty imposed by state law which caused plaintiffs' constitutional injury. *See Williams,* 689 F.2d at 1381. The parties agree, however, that Turner could not have breached a duty imposed by

Fla.Stat.Ann. § 20.315(1)(c) (West 1987 Supp.), the statute relied on by the Magistrate, because that statute on its face applies only to the DOC and not to individual superintendents. The objection is sustained, and Magistrate's conclusion in this regard (DE 128, at 111–13) is rejected.

back). *Fourth,* Turner's callous indifference to the obvious and rampant indicia of homosexual activity was the proximate cause of rapes, attacks, or repeated harassment (Aldred, Durrance, Bronson, Saunders, and Harper raped; Bronson forced to commit nonconsensual sexual act in movie trailer; Johnson sexually harassed and later attacked four times; constant threats and sexual solicitation caused LaMarca to escape, take protective confinement, and receive disciplinary reports; Cobb injured in fight over homosexual). *Fifth,* Turner's failure adequately to supervise correctional officers up to the lieutenant level resulted in corruption and incompetence among the officers and a lack of reasonable protection of inmates (Cobb's assailant worked as an "enforcer" with GCI staff and was protected by them; LaMarca complained to Barrett about threats and assaults and was given a knife by Barrett; Bronson afraid to report rape because he had witnessed inmates exchanging money and drugs with guards). The Magistrate's findings, supported by the record, contain more examples of how Turner's callous indifference proximately caused the injuries to Aldred, Durrance, Bronson, Saunders, Harper, Johnson, Cobb, and LaMarca.

■ The district court is not satisfied, however, that the requisite causal connection has been established with respect to the claims of Epprecht and Gordon. When Epprecht was assaulted with a pipe in the dormitory, he could see no guard in the wicket. Because there is no other evidence regarding the attack, such as its length, the district court is unable to determine whether the lapse in supervision was merely accidental or whether it flowed from Turner's actions. The fact that the attack was provoked because Epprecht possessed cash money also does not establish causation because a cash money system in prison does not in itself prove callous indifference. Similarly, with respect to Gordon, the evidence shows only that he was assaulted three times at GCI. He was knocked unconscious once in front of the canteen, his buttocks were burned when inmates who had been drinking prison-made wine set his polyester underwear on fire, and he was hit in the head with a pipe in a robbery. The eighth amendment entitles a prisoner only to *reasonable* protection from violence. *Williams,* 689 F.2d at 1380. The district court fears that, were it to find Turner liable for the damage sustained by Epprecht and Gordon, Turner might become an insurer for every attack on an inmate which occurred during his tenure. The recommended $17,000 award of compensatory damages to Epprecht and the $6,000 to Gordon must therefore be rejected.

In summary, the facts and the law support the Magistrate's conclusions that certain of defendant Turner's actions and inactions in running GCI constituted callous indifference to plaintiffs' eighth amendment right to reasonable protection from violence. The evidence further establishes that, with respect to all of the plaintiffs except Epprecht and Gordon, Turner was in a position to take steps that could have averted the attacks on these plaintiffs but, through his callous indifference, failed to do so. The record finally establishes that these constitutional deprivations were a legal cause of plaintiffs' damages. Under the prevailing law in this circuit, *see id.* at 1381, plaintiffs Aldred, Durrance, Bronson, Saunders, Harper, Johnson, Cobb, and LaMarca should prevail against defendant Turner under 42 U.S.C. § 1983.

## VIII.

## OBJECTIONS TO INJUNCTIVE RELIEF

■ The Magistrate found that, although defendants had instituted improvements of unconstitutional conditions at GCI, there was a reasonable expectation that the violations would recur. Accordingly, the Magistrate held that defendants' efforts at correcting deficiencies at GCI did not deprive the court of the power to order injunctive relief. *See County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). He recommended the creation of two committees, one of penologists and the other of psychologists or psychiatrists, to advise the court

in the formulation of specific injunctive relief. The charter of the committee of penologists is to ferret out other rape victims at GCI who were not identified through this litigation so that they might be provided with therapeutic assistance and to review and develop procedures at GCI to minimize future assaults, extortions, and rapes. The charter of the committee of psychologists or psychiatrists is to prescribe a treatment plan for the plaintiffs and witnesses in this action who remain incarcerated and to develop procedures at GCI to provide rape victims with support similar to that received by unincarcerated rape victims from rape crisis centers.

Defendants argue that the establishment of the committees was premature because the Magistrate adjourned the class action aspect of the case before defendants had an opportunity to present evidence countering plaintiffs' claims regarding current conditions at GCI. Although it is true that the parties presented incomplete proof on the issue of injunctive relief, the district court is not persuaded that at this juncture further evidentiary hearings are appropriate. In particular, the district court recognizes its lack of expertise in resolving the "complex and intractable" problems of prison administration. *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). The committees recommended by the Magistrate would provide valuable expert testimony to the court on the persistence of unconstitutional conditions at GCI and recommended equitable remedies.

▆ The injunctive relief recommended by the Magistrate is adopted with the following modifications. Two committees shall be established, one of penologists and the other of psychologists and psychiatrists. Each committee will be comprised of three members. Each party will nominate one member of each committee. The third member of each committee will chair the committee and will be selected by the district court. The parties will submit names of persons they recommend for the position of chairman, including a curriculum vitae for each nominee, and the dis-

trict court will consider these recommendations in appointing the third member of each committee. The charter of the committees will be that recommended by the Magistrate, with the additional task of reporting to the court on the status of current conditions at GCI and the necessity for further injunctive relief. The work of the committees will not end with this original report, as their expertise may be needed from time to time to assist in monitoring conditions at GCI. The cost of establishing and maintaining the committees shall be borne by the State of Florida.

The parties shall file their nominations of committee members with the district court by June 17, 1987. Thereafter, the district court will issue an order setting forth its selection of the chairman of each committee and establishing a date by which the committees shall file a written report with the court in accordance with the terms of this order. After the committees have filed their reports, the parties will have ten days in which to file a motion if they desire to present additional evidence regarding current conditions at GCI and the necessity of further injunctive relief. Such motions shall be accompanied by an offer of proof which shall include a list of witnesses and the substance of their proferred testimony. The parties will have five days to respond to each other's motions. After it has the reports of the committees and these submissions of the parties, the court will determine whether additional hearings are necessary to formulate specific injunctive relief.

## IX.

## CONCLUSION

In accordance with the terms of this memorandum and order, it is

ORDERED and ADJUDGED that the report and recommendation of the Magistrate filed January 8, 1986 (DE 128) is affirmed and adopted as the order of this court except as modified or rejected by this order. It is further

ORDERED and ADJUDGED that judgment shall be entered for plaintiffs LaMar-

ca, Saunders, Johnson, Aldred, Bronson, Cobb, Durrance, and Harper and against defendant Turner in accordance with the following award of compensatory damages for Turner's violation of plaintiffs' constitutional rights:

| | |
|---|---|
| Anthony LaMarca | $9,000 |
| Martin Saunders | $30,000 |
| Edwin Johnson | $13,000 |
| David Aldred | $30,000 |
| Steve H. Bronson, Jr. | $30,000 |
| Eddie Cobb | $6,500 |
| Ron Durrance | $30,000 |
| Billy Joe Harper | $30,000 |

Interest on this judgment shall run from the date of judgment until paid, at the rate of 7.02 percent. It is further

ORDERED and ADJUDGED that on the claims of plaintiffs Epprecht and Gordon judgment shall be entered for defendants and against plaintiffs, the plaintiffs to take nothing. It is further

ORDERED and ADJUDGED that two committees shall be established to advise the court in the formulation of injunctive relief, in accordance with the court's specific directives set out at page 666 of this memorandum and order. It is further

ORDERED and ADJUDGED that defendants' motion filed February 10, 1986 for an enlargement of time to respond to plaintiffs' motion for attorneys' fees and expenses (DE 149) is granted as follows: Defendants shall have twenty days from the date of this order to file their response. It is further

ORDERED and ADJUDGED that the court will defer ruling on plaintiffs' motion filed January 31, 1986 for oral argument on their motion for fees and expenses (DE 141).

1. Similarly, our Chief Justice has observed: "[T]he way a society treats those who have transgressed against it is evidence of the essential character of that society." *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393 (1984) (Burger, C.J.).

2. The case was transferred, pursuant to Local Rule 1(f) (Magistrate Rules of the United States District Court, Southern District of Florida) which provides:
(f) Prisoner Cases Under 42 U.S.C. § 1983.

## REPORT AND RECOMMENDATION

### Jan. 8, 1986

PETER NIMKOFF, United States Magistrate.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

"The degree of civilization in a society can be judged by entering its prison" Dostoevsky [1]

### A. PROCEDURAL BACKGROUND

#### 1. GENERAL BACKGROUND

1. On May 14, 1982, over three and one-half years ago, Anthony LaMarca, then an inmate at the Glades Correctional Institution (hereinafter "GCI") in Belle Glade, Florida, filed a handwritten complaint *pro se* in this Court under 42 U.S.C. § 1983, suing Defendant R.V. Turner, Superintendent of that institution. The Complaint contained, *inter alia*, allegations that Plaintiff LAMARCA was was being subjected to ongoing physical violence and harassment by other inmates because of his refusal to participate in homosexual activity, and that officials at the institution failed to take any corrective action to alleviate that situation.

2. On June 14, 1982, this case was referred to me for further proceedings. [2]

3. On September 21, 1983, Plaintiff LaMarca, now represented by counsel and joined by three other former and/or present inmates at GCI, Martin Saunders, Edwin Johnson, and Henry Rosenbaum, [3] filed an Amended Complaint Class Action on behalf of themselves and other inmates at the Institution, seeking to redress physical and sexual assaults and threats of physical and sexual assaults. In the Amended

A Magistrate may issue any preliminary orders and conduct any necessary evidentiary hearing or other appropriate proceeding and shall submit to a District Judge a report containing proposed findings of fact and recommendation for the disposition of petitions filed by prisoners challenging the conditions of their confinement.

3. The claims of Plaintiff Henry Rosenbaum were severed from this action by Order of this Court of July 15, 1985.

Complaint Plaintiffs sought declaratory and injunctive relief to enjoin Defendants from various practices and inaction which resulted in Plaintiffs', and the proposed plaintiff class, being subjected to violence, threats, and sexual abuse by other prisoners. The four named plaintiffs also sought damages on behalf of themselves. In addition, the Amended Complaint Class Action named Louie L. Wainwright, Secretary of the Florida Department of Corrections as a Defendant.[4] Plaintiffs did not request a trial by jury in their Amended Complaint or in any other related pleading.

4. On November 2, 1983, Defendants' filed their Answer to Plaintiffs' Amended Complaint. Like Plaintiffs, no demand for jury trial was made by Defendants.

5. On April 13, 1984, this Court (Paine, J.) ordered that this case proceed as a class action defined as those persons who are or will be incarcerated at the GCI for purpose of the injunctive relief sought by the named plaintiffs.

6. On August 26, 1985, Plaintiffs filed a Motion for Leave to File a Second Amended Complaint simultaneous with the proposed amended pleading, which was granted by this Court on September 19, 1985, *nunc pro tunc* August 26, 1985. The Second Amended Complaint virtually mirrored the allegations in Plaintiffs' Amended Class Complaint filed two years earlier alleging that certain practices by Defendant prisoner officials resulted in Plaintiffs' being assaulted, battered, and/or homosexually raped. Seven additional plaintiffs[5], all present and former inmates at GCI, were added in the Second Amended Complaint, each of whom suffered the same injuries as the named plaintiffs and the class. These seven additional named plaintiffs sought compensatory damages from Defendant R.V. Turner resulting from his alleged unconstitutional action against them.

7. Randall Music, the present Superintendent at GCI, was added to the Second Amended Complaint as a Defendant, solely for the purpose of injunctive relief since he had replaced R.V. Turner as Superintendent. Music is sued only in his official capacity.

8. On October 8, 1985, Defendants filed a Motion for More Definitive Statement in response to Plaintiffs' Second Amended Complaint. On October 25, 1985, in response to the Defendants' Motion, Plaintiffs filed a twelve-page pleading providing Defendants with a factual overview response to the various requests for more information raised in Defendants' Motion.

9. On November 6, 1985, Defendants Turner and Music, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, served their "demand for trial by jury on all issues so triable." In their demand for jury trial, Defendants stated "the action is not at issue." Apparently, this was Defendants' view in light of the fact that Defendants' Motion for More Definitive Statement was still pending and no answer had been filed yet to the Second Amended Complaint. Defendants further stated that while their "Demand" would ordinarily be contained in their Answer, they wanted to advise parties and the Court at this time of their intent to request a jury trial.

10. On November 13, 1985, Defendants filed a Motion to Continue the trial scheduled for on December 2, 1985. On November 21, 1985, Plaintiffs filed a Memorandum opposing Defendants' Demands for Jury Trial and in Opposition to Defendants' Motion for Continuance.

11. Subsequently, on November 15, 1985,[6] Plaintiffs filed a Motion for Leave to

---

**4.** Louie Wainwright, Secretary of the Florida Department of Corrections has been subsequently dropped as a party defendant. *See,* Plaintiffs' Second Amended Complaint (filed August 26, 1985).

**5.** The seven additional plaintiffs added in the Second Amended Complaint are: (1) David Aldred, (2) Steve H. Bronson, Jr., (3) Eddie Cobb,

(4) Ron Durrance, (5) Wayne Epprecht, (6) Michael Gordon, and (7) Keith Harris.

Prior to commencement of trial on December 2, 1985, with a written Order following on December 10, 1985, this Court granted Plaintiff Keith Harris' request to withdraw as a party to this action.

**6.** Although the Third Amended Complaint was not filed with the Court until November 15,

File a Third Amended Complaint along with the amended pleading. The Third Amended Complaint provides for the dismissal of all claims relating to Plaintiff Keith Harris; substitutes a new Plaintiff, Billy Joe Harper; cures several typographical errors in the prior pleading; and, according to Plaintiffs, adds the State of Florida as a Defendant solely for the purposes of an attorney fee award, citing *Leggett v. Badger,* 759 F.2d 1556 (11th Cir.1985).

12. On November 25, 1985, following a hearing on the pending motions, this Court issued an Order which (a) granted Plaintiffs' Motion to file a Third Amended Complaint, *nunc pro tunc* November 14, 1985, without ruling on the presence of the State of Florida for purposes of the recoverability of attorneys fees; (b) denied Defendants' jury demand; and (c) denying Defendants' request for further continuance of trial.

13. On November 27, 1985, Defendants, pursuant to Magistrate Rule 4(a) of the Local Rules of this Court, filed an Emergency Appeal from the November 25, 1985 Order of Magistrate Nimkoff to the United States District Court Judge Paine on grounds that the Magistrate erred (1) in denying Defendants' demand for jury trial; and (2) in denying Defendants' request for continuance of trial.

14. On November 29, 1985, Defendants filed their Answer to Plaintiffs' Third Amended Complaint. On December 2, 1985, Judge Paine denied Defendants' Appeal from Magistrate's Order of November 25, 1985.

15. While not stated in the November 25, 1985 Order, this Court's reasoning in denying Defendants' Demand for Jury Trial is set forth herein.

## 2. JURY TRIAL DEMAND

### a. FEDERAL PRINCIPLES REGARDING WAIVER OF RIGHT TO JURY TRIAL

16. The Seventh Amendment to the Constitution preserves the right of trial by jury "in suits of common law." However, the right to a jury trial, although constitutional, is indeed waived by a failure to demand it in a timely fashion. Fed.R. Civ.P. 38(d);[7] *Cox v. C.H. Masland and Sons, Inc.,* 607 F.2d 138, 142 (5th Cir.1979).

17. Specifically, Rule 38(b)[8] provides that a demand for a jury trial of any issue be served within ten days of the "last pleading directed to such issue."

18. It is further well-settled that if the original pleadings in an action effectively waive trial by jury under Fed.R.Civ.Proc. 38(b) and (c), the right to trial by jury of all matters waived in those pleadings "cannot be later revived by amending the original pleadings." *Walton v. Eaton Corp.,* 563 F.2d 66, 71 (3rd Cir.1977); *Hostrop v. Board of Junior College District No. 515,* 523 F.2d 569, 581 (7th Cir.1975); *Trixler Brokerage Co. v. Ralston Purina Co.,* 505 F.2d 1045, 1049 (9th Cir.1974); *Lanza v. Drexel and Co.,* 479 F.2d 1277, 1310 (2nd Cir.1973); *Williams v. Farmers and Merchants Ins. Co.,* 457 F.2d 37, 38 (8th Cir. 1972); *Connecticut General Life Ins. Co. v. Breslin,* 332 F.2d 928, 931 (5th Cir.1964); 9C *Wright and Miller,* Federal Practice and Procedure § 2320; 55. Moore *Federal Practice,* ¶¶ 38–39[2].

19. While a jury trial may be demanded for any *"new issues"* within the meaning of Rule 38 raised by the amended pleadings, the "amendment does not revive a right previously waived to demand jury

1985, Defendants had received a copy of the pleading one week earlier on November 8, 1985. *See,* Defendants' Motion for Continuance filed November 13, 1985, p. 3.

7. Fed.R.Civ.P. 38(d) states:
The failure of a party to serve a demand as required by this rule and to file it as required by Rule 5(d) constitutes a waiver by him of trial by jury. A demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties.

8. Rule 38(b) provides:
(b) DEMAND. Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue. Such demand may be endorsed upon a pleading of the party.

trial on the issues already framed by the original pleadings." *Walton v. Eaton Corp., supra,* 563 F.2d at 71–72; *Williams v. Farmers and Merchants Ins. Co., supra,* 457 F.2d at 36 and cases cited therein.

20. The various Circuit Courts of Appeals generally have reasoned that amended pleadings which concern the "same general issues" do not raise "new issues within the meaning of Rule 38(b) even if they differ from the earlier pleadings in some particulars." *See, Walton v. Eaton Corp., supra,* 563 F.2d at 72; *Hostrop v. Board of Junior College District No. 515, supra,* 523 F.2d at 380–81; *Trixler Brokerage Co. v. Ralston Purina Co., supra,* 505 F.2d at 1049–50; *Lanza v. Drexel and Co., supra,* 479 F.2d at 1309–11; *Moore v. United States,* 196 F.2d 906, 908 (5th Cir.1952).

### b. APPLICATION OF PRINCIPLES TO THE FACTS IN THIS CASE

21. On September 21, 1983, Plaintiffs filed their Amended Complaint Class Action. On November 2, 1983, Defendants served their Answer. Neither party filed a Request for Jury Trial at that time. On November 6, 1985, over *two* years after filing their Answer to Plaintiffs' Amended Complaint Class Action, Defendants served their Demand for Jury Trial.

22. The Court finds that Defendants' failure to comply with Rule 38(b) in not demanding a jury trial within ten days of the filing of their Answer on November 2, 1983, constituted a waiver of their right to a jury trial. *U.S. v. 110 Bars of Silver Coins,* 508 F.2d 799 (5th Cir.1975) *cert. denied* 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89 (1975); *McCorstin v. U.S. Dept. of Labor,* 630 F.2d 242, 244 (5th Cir.1980); 9 *Wright and Miller,* Fed. Practice and Procedure, § 2320 at p. 92 (1972) ("[T]he demand for jury trial must be served within ten days after service of the answer.").

23. Indeed, in their November 6, 1985 Jury Trial Demand, Defendants state *no* reasons why they did not timely request a jury trial following their November 2, 1983 Answer, but merely identify issues pertaining to Plaintiffs' Second Amended Complaint filed on September 21, 1985.

24. While this Court, under Fed.R.Civ. Proc. 39(b),[9] may have authority to grant Defendants' demand for jury trial notwithstanding their belated request, none of the factors identified by our Circuit which would justify a tardy request are present here. *See, Parrott v. Wilson,* 707 F.2d 1262, 1267 (11th Cir.1983) (Trial Court did not abuse its discretion in denying Defendants belated jury request). Factors identified by the Eleventh Circuit in *Parrot v. Wilson, supra,* 707 F.2d at 1207 to be reviewed by this Court in evaluating whether to grant Defendants' belated request for jury trial include:

(1) whether the case involves issues which are best tried to a jury; (2) whether granting the motion would result in a disruption of the court's schedule or that of the adverse party; (3) the degree of prejudice to the adverse party; (4) the length of the delay in having requested a jury trial; and (5) the reason for the movant's tardiness in requesting a jury trial.

25. Applying these factors to Defendants' untimely jury trial request support the denial of Defendants' belated request. *First,* the complex issues involved in this litigation regarding the constitutionality of conditions at the Glades Correctional Institution are most typically not subject to jury trials. *Second,* granting Defendants' motion would certainly prejudice Plaintiffs' trial preparation. *Third,* this is *not* a situation where a party makes a belated jury trial request several days, weeks, or even months following their last pleading. Indeed, Defendants' request was made over *two years following* their answer to Plaintiffs' Amended Complaint Class Action and less than *one month prior* to the beginning of the December 2, 1985 trial. *Finally,* Defendants offer *no* reason for their tardiness and our Circuit and its predecessor has repeatedly rejected "mere inadvertence on the movant part" as a basis to

---

9. Rule 39(b) states in part:
[N]otwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion upon motion may order a trial by a jury on any or all issues.

allow a tardy jury trial request. *Parrot v. Wilson, supra,* 707 F.2d at 1267; *Rhodes v. Amarillo Hospital District,* 654 F.2d 1148, 1154 (5th Cir.1981); *Mesa Petroleum Co. v. Coniglio,* 629 F.2d 1022, 1029 (5th Cir. 1980).

26. Under Rule 38(b), pleading "amendments not introducing new issues will not give rise to a jury trial." *Guargando v. Estelle,* 580 F.2d 748, 752–753 (5th Cir. 1978). A party's failure to demand a jury trial waives his "right as to all issues relating to the general area of dispute." *Walton v. Eaton Corp. supra,* 563 F.2d at 66. In rejecting the claim that a new issue had arisen in the amended pleadings which revived the right to request a jury trial, the *Walton, supra,* 563 F.2d at 73, Court reasoned:

> Both "amendments" pleaded facts which had not been alleged in the previous complaints, but neither raised a "new issue," since they did not change the "basic issue" in the case or the "general area of dispute."

27. The *only arguable new issues* raised by Plaintiffs' Second and Third Amended Complaints would relate to the additional plaintiffs.[10] However, since evidence pertaining to the injuries suffered by additional plaintiffs while at GCI would be introduced irrespective of the pleading amendment as support for Plaintiffs' injunctive relief, no new issues are raised. *Hostrop v. Board of Junior College District No. 515, supra* (All the evidence which might be introduced under amended claims was probative evidence of pre-amended claims this additional count did not introduce a new issue.); *Lanza v. Drexel and Co., supra,* 479 F.2d at 1310 (Jury

trial waived "as to all issues relating to the general area of dispute.").

\*　　\*　　\*　　\*　　\*　　\*

28. Having considered all of the evidence presented over a 10 day trial held in United States District Court for the Southern District of Florida in Miami, Florida on December 2–6, 9–13, 1985; heard testimony of 27 witnesses and reviewed a series of Exhibits and depositions of an additional series of inmate witnesses; requested, received and closely reviewed extensive post trial submissions; and heard oral argument of counsel on December 27, 1985, the Court pursuant to Rule 52(a) F.R.C.P., now issues its Findings of Fact and Conclusions of Law.

## B.  GLADES CORRECTIONAL INSTITUTION

### 1.  HISTORY

29. Glades Correctional institution is one of thirty major prison facilities in the State of Florida. (Turner) As the second oldest prison in Florida, the development of Glades Correctional Institution reflects the recent history of the State. (Swanson, Pg. 36). The State of Florida acquired the site where the present institution is located through land acquisitions from delinquent tax payers under the Depression Era Murphy Act. (*Ibid*). Built in 1932, the facility began its operation and was known as State Prison Farm No. 2. (Turner). Located in agricultural western Palm Beach County, the facilities' inmates grew fresh vegetables for the three state institutions: Florida State Prison, Chattahoochee State Hospital, and the Work Farm. (*Ibid,* Pgs. 36–37).

---

**10.** The Amended Complaint in this action, filed over two years ago, raises claims that inmates at Glades Correctional Institution were being assaulted, battered, and/or homosexually raped because:

> 2. There is, within this institution, a pervasive risk of harm to inmates. Prisoners are repeatedly threatened, beaten and sexually abused by other prisoners. This occurs with the knowledge of the institution staff and is due to the staff's unwillingness or inability to prevent it.

> 3. There are no protective measures available to inmates of GCI that do not result in the inmates' confinement under punitive, degrading and inhuman conditions.

Amended Complaint at Pgs. 1–2.

These allegations were denied by Defendants in their Answer filed November 2, 1983. Plaintiffs' Second Amended Complaint, served August 26, 1985, like their Third Amended Complaint, is based on these identical allegations.

30. Throughout the first several decades of its existence, GCI was a black segregated facility whose inmates worked in various agricultural endeavors. (Turner). In the early 1950's, the institution moved into the open dormitory buildings at its current location. A federal mandate integrated the all-black prison. (Swanson, Pg. 37).

## 2. OVERVIEW

31. Defendant R.V. Turner held the position of Superintendent of GCI from mid-1976 through his retirement on August 31, 1984. (Turner). Ron Jones was Superintendent in an interim capacity from September 1, 1984, through October 15, 1984. Thereafter, present Superintendent Randall Music served as Superintendent. (Swanson, Pg. 38). Mr. Music's last day as Superintendent coincided with the last day of trial, December 13, 1985. (Music)

32. As of July 29–31, 1985, 875 inmates were incarcerated at GCI. (P.Ex. 7) (Prison Inspector Report). Approximately 60% of these inmates were Black; the remainder were White or Hispanic. (*Ibid.*)

33. While Superintendent Music estimated the Hispanic population at 7% to 10%, records reflect that during an earlier period germane to this litigation, the Hispanic population was apparently even higher. D.Ex. 7 (Supt. Monthly Report of November, 1981, Pg. 2) ("Potentially serious management problems may develop due to *large contingent* of Latins in population.") (emphasis added). Because of DOC's general, although not absolute policy of incarcerating inmates as close to their home areas as possible, GCI draws many of its inmates from the South Florida area. (Brierton, Pg. 42) *See, also,* (Swanson, Pg. 129) ("Superintendent Music said that GCI seemed to have the function of taking care of anything in South Florida that no one else can handle, that it has become the catch-all for the Southern region."). During the Turner administration, 65% to 70% of those incarcerated were "close custody" prisoners. (Turner)

34. Inmates are housed in four open dormitories at GCI. These dormitories are referred to as Dorm A, B, C and D. Dorm A and D are the larger dormitories at any given time housing approximately 200 to 300 inmates. Dorms B and C are somewhat smaller and have a capacity to house approximately 70 to 80 inmates. (Swanson, Pgs. 112–113) The dormitories are arranged in the same manner insofar as inamate bunk arrangements. In A and D Dorms there were three rows of 20 bunk beds on each of the two wings within a dormitory. In B and C Dorms double bunks are also arranged in three rows. Dorm E is an honor dorm, which is somewhat different from the others.

35. In the front of each dorm there is a doorway. Behind the doorway is a screened area in which an officer is situated. This area is separated from all contact with the inmates by a cage, which is referred to as a "wicket." (Swanson, Pgs. 111–112). There are two dayrooms within the four main dormitories. On one side of the dayroom is a television and on the other side are game tables. (Swanson, Pg. 138). At the end of the dorm on the far side are the showers. In the shower area there are also urinals, washing and bath facilities. The shower areas are obscured from view if an officer is stationed in the "wicket." *See,* (P.Ex. 40, 41 and 42), (drawings of bunk, shower, dayroom and confinement areas by Dr. Swanson). *See also,* D.Ex. 1a–3c. (Composite photographs)

## C. THE CONTEXT

36. The individual named Plaintiffs' damage claims can be analyzed only within the context of the general operational policies, practices, conditions and events existing at the general time period in which their claims arise. Disparate factors—ranging from wholesale manufacture of prison wine and regular screenings of sexually explicit videotapes to a heterosexually starved audience of inmates, to the maintenance of an ill-assorted guard corps whose members the inmates perceived as regularly trafficking in contraband, extortion, and neglect—converge into a tapestry that forms the backdrop for Plaintiffs' claims. A discussion of these contextual realities follows.

## 1. AN INSTITUTION

### a. OFFICIAL DOCUMENTATION

37. Several written documents provide critical evidence as to the general nature and depth of security problems existing at GCI during the relevant time period of Plaintiffs' damage claims. (1980–1984).

### (1) TURNER'S ACKNOWLEDGEMENTS TO SECRETARY WAINWRIGHT

38. Conditions at GCI were known to Superintendent Turner. On July 16, 1981, Turner wrote to the Secretary of Florida's Department of Corrections Louie L. Wainwright and informed him of the following:

> On an almost daily basis I feel that our security staff is simply being tolerated by the inmate population *rather than being in control of the operation* of the institution. (emphasis added). (D.Ex. 13, Pg. 2).

39. Similar acknowledgement of severe security problems were provided in an earlier correspondence from Turner to the Secretary on March 15, 1979. (D.Ex. 14) (Vacancies of ⅓ of total COI's staff is "dangerous to the staff *and* inmate population. [emphasis in original] Only two officers assigned to 220 inmate dorm for supervision of inmates.") Turner stated:

> Currently our count is in the neighborhood of 800. Approximately 400 of these inmates are close custody. I am apprehensive about our ability to *control* this population under the circumstances. (emphasis added).[11] (D.Ex. 14).

### (2) THE 1980 PALM BEACH COUNTY GRAND JURY PRESENTMENT AND FINAL REPORT OF THE INSPECTOR GENERAL (1980)

40. In 1980, the Palm Beach County Grand Jury issued a presentment on January 30, 1980. The apparent impetus for the Grand Jury Presentment related to issues involving a audit and inventory relating to shortages of certain food products. However, the presentment also raised serious issues of inmate security germane to this case. Matters relating to the primary issues raised by the Presentment which concerned discrepancies in audit and shortages of meat and food, raised additional general matters concerning a breakdown of proper prison management: shortages were caused, among other reasons, through theft by inmates and staff. (P.Ex. 4, Pg. 3 of Grand Jury Presentment). Additionally, and more germane to the issues raised in this case, is the reporting through various testimony before the Grand Jury of problems relating to "lax security precautions." Testimony of staff and inmates revealed a free flow of contraband "including drugs, alcohol, gambling, theft, confiscation, and payoffs among the inmates and personnel of GCI." (*Ibid*, at Pg. 6).

41. Approximately eight (8) months later, the Department of Corrections Office of Inspector General conducted its management review of GCI. (P.Ex. 4, Tab B). The Office of Inspector General, under the direction of David Brierton, was established in 1979 (Brierton, Pg. 47) and acts as

---

11. It is noteworthy that during this general period when Turner recognized the severity of the problems at GCI, D.Ex. 14 ("I felt that it was necessary to bring you up to date on this critical situation") the institution received its first accreditation in 1980 and subsequently again in 1984 (Mulally). Indeed, at the time of the first accreditation and during that general time period of Turner's acknowledgement to Secretary Wainwright of severe and dangerous security problems, GCI was given the second highest score for an institution in the State. (*Ibid.*) (Swanson, Pgs. 278–279).

The accreditation process was explained at some length by Ray Mulally, a Department of Corrections (DOC) employee in charge of securing institutional accreditation in Florida.

(D.Ex. 6). Plaintiffs' correctional expert, Dr. Richard Swanson, noted that during litigation concerning conditions at the Florida State Penitentiary (FSP) was receiving its accreditation while at the same time the trial court was concluding that conditions and practices were unconstitutional. Further, notwithstanding the serious and long-standing system-wide litigation of *Costello v. Wainwright* in which the United States District Court for the Middle District of Florida has consistently found practices and conditions which offend the constitution, literally all institutions remain accredited. (Swanson, Pgs. 278–279; 410–412).

For these reasons, the Court finds the GCI accreditation as having virtually no significance to this litigation.

an independent auditor and investigative arm of DOC (Brierton, Pgs. 6–7).

42. The Inspector General Report observed and corroborated similar issues concerning a breakdown of security as those identified in the Palm Beach County Grand Jury Presentment. The Inspector General found, among other matters, that

"[s]upervision in all three general areas of the compound must be described as serious, due to the lack of security personnel. Vacancies continue to be a serious problem. The dormitory situation is critical as there have been occasions when one dormitory officer is responsible for supervising more than one dorm at the same time." (P.Ex. 4, Tab B, Pg. 4 "Executive Summary").

43. Additional reporting of increase "inmate on inmate" and "inmate on staff" assaults reflected an increase over a past six month period (*Ibid*, Pg. 5). These assault trends, both inmate on inmate and inmate on staff were reflected elsewhere. (*Ibid*, Pgs. 20–21, ¶ 9.1 "Conclusions and Recommendations").

44. Moreover, the security problems were exacerbated by low morale GCI staff. An employee survey conducted by the Inspector General revealed that staff members did not feel that there were enough people in their unit to perform their duties properly, and when asked the question, "Did you receive instructions or guidelines on the responsibilities and supervisory functions of your job when you became supervisor?," they answered with a "resounding no." (*Ibid*, ¶ 29.1, Pg. 33).

### (3) THE 1983 INSPECTION REPORT OF THE OFFICE OF THE INSPECTOR GENERAL

45. Approximately three years later, on September 19–21, 1983, DOC's Office of Inspector General conducted a subsequent investigation at GCI. In that report, the Inspector General noted "we fail to understand and appreciate laxity, in some instances, the disregard for established procedures." (P.Ex. 6, Pg. 2). In reviewing conditions at Belle Glade, the Inspector General offered the following overview: "In conclusion, the team found a need for a great deal of improvement at Glades Correctional Institution." (Ibid.). *See also,* (*Ibid,* Pg. 9), (Security problems relating to an inmate armed with a homemade knife threatening a correctional officer); (*Ibid,* Pg. 22) ("Inmate personal property is in no way orderly or neat. Homemade lockers are abundant.").

### b. MAJOR INCIDENTS

### (1) THE BARRETT INCIDENT

46. On April 15, 1984, at approximately 6:30 P.M., a fight broke out in C Dormitory involving several inmates. As a result of the fight, a state of confusion developed at GCI. Lt. James Schrader, the OIC (Officer in Charge) requested that off duty personnel be summoned to the institution. Lt. William Barrett, the acting Chief Correctional Officer; Lt. L.A. Peters, GCI's Internal Inspector; and Sgt. Ricky Hayes, were summoned. Those three individuals, were attending a local festival in Belle Glade known as the "Black Gold Festival". All three officers admitted they had been drinking alcoholic beverages. Barrett and Hayes had their faces made up to resemble clowns for the festival. Lt. Barrett and Sgt. Hayes arrived immediately and proceeded to the Gate House. Sgt. Barbara Wiesel, the Main Gate Supervisor, advised that there was an uncontrolled situation in C Dorm. Sgt. Wiesel reported at the time, that she noted a strong odor of alcohol, and noted that Lt Barrett appeared to be absolutely unsteady on his feet and constantly leaning against the counter. Lt. Barrett requested that Sgt. Wiesel give him a shotgun and fifteen rounds of ammunition. Lt. Barrett loaded his shotgun. Lt. Barrett approached the C Dormitory. (Swanson, Page 208–210); (P.Ex. 9, Pgs. 1, 6—The Special Investigation Entry No. 84–37911).

47. At that time, Lt. Barrett responded in slurred speech to Lt. Pipta, that "I want to teach these mother fuckers who runs this place". As Lt. Barrett remained outside, and Lt. Pipta entered C Dormitory and found the inmates sitting on their bunks and the situation otherwise calm. Barrett, while armed with a shotgun began yelling obscenities to the inmates and mak-

ing threats such as "I'm going to kill you mother fuckers." Lt. Barrett then ordered the inmates brought out of the dorm. Inmates Robert Whidden and William Allen were ordered to lay face down on the sidewalk at which time Lt. Barrett smashed them in the back of the head with the shotgun and continued to "jab them in the back of the neck with the barrel and continued yelling at them." Inmate Allen's head was split open after being struck by the stock of Lt. Barrett's shotgun. A third inmate, Westley Smith, was also struck. Two additional inmates, Jimmy Daniels and Melvin Kraft, were brought out from the dorm and kicked by Lt. Barrett. Following the incident, Superintendent Turner was made aware of what occurred. Turner did not notify the Prison Inspector because he "did not feel that the situation warranted notification of a Prison Inspector" (Ibid., Pg. 5). The Inspector General, David Brierton, through his office, did conduct a thorough investigation (P.Ex. 9). The Inspector General's office concluded that Lt. Barrett had committed various prison Rule violations. (Ibid, Pg. 6–12)s Additionally, Lt. L.A. Peters, GCI's Internal Prison Investigator, was also found to have committed additional prison infractions. (Ibid., Pg. 10–11).

48. Plaintiffs' correctional expert, Dr. Richard Swanson, corroborated the findings of the Prison Inspector's Office in concluding that senior officer Lt. Barrett had made gross errors in judgment. Dr. Swanson observed that the violations were so gross that immediate action should have been taken to at least suspend Lt. Barrett from the operation of a prison.[12]

49. Lt. Barrett remained functioning as a correctional officer for at least a full week following the April 15, 1984, incident. (P.Ex. 9, Exhibit 2) (Last page indicating the signature of William Barrett of April 23, 1984 on Incident Report).

50. Plaintiffs' expert, Dr. Swanson, noted his opinion that Superintendent Turner appeared to unduly delay in suspending Lt. Barrett. This was particularly poor management in the context of the egregious nature of the incident (Swanson, Pg. 329) ("His [Turner] initial reaction seemed to be oddly mild."); (Swanson, Pg. 211) ("The violation was so gross, that it seems to me that immediate action should have been taken to at least suspend the Lieutenant from the operation. Some action ultimately occurred, but took considerable amounts of time.")[13]

(2) THE ILLEGAL ACTIVITIES OF OFFICER DIXON

51. In mid–1974 the activities of a correctional officer, Clarence Dixon, were investigated by various authorities including the Inspector General's Office of the Department of Corrections and the Palm Beach County State Attorneys Office. Evidence related to Mr. Dixon's trafficking in drug contraband and extortion of inmates and their families. This documented investigation corroborates other inmate allega-

---

**12.** Although not directly related to Turner's management of the personnel aspects of the Barrett incident, Dr. Swanson referred to a transcript of a tape recorded conversation between Turner and an inmate, William Allen, in which Allen described the situation that led up to the disturbance of that precipitated Barrett's presence.

> In it, it's very clear the inmate is talking about the wide use of alcoholic beverages within the institution.
> In talking about this, it's clear from the conversation that's recorded in these pages, that it is not a surprise at all to Superintendent Turner that alcohol and drugs are available on a widespread basis in the institution. (Swanson, Pg. 212).

**13.** Indeed, Florida law permits an immediate suspension of a State employee such as Lt. Bar-

rett in an incident such as this. See, Florida Administrative Code § 22A–10.046, which provides as follows:

> In extraordinary situations, such as when the retention of a permanent career service employee would result in damage to property, would be detrimental to the best interests of the State, or would result in injury to the employee, a fellow employee, or some other person, such employee may be suspended or dismissed immediately, provided that written notice of such action is furnished to the employee within twenty four hours.

Superintendent Turner himself was suspended *immediately* in a similar context for an incident which occurred on May 6, 1971. See, (P.Ex. 1, Tab D) (Letter of May 7, 1971 from Louis L. Wainwright *to* R.V. Turner).

tions of wholesale staff corruption with regard to the extortion of inmates, and the free flow of contraband within GCI.

52. The investigation resulted in Mr. Dixon's being arrested and charged with three counts of bribery. (P.Ex. 10, Tab B, Pg. 5, Special Entry # 84–4647). Moreover, the investigation of Officer Dixon further demonstrates the careless manner in which Dixon had been screened for employment. Prior to his employment at GCI, Dixon had been terminated from Paholkee High School following the Broward County school board's obtaining a revocation of Dixon's teaching certificate. While at Pahokee, Dixon had collected $75 fees from graduating students to introduce them to colleges, had taken them to the campuses, but had failed to make any arrangements for introduction (P.Ex. 10, Tab C, Memo of March 6, 1984); (Swanson, Pgs. 222–224).

### (3) LARRY PRYOR

53. The assertions of Larry Pryor, while offering less conclusive credibility than the external investigative reports of Lt. Barrett and Officer Dixon, nonetheless reveal additional evidence of wholesale staff corruption. Pryor worked as an informant-enforcer for various correctional officers, who either permitted him or directed him to harass other inmates (Deposition of Pryor, Pg. 35).[14]

54. Pryor worked with several officers (Ibid, Pg. 35). When Pryor indicated that he was going to do something about inmate Eddie Cobb, Pryor was told by Lt. Barrett that whatever he chose to do should be done on Barrett's shift (Ibid, Pgs. 39–40). Pryor understood that to mean that if he took any action against Cobb on Barrett's shift, he "wouldn't go to jail or get prosecuted for it." (Ibid., Pg. 17). Following a fight with Cobb in which Pryor stabbed him, Pryor was put in a confinement cell until "things blowed over," but was never given any disciplinary report (DR) for the incident. (Ibid, Pg. 19).

### c. THE FREE FLOW OF CONTRABAND AND EXTORTION

55. A distinct picture of a wide range of free flowing contraband into GCI emerges from independent and corroborative sources of information and record evidence. The contraband includes: drugs, alcohol, weapons and extortion activities flowing from this illegal traffic.

56. Dr. Swanson, Plaintiffs' correctional expert, observed that "little or no effort was taken to control illicit activity" resulting "in readily available contraband" (Swanson, Pgs. 49, 326) including "drugs, alcohol and weapons to inmates apparently upon demand." (Ibid, Pg. 50). The free flow of contraband (Swanson, Pg. 121) seemed to be common knowledge; "people carried knives, people smoke dope without worrying or trying to hide it from officers" and the staff was "actively involved in these illicit activities," (Ibid.) as well as actually promoting the influx of contraband. (Swanson, Pg. 199). Swanson's conclusion, with which the Court agrees and so finds, provides an unmistakeable pattern of free flow of contraband, is based upon corroborative evidence including: (i) written documentation[15], as well as by inmate testimony[16].

14. At the commencement of his testimony, Pryor indicated that he had been harassed by officials from the Department of Corrections at the Florida State Penitentiary, at Glades Correctional Institution, and at DOC's Dade Correctional Institution over a period of several days prior to being transported to Miami for purposes of offering his testimony. While this Court makes no conclusive findings as to whether Pryor in fact was threatened by DOC officials due to his impending testimony, Pryor's earlier deposition testimony was accepted by this Court pursuant to Rule 32(a)(3)(E) Federal Rules of Civil Procedure.

Following Pryor's accusations that he had been threatened by DOC officials, he was appointed private counsel by this Court and upon counsel's advice Pryor chose at trial under the Fifth Amendment to refuse to answer any self-incriminating questions.

15. See, e.g., (P.Ex. 4) (Palm Beach Grand Jury Presentment, Pg. 6) ("Testimony of inmates and some correctional personnel indicate marijuana and other drugs are available to inmates due in a large part from lax security precautions. Alcohol use and its manufacture by the inmates' ingenuity also appears prevalent; Peters' investigation of 20 gallons of "buck" (inmate homemade wine) (Peters); (P.Ex. 4) (Management Review of GCI, "Conclusions and Recommendations; ¶ 10.1 40 disciplinary reports for "Consumption of Intoxicants" during 1–year period);

## 2. FAILURE TO PROPERLY SUPERVISE PERSONNEL AND MANAGE INSTITUTION

### a. STAFF TRAINING

#### (1) WEAPONS

57. One barometer of poor staff training can be gleaned from internal GCI records. GCI incident reports revealed officers (P.Ex. 33) lack of familiarity with weapons. (Swanson, Pg. 135). This opinion of Plaintiffs' expert was also expressed to him by Lt. Peters in an interview and was not rebutted at trial. (*Ibid.*) Peters also noted that a recently implemented weapon system developed under Superintendent Music "may" solve some of the weapon problem. This system requires officers to first demonstrate some qualification with a weapon prior to obtaining it. (*Ibid.*, Pgs. 135–136).

58. Problems with improper training and use of weapons ranged from the Barrett incident to day-to-day incidents of problems with weapons by staff. (P.Ex. 33) (Incident Reports).

#### (2) STAFF OUT OF CONTROL

59. The Barrett-Dixon incidents underscore the day-to-day operation of GCI with its staff not controlled by Superintendent Turner. Staff morale was low. (P.Ex. 4, Management Review of GCI, ¶ 29.1, Pg. 33) (Employee Questionnaire reflected that staff believed (i) not enough officers in unit to do job right and (ii) insufficient instructions and guidelines given when officers became supervisors). Turnover was high. (D.Ex. 14) (Turner letter to Wainwright) (Critical situation of ⅓ of staff vacancies); (P.Ex. 39) (Summary statistics of turnover rate) (Swanson, Pg. 184–185); (P.Ex. 31)

(Superintendent Monthly Reports reflecting turnover). Officers worked excessive hours and often two shifts. (P.Ex. 39) (Swanson, Pgs. 184–188).

60. A direct result of a staff which was inexperienced, over-worked, under-educated, ill-informed, insecure, and otherwise unable to protect inmates under their charge (i.e., reluctance to report rapes) is the general climate of a facility with a high security risk. (Swanson, Pg. 197)

### b. FAILURE TO SUPERVISE STAFF

61. Directly related to the individual raping and assaults of the named plaintiffs was the lack of proper staff supervision due to Defendant Turner's failure to station the officers properly.

62. As Lt. Peters admitted, due to the (i) sheets, clothes and personal lockers hanging from the bunks (Swanson, Pg. 318); (ii) the obstruction of a second level of bunks in the middle row of beds (*Ibid*), an officer's view from the cage or wicket in which he was stationed was obscured. (Peters) The view from the wicket into the shower area was even more obscured. (Swanson, Pg. 113) Lt. Peters, the Chief Investigative Officer during the Turner administration, admitted the lack of any clear vision to the shower area by an officer stationed in the wicket because of the various obstructions. (Peters)

63. While Peters knew that officers were supposed to be on constant patrol within the dorms, this did not take place. (Peters) Moreover, and even more seriously, Turner could recall no action *ever* taken against an officer—by reprimanding, suspending, or otherwise disciplining—for failure to patrol the dormitories. (Turner)

(P.Ex. 10) (Extortion and drug activities discussed in the Dixon matter); (P.Ex. 9) (Swanson, Pg. 212) (inmate access to alcohol discussed in the Barett incident); (P.Ex. 6, Pg. 9 (Prison Inspector Report) (laxity in security, inmate in possession of homemade knife.).

16. (Pryor, Dep. Pg. 12) (Selling of marijuana by Pryor); (*Ibid*, Pg. 33) (access to knives by Pryor —"I have so many knives."); (Swanson, Pg. 57) (drugs, liquor available); (Swanson, Pg. 71) (joints smoked in front of guards); (*Ibid*) (in-

mates "strapped to the max" at GCI with knives); (Swanson, Pg. 77) (availability of dope and wine); (*Ibid*) (protection rackets involving dope and wine; (*Ibid*, Pg. 78) (staff afraid of inmates armed with knives and shanks; (LaMarca) (inmates had money from selling reefer, making wine and weapons; (*Ibid*) (LaMarca given knife by officer to protect himself; (Gordon) (blacks ran drugs in GCI); (Epprecht) (free flow of drugs and alcohol at GCI.

#### c. NO PROCEDURE FOR INVESTIGATING RAPES

64. As discussed in greater detail, *infra*, ¶ 82, Lt. Peters, the Chief Internal Investigator at GCI, candidly recognized that *no* procedure ("standard operating procedure") existed in which to investigate rapes or alleged rapes. No standard interview process, no standard polygraph procedure, no standard rectal examination, no psychiatric examination, and no standard reporting to any law enforcement authority occurred. (Testimony of Peters and Turner). No such policy was ever written. (*Ibid*)

65. Indeed, Defendants' own witness, Inspector General Brierton, opined that at the very minimum: (i) medical evidence should be secured; (ii) a full statement taken from the alleged victim, and (iii) the matter should always be referred to a local prosecutor. (Brierton, Pgs. 109–111) These steps were not followed. (Peters); (Saunders, Pgs. 556–557); (Aldred, Pgs. 812–813); (Harper, Pg. 746).

66. This lack of any procedure relating to the investigation of rapes resulted in the prosecution of only one rape in the entire Turner administration. Moreover, no rapes were ever reported by GCI authorities in any of the massive amounts of internal documents generated from the institution. (Swanson, Pg. 150).[17]

67. The Court is convinced that the lack of investigative procedure led to an atmosphere where inmates could rape other vulnerable inmates without concern of being detected or deterred.

#### d. THE LAWSUIT

68. During the early stages of this lawsuit in 1982, this Court took testimony from Plaintiff LAMARCA (Swanson, Pg. 258). LaMarca provided an account of other inmates who had been abused or otherwise violated (*Ibid*, Pg. 259). Counsel for Defendants, Mr. Belitsky of the Attorney General's Office and Assistant Superintendent Arline, were present during the course of those proceedings (*Ibid*). The Court was assured by Messrs. Belitsky and Arline that a full investigation of Plaintiff's allegations of additional inmate violations would take place (*Ibid*, pg. 260).

69. Not only did it become apparent that no investigation occurred when no response was forthcoming from Defendants, but Defendant Turner testified that he was totally unaware that these assurances were made to the Court and that he was completely unaware even of the circumstances of this lawsuit until the recent pre-trial activities (Turner).[18]

70. Simply, the point is that this lawsuit, unquestionably raising matters of *grave* concern involving allegations of the most degrading violations to Plaintiffs, somehow got lost between the rather large "cracks" of Defendant Turner's management system. This account serves merely to underscore Plaintiffs' position that GCI, under the Turner administration, was an institution not under the control of that Defendant.

3. THE LACK OF THE MOST ELEMENTARY PROCEDURES TO MINIMIZE THE LIKELIHOOD OF RAPINGS AND ASSAULTS

a. KNOWLEDGE: THE INDICES OF RAPE THAT A PRUDENT ADMINISTRATOR WOULD DISCERN

71. It is clear to this Court that various indices, when considered in combination,

---

**17.** Several of the plaintiffs, who have alleged that they were raped, also reported that they had informed the correctional officers of the violation. *See*, Aldred, *infra*, ¶ 124; Saunders, *infra*, ¶ 154; and Harper, *infra*, ¶ 164.

Apparently, in the case of Saunders and Aldred that information was never relayed to any higher authority other than the Lieutenant to whom each personally reported his rape. As to Harper, the Court reviews his reporting elsewhere. *Infra*, ¶ 164.

**18.** In connection with a Return to Order to Show Cause filed under a certificate of service dated October 12, 1982, Lt. Peters executed an affidavit addressing the issues raised by the initial *pro se* complaint filed by Anthony LaMarca. Superintendent Turner was a party to the action at that date. The third paragraph of the affidavit reads:

> Be it also known that this affiant has prepared this affidavit with full knowledge and sanction of all parties named as Defendants in the above referenced case number.

should make it readily discernible to any prudent prison administrator that inmate rapes are occurring. The corollary, of course, is that armed with the knowledge that rapes were occurring, the failure to promulgate and adhere to the most rudimentary procedures constitutes a deliberate indifference toward inmate security. While none of the indices alone would reasonably suggest the occurrence of rape, the combination of these indices, as in this case, raises an issue of *knowledge* or *constructive knowledge* on behalf of Defendant Turner. The Court now reviews these indices.

72. *First,* the free flow of contraband, and assaultive inmate-on-inmate and inmate-on-officer behavior previously reviewed, provides a picture of an institution marred by violence and illegal activity. Plaintiffs' experts, Dr. Swanson and Dr. Caddy, as well as Defendant Turner and Inspector Brierton, all agreed that rapes in prison are a manifestation of acts of violence and domination, in contrast to acts of sex. *See, infra,* ¶ 117. Thus, homosexual rape is but an additional and inevitable, albeit extreme, discord in the cacophony of inmate assaults, extortions, drunkenness, drug use, and armament that characterized GCI during the tenure of Defendant Turner.

73. *Second,* the consistent and disproportionate number of young white inmates who "checked in" to protective confinement further corroborates the white plaintiffs' recollection of terror on the compound. Consider, for example, the following statistical snapshot of the protective custody population in mid-September, 1983:

PROTECTIVE CONFINEMENT POPULATION [19]

| WHITE | BLACK | TOTAL |
|-------|-------|-------|
| 20 | 1 | 21 |

(P.Ex. 6) (Inspection Report of September 19-21, 1983)

**19.** Whites constituted a minority of the prison population (397 of 833 inmates) and those fig-

74. The volume of the warning that such statistics should have signaled was amplified by the punitive nature of protective confinement during the 1980-1984 period. The inmates who checked in were very distressed; otherwise they would not have been checking in (Caddy, Pg. 1265).

75. Moreover, the impact of the statistics is further underscored when considered in the context of the punitive nature of protective confinement, at least during the period of 1980-1984. Conditions in protective confinement were punitive; the cells lacked adequate ventilation (P.Ex. 5, Memo of September 22, 1985) (Prison Inspection Report); the lighting was poor (*Ibid*); two, three four and five inmates were placed in the cells containing two bunks (*Ibid*); (Testimony of Eddie Johnson, Greg Zatler); the cells were infested with roaches and vermin (*Ibid*); inmates in protective confinement were taunted by others outside of the confinement area (Swanson, Pgs. 123, 139); protective confinement inmates often were housed with administrative detainees (Turner); no exercise was offered; showering was allowed only three times per week (Eddie Johnson and Greg Zatler); and inmates in protective confinement lost their canteen privileges. (*Ibid.*)

76. Notwithstanding the punitive nature of protective confinement, some inmates would remain in the confinement for months. Indeed the shortages of cell space attests to the inmate demand to "check in." (Swanson, Pgs. 203, 316) Plaintiffs' expert psychologist, Dr. Caddy, observed that the inmates who had opted to check into a confinement area as described would clearly manifest a high level of distress in the general dormitory population. (Caddy, Pgs. 1263-1266).

77. *Third,* the general "wolfing" and cat-calls of aggressive black inmates stationed around the compound during the initial periods of incarceration when new

ures considered Hispanics as Whites. (P.Ex. 6)

inmates were transferred to GCI (particularly the smaller, younger and at least physically more vulnerable white inmates) would suggest, in combination with other factors, that sexual pressures were severe. The corroborative description of these inmate experiences to Dr. Swanson when he interviewed the individual Plaintiffs incarcerated in institutions in different parts of the State prior to the trial enhances the credibility of their individual recollections.[20] The Court finds that the events did take place.

78. *Fourth,* more overt signs of sexual activities, some consensual, further provide an indication of assaultive rape conduct. Sheets hung from the bunks; inmates moaning in their bunks; the showing of pornographic movies (Swanson, Pgs. 8–9, 375–376) in a trailer in which "cries and moaning" of inmates were heard, apparently are all part of the ritual at GCI.

79. *Fifth,* some rapes, in fact, were reported; although in the case of Plaintiffs Aldred and Saunders, Defendant Turner apparently was not made aware of these facts. Plaintiff Harper's reporting and subsequent meeting with Turner is discussed elsewhere. *See, supra,* Pg. 678, n. 17.

\* \* \* \* \* \*

80. Having reviewed the *knowledge* or *constructive knowledge* that rapes were occurring, the Court now addresses various elementary procedures that could have been utilized to minimize the likelihood of raping and assaults.

### b. THE PROCEDURES WHICH SHOULD HAVE BEEN EMPLOYED

#### (1) IMPLEMENTATION OF A STANDARD PROCEDURE TO INVESTIGATE RAPES

81. As previously detailed, *see, supra,* ¶ 64, the Court has reviewed the fact that there existed no procedure known to the highest ranking investigator at GCI—Mr. Peters. (Peters) (No "standard operating procedure.")

82. In sum, no process or procedure was utilized to insure the full investigation of the possibility that a rapes had occurred.[21] This created an atmosphere where assaultive inmates could continue to prey upon more vulnerable prisoners and never run the risk of detection. Indeed, the Investigator at GCI, Mr. Peters, had never talked to two of the Plaintiffs who reported being raped—David Aldred and Martin Saunders. Nor did Defendant Turner talk to these individuals.[22]

#### (2) NO REQUEST FOR INVESTIGATIVE AND PROSECUTORIAL ASSISTANCE

83. As previously noted during the entire Turner administration, Defendant Turner and Lt. Peters could recall only one rape incident ever prosecuted. (Peters and Turner) Other areas of criminal activity within the prison met with a similar fate. During Turner's administration no State prosecution was ever initiated for any weapons possession by any inmate at GCI. (Peters)

84. The Court further finds that the atmosphere that existed at GCI during the tenure of Defendant Turner was one in which inmates bent on rapes and other

---

**20.** Consider, in addition to the similarities that Dr. Swanson testified to finding in the inmates' account of "wolfing" upon arrival, the similarities in the accounts given by those inmate plaintiffs who testified. Saunders was greeted by a "great multitude" of blacks in February, 1983, and described the scene as being like a "meat market" (Saunders, Pg. 536); LaMarca recalled catcalls from a "line of black inmates" about his being a "fat skinny white boy" (LaMarca, Pg. 948); and Aldred remembers 150 to 200 mostly black inmates pressing up to the fence and arguing about who would get him (Aldred, Pg. 893).

**21.** Among the investigative procedures *not* used were: polygraphing of alleged victims and assailants; rectal examinations of victims; psychiatric and psychological examinations of the victims; thorough interviews of the victims by trained investigators. (Peters and Turner)

**22.** Inspector Brierton made clear that immediate interviews of alleged victims was a critical step in any rape investigation in an attempt to amass as much intelligence as possible. This is what we, of course, would expect in any criminal investigation. (Brierton, Pg. 109)

expressions of violence roamed the compound with impunity. It was an atmosphere fostered by the institutional leadership's failure to initiate criminal prosecution against any but one prison rapist. It was an atmosphere nurtured by Defendant Turner's refusal to seek assistance from outside state investigators (prison inspectors, sheriff's deputies, State Attorney's investigators) and prosecutors to deal with such state crimes as sexual battery, aggravated assault, and armed robbery, as well as to seek assistance from federal officials for criminal violations of 18 U.S.C. § 241, *et seq.*, or any other applicable federal statute arising from such activities as those ascribed to Lt. Barrett and Correctional Officer Dixon. While accepting as true the Defendant's testimony that he spoke to legislative committees and civic clubs concerning funding levels for GCI, the Court finds that he absolutely ignored the criminal justice remedies to which he had ready access on behalf of his charges.

85. While the independent Inspector General, offices of David Brierton were called upon in such matters as the Barrett and Dixon investigation, Turner never called upon that office to conduct any investigation into assaultive behavior by inmates or any rapes that occurred. (Turner).

86. Peters conducted investigations at GCI only when directed by Superintendent Turner. (Peters). Turner never requested an investigation of the rapes of David Aldred, Martin Saunders, or Billy Joe Harper. (Turner). Each of the three Plaintiffs had reported to other prison authorities that they were raped (Saunders, Pg. 1563); (Aldred, Pgs. 812–815); (Harper, Pg. 746); however, because there was no discernable process to inform the higher chain of command at GCI, neither Aldred nor Saunders were ever interviewed by Lt. Peters.

87. Beyond the availability of the staff of the Inspector General's Office, Superintendent Turner failed to avail himself to other possible investigative arms of the government. While Turner referred all litigation to the Attorney General's Office, he never requested investigative assistance through the offices of the Attorney General. (Turner) Although there was some testimony that Lt. Peters had sought criminal prosecution from the State Attorney's Office of Palm Beach for various matters, it appears that no request other than the single rape prosecution was ever made for criminal activity involving rape. (Peters) Additionally, there was no evidence that Defendant Turner ever attempted to personally meet with officials of the State Attorney's Office in order to develop a meaningful protocol of procedure and policy in which to involve the State Attorney Office in various criminal investigations at GCI. Finally, while the Federal Bureau of Investigation investigated at least one matter, its investigative offices were never requested by Superintendent Turner in order to conduct investigations of violations of inmates' civil rights under the various federal criminal statutes.

88. The fact that no investigations of rapes occurred is demonstrated by the conspicuous absence of any reference to rapes in the reams of internal documents analyzed by Dr. Swanson. (Swanson, Pgs. 150–151), P.Ex. 31.

### (3) INMATE MOVEMENT CONTROLS

89. During the Turner administration, inmates had free ingress and egress throughout the compound and dormitories. As stated previously, inmates were able to crawl under the fence fronting the protective confinement cell area and harass or threaten those inmates housed in protective confinement. The Prison Inspector Report of September 19–21, 1983, (P.Ex. 6, Pg. 8), notes that inmate movements from one location to another are *not* properly controlled nor supervised by staff.

90. The control of inmate movement, particularly in an institution such as GCI with a high number of close custody inmates (65% to 75%) (Turner) and in an open dormitory setting, would make the necessity for some limitation on inmate movement critical.

91. Not until October 15, 1984, when Defendant Music became Superintendent at GCI, was a pass control system utilized to

682

monitor the movement of inmates (Swanson, Pg. 137), (Music).

### (4) STATIONING OF OFFICERS

92. As previously reviewed, due to the physical structure of the dormitory, an officer stationed in the wicket cage did not have a clear view of other areas of the dormitory because of clothing and other personal possessions that inmates kept on their bunks, *supra*, § 62. Additionally, during the Turner administration double bunking existed in the middle level of bunks, *supra*, § 34. Finally, because of the location of the shower area, it was impossible for an officer to view activities occurring in the shower from the wicket. (Swanson, Pg. 113) ("You cannot see back to the shower area for the obstruction of the bunks and the property piled on top of the bunks.") (Swanson, Pgs. 317–318) (Difficult if not impossible for officer in wicket to see shower area; double bunk in middle row obscures vision from wicket.).

93. Notwithstanding these obstacles, Defendant Turner never initiated any administrative policy that officers patrol the dormitory on a regular basis. Turner testified that he could not recall disciplining; suspending; or ever reprimanding an officer for failing to patrol the dormitory area. Lt. Peters recognized that it would take an officer approximately ten minutes to walk throughout the dorm and agreed that if a rape took more than ten minutes in the shower area, then an officer properly on patrol would walk into the area of the shower while the rape was in progress.[23]

94. Following Turner's retirement, Superintendent Music removed the second bunk level in the middle row of the dormitories and restricted the placement of personal property, sheets and lockers on the bunks in the dormitories in order to eliminate the obstruction of the officer in the wicket. (Swanson, Pgs. 128–129).

### (5) TRANSFER OF THE WOLVES

95. It is instructive to compare Superintendent Turner's practice in managing the transfer of aggressive assailant "wolves"

who assaulted, extorted and sometimes raped more vulnerable inmates with that of his successors, Jones and Music.

96. Aggressive wolves appeared to be tolerated rather than transferred out of GCI; these assailants were allowed to recruit and prey on vulnerable inmates. (Swanson, Pgs. 51, 202). Turner articulated his helplessness in removing the wolves from damaging and violating other inmates. (Turner). Attentive review of the facts in considering two areas of evidence reveals Turner's deliberate indifference to his responsibility to protect more vulnerable inmates.

97. *First*, in his short stay at GCI interim Superintendent Jones (August 1, 1984—October 15, 1984) shipped out six busloads of problem inmates. (Swanson, Pgs. 134, 202). In each of his first six months as Superintendent Music effectuated monthly five negative transfers (a rejection of an inmate assigned to GCI). (*Ibid.* Pg. 203). Additional inmates were "swapped" or exchanged by Music. (*Ibid.* Pg. 130). These efforts were not made by Turner. The unrebutted opinion of Turner's Chief Investigator, Peters, as to this matter is clear and revealing:

When asked how Superintendent Jones could do this [transferring known inmate assailants] when it seemed not to be possible for Superintendent Turner, Lieutenant Peters said perhaps you have to understand Superintendent Turner's background. He did not seem to see this kind of inmate as a problem in the institution. I then asked if the problems are being understaffed, there was a chronic understaffing, would the high turnover have let Mr. Turner to dismiss problem staff. Lieutenant Peters said if you work with a chain gang for 30 years, you define problems with a different perspective. (Swanson, Pg. 134)

98. *Second*, a more empirical review of three known inmate "wolf-assailants" is equally informative. The first, Larry

---

**23.** Durrance's rape lasted 35 to 40 minutes (Durrance, Pg. 461). Aldred's rape lasted 15 to 20 minutes (Aldred, Pg. 810).

Pryor, had harassed plaintiff Martin Saunders and raped him in the bathroom in the Classification Building. *See, infra,* ¶ 151–

153. Subsequently, Pryor also stabbed Plaintiff Eddie Cobb. *See infra,* ¶ 177. The following chronology is revealing:

CHRONOLOGY CONCERNING LARRY PRYOR

| DATE | DOCUMENT | COMMENT |
|---|---|---|
| January 21, 1983 | Parole Report | Pryor "reflects" a serious pattern of assaultive behavior." |
| March 1983 | | Pryor rapes Martin Saunders. (*infra,* ¶ 153). |
| November 15, 1983 | Classification [24] Team at GCI | "The team recommends transfer of the above mentioned inmate for security reasons. We have received information that inmate Pryor is actively involved in strong arm tactics . . ." [I]nmate Pryor assaulted inmate Kinner while taking these items. |
| December 29, 1983 | Computer message from GCI | Cancelling scheduled transfer of Pryor from GCI to UCI. |
| January 27, 1984 | | Pryor stabs Eddie Cobb (*infra,* ¶ 177) |
| October 15, 1984 | | Music becomes Superintendent |
| November 10, 1984 | | Pryor transferred to FSP incident of November 12, 1984 (less than *one* month after Music becomes Superintendent) |
| | | [*Source*: P. Ex. 26 (Pryor Inmate File); (Swanson, Pgs. 157–159).] |

99. The second assailant, Willie Dock, was transferred out of GCI on September 6, 1984 (P.Ex. 16, Tab B) (Swanson, Pg. 155), for "management and security reasons." This occurred only *one* month after interim Superintendent Ron Jones replaced R.V. Turner. Just several months earlier in March, 1984, Willie Dock gang-raped Ronald Durrance. *See, infra,* ¶¶ 132–133.

100. The third assailant, Levi Fisher, was involved in homosexual activities with young white males. (Peters). Lt. Peters testified that Fisher had assaulted other inmates as well and knew Fisher to be a wolf.[25] Nonetheless, Fisher was left in the D–Dorm and raped Billie Joe Harper. *See, infra,* ¶ 162.

(6) THE PORNOGRAPHIC MOVIES

101. Hard-core pornographic video moves showing explicit acts of intercourse and anal penetration were shown on a regular basis at GCI. (Swanson, Pgs. 375–376) The movies were a trap. They were unsupervised. (Swanson, Pgs. 88–90). Sounds of inmates screaming and crying could be heard from the trailer. (Swanson, Pgs. 107–108). Plaintiff Bronson was forced to masturbate an assailant at knife point in the movie trailer. (Swanson, Pg. 77), (Bronson). *See, infra,* ¶ 144.

102. This Court has no hesitation in agreeing with Plaintiffs' experts that the showing of unsupervised pornographic movies at GCI is absolutely inappropriate and indeed would only serve to "maximize the possibility of sexual and other violence." (Caddy, Pg. 1267).[26]

24. Turner testified that in regard to transfers, "I depended upon the classification team, that was their job." Turner obviously did not adhere to the classification teams' decision in the case of Larry Pryor.

25. Peters also acknowledged that he knew that Dock and Bone, who raped Ronald Durrance, were wolves.

26. While Defendants witness Inspector Brierton was apparently non-committal as to whether he would permit video pornographic movies to be viewed which show explicit scenes of vaginal and anal penetration (Brierton, Pgs. 101–103), he did not hesitate in opining that he would investigate a movie event if inmates were heard

### 4. WITHIN THE CONTROL OF TURNER: THE LIMITED FINANCE ISSUE

103. Defendant Turner has presented evidence which focuses upon the inherent limitations within which he performed his duties as Superintendent at GCI. These limitations relate to the fiscal realities in attempting to comply with various constitutional norms. Turner articulated these limitations in describing two overriding problems during his administration. (1) the lack of staff, and (2) the physical plant. The Court is sensitive to the inherent financial problems incurred by Turner, or for that matter any higher level correctional official occupying the position of Superintendent at GCI. Limited financial resources however is not dispositive of Turner's potential liability in this case. Rather, the issue to be considered is whether "full compliance [of constitutional norms] is beyond the control of a particular individual and that individual can demonstrate that he accomplished what could be accomplished within the limits of his authority". *Williams v. Bennett,* 689 F.2d. 1370, 1387–88 (11th Cir.1982).

104. The Court has made inquiry into this issue and is convinced that events were not beyond the control of Mr. Turner and that even in light of the financial limitations and realities in which he operated, his conduct fell short of accepted and prudent correctional practices.

105. In support of this conclusion, the Court lists the following specific evidence which reflects practices which would cost *little* or *no* monies; which were either ignored or intentionally rejected by Turner, which were well within his administrative control, and which, when considered separately and in combination—the Court is convinced—would have minimized or eliminated the likelihood of rape and assaults of the various Plaintiffs at GCI.

(i) Turner's failure, at no cost, to reprimand, discipline, or suspend staff officers who failed to carry out the most elementary assignments such as regularly patrolling the dormitories, particularly in the evening hours, which would have minimized the opportunity for rapes and assaults to have occurred. *See, supra.,* ¶ 63.

(ii) Turner's overall laxity, with his staff insofar as evidence of minimal or no control through reprimands, discipline or suspension which allowed correctional officers to function with impunity in the face of wholesale extortions, free flow of contraband including weapons, drugs, and alcohol; and permitting sexual activities such as the pornographic video movies to occur thus creating a general lawless climate from which the natural and forseeable consequences were wholesale inmate assaults and rapes. *See, supra,* ¶¶ 61, 101

(iii) Turner's failure, at no cost, to control and direct his staff and inmate population to remove sheets, personal property, lockers draped on inmate bunks in order to provide a clear unobstructed view for staff to monitor prisoner activities within the dormitories. This failure led to an officers' obstructive view of the dormitory and showers where rapes of Plaintiffs occurred. *See, supra,* ¶ 61.

(iv) Turner's rather shocking failure, at no cost, to promulgate and adhere to any meaningful process to investigate allegations of rapes and inmate assaults. This failure led directly to staff not reporting allega-

---

moaning, crying or screaming. (Brierton, Pgs. 103–104).

Finally, it is noteworthy that Defendants did not offer a scintilla of evidence refuting that both the pornographic movies occurred and also that certain inmates were trapped into the setting and apparently victimized in the movie trailer. *See,* Devitt and Blackmar, *Federal Jury*

*Practice & Instructions,* 3rd Ed., Vol. 2, § 72.17 (1977) ("If a party fails to produce evidence which is under his control and reasonably available to him and not reasonably available to the adverse party, then you may infer that the evidence is unfavorable to the party who could have produced it and did not.").

tions of rape through the chain of command, *supra,* ¶ 63 (Aldred and Saunders); led to rapes never reported by line correctional officers; and further resulted in rapes not investigated with low cost procedures such as: (i) rectal examinations; (ii) polygraphic tests; (iii) psychiatric evaluations; and (iv) in depth interviews. *See, supra,* ¶ 82. The consequences of these failures were that rapes remained uninvestigated and not prosecuted thus insuring a climate where an inmate assailant could sexually violate more vulnerable inmates with absolute impunity.

 (v) Turner's failure, at no cost, to enlist the investigative and prosecutorial assistance of other branches of government to at least minimally make an effort to investigate and prosecute rapists and assaultive inmates. Available investigative resources never properly utilized include the ((i)) Palm Beach County State Attorney; ((ii)) Office of the Inspector General of Florida; ((iii)) the Attorney General; ((iv)) the Federal Bureau of Investigation.[27]

 (vi) Turner's failure unlike his successors to impose inmate controls, at no cost, on prisoner movement throughout the compound and dormitories. *See, supra,* ¶ 89.

 (vii) Turner's failure, at no cost, to transfer known assailants out of GCI through requests to DOC; through informal "swaps" or by merely adhering to classification decisions. *See, supra,* ¶ 96. This failure allowed Larry Pryor to remain at GCI at the times that he raped Saunders and stabbed Cobb, *see, supra,* ¶ 98, and allowed Willie Dock to remain

at GCI at the time he and others raped Durrance, *see, supra,* ¶ 99.

## D. RAPE

### 1. OVERVIEW

106. In an effort to appreciate and address general principles concerning the issue of rape in prisons and most specifically, the dynamics of rape which is in part the subject matter of this lawsuit, the Court will review and make general findings on this subject. These findings, in turn, will affect and further define other previous factual findings provided in this decision.

### 2. FINDINGS

#### a. CORROBORATION: DID THE RAPES OCCUR?

107. The obvious fundamental issue which necessarily must be resolved is whether the rapes of Plaintiffs and other inmate witnesses occurred.

108. Beyond the Plaintiff-inmate testimony, which this Court has intentionally reviewed with great care and factual precision, two additional corroborative avenues support the inmate testimony. This corroboration comes in the form of extensive expert testimony of Plaintiffs' experts. *First,* Dr. Richard Swanson, a correctional expert trained in both psychology and law (P.Ex. 34) (Curriculum Vitae), (Swanson, Pg. 3–18), utilized a multi-variate approach (*Ibid,* Pg. 21) in drawing from essentially five independent sources of data to analyze Plaintiffs claims.[28]

109. *Second,* Dr. Glenn R. Caddy, a clinical psychologist, (P.Ex. 35), (Caddy, Pg. 1115–1128), with personal experience in treating rape victims and general research devoted to the issue of rape (Caddy, Pg. 1125), and also experienced with treating and investigating matters concerning pris-

---

**27.** No attempt was even made to enlist the assistance of any federal investigative or prosecutional body to address whether a federal investigation or prosecution could occur with regard to rapes and assaults against prison inmates at GCI. Title 18 U.S.C. § 241 makes it a federal crime for "two or more persons to conspire to injure, oppress, threaten or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States."

**28.** This data, reviewed at great length, (Swanson, Pgs. 21–244) provided: (1) internal archival documents generated from GCI (*Ibid,* Pgs. 21–29); (2) external documents generated from independent sources outside of GCI (*Ibid,* Pgs. 29–31); (3) interviews of Plaintiffs and inmate witnesses (*Ibid,* Pgs. 32–35); (4) interviews of correctional staff including Defendant Music (*Ibid,* Pgs. 35–36); and (5) a general tour of GCI. (*Ibid* ).

oners. (*Ibid*, Pgs. 1125–1126), additionally corroborated the fact that in his opinion the Plaintiff rapes had indeed occurred.[29] (Caddy, Pgs. 1241–1246) This conclusion was based upon: (1) the integrity of each of Plaintiffs' separate emotional responses in recounting the specific incidents of their rape experience. (*Ibid*. Pg. 1242) ("Those men who have been raped present essentially classic profiles of the consequences of rape.") Dr. Caddy observed that in his professional opinion it would be unlikely, *Ibid*, ("I have no reason to believe") that the plaintiffs-witnesses could artificially construct the emotional state that he observed[30]; (2) the inference of integrity from the commonality of the reporting of rapes to him which provided internal consistency to the varied circumstances supporting the conclusion that rapes occurred. (*Ibid*, Pgs. 1242–43); and (3) generally, *see infra* ¶ 198, that in the context of the accepted frequency of not reporting ("underreporting") of rape, coupled with the normal inmate disinclination to report.

110. Based upon these reasons, as well as the totality of facts discerned, not only from the Plaintiff-inmate testimony, *infra*, ¶¶ 122–195, but the other findings, this Court concludes that the rapes and assaults alleged by the various Plaintiffs and inmate witnesses indeed occurred.

### b. UNDERREPORTING

111. Both of Plaintiffs' experts confirmed the generally accepted principal that rapes typically are underreported.[31] (Swanson, Pgs. 150–154); (Caddy, Pg. 1243) (As much as 50% of female rape in the non-institutional context are not reported. Concludes that underreporting would be even higher within a prison.)

112. Dr. Caddy's view of even greater underreporting of rape within a prison is based upon the inmate disinclination to report because they not only have to deal with the degrading and humiliating consequences of reporting as do citizens in the outside world but also may "dramatically increase rather than decrease the risks that they will be seen to be vulnerable people to be raped again." (*Ibid*, Pg. 1243) Simply, the terror often survives the initial assault—once an inmate is raped, he is marked as a victim for repeated sexual assaults for the remainder of his imprisonment.

113. In accepting these findings of underreporting of rape at GCI, this Court is not alone.[32]

### c. THE DEGRADATION OF RAPE

114. At the risk of finding the obvious, the Court deems it necessary, particularly

---

**29.** Dr. Caddy's investigation in this case included; (1) interviewing of the Plaintiffs and innate witnesses (Caddy, Pg. 1130); (2) administering an analysis of specific psychological tests (*Ibid*); (3) reviewing various internal GCI—DOC documents relating to the various Plaintiffs and Inmates (*Ibid*, Pg. 1131); and (4) reviewing related professional literature in the field of rape. (*Ibid*)

**30.** The general symptomology, discussed in greater detail as to each inmate reflects a post traumatic anxiety disorder consistent with rape syndrome (Caddy, Pg. 1244).

**31.** In the instant case, three of the five sexual assaults upon the plaintiffs *were* reported by the victims, but simply were not followed through on by the correctional officials. The two inmates who did not report their assaults, the raped Durrance and the abused Bronson, testified credibly as to their reasons for not reporting. The first, Durrance, acted out of fear and lack of confidence that it would serve any purpose (Durrance, Pgs. 465–471); the sentence completion test administered to Durrance reflected a fear of telling people what happened to

him because of the great embarassment and discomfort of it (Caddy, Pg. 1224). Bronson did not tell because he had been warned not to, which warning he took to heart (Bronson, Pg. 700); additionally, he was aware of illicit dealings between his assailants and guards (*Ibid*, Pgs. 692 and 701).

Non-party witness Larry Brown testified that he did not tell a guard immediately after the rape because his assailants remained awake watching him from adjacent bunks (Brown, Pg. 845), but did tell a black guard the next day (*Ibid*, Pg. 847), and four days after the incident confirmed to Lt. Minor the lieutenant's assertion that Brown had "had a line as long as the dorm." (*Ibid*, Pg. 851).

**32.** Courts have recognized the underreporting of rapes and sexual assaults within our prisons. *See, e.g., United States v. Bailey*, 444 U.S. 394, 426 n. 6, 100 S.Ct. 624, 643 n. 6, 62 L.Ed.2d 575 (1980) (Blackmun, J. dissenting) (If a kid who is raped tells the guards, "his life isn't worth a nickel"); *Martin v. White*, 742 F.2d 469, 473 (8th Cir.1984) (Statistics on inmate assaults reflect "merely the tip of the iceberg as many

in light of the requested damage award for the individual Plaintiffs and also in the context of Plaintiffs' request for general injunctive relief, to make findings as to the general nature of the violation of rape.

115. Defendants' own witness, Inspector Brierton expressed it plainly and with clarity (Brierton, Pg. 89). ("You have to look at rape as an assault"); Defendant Turner's opinion is equally forceful: "Short of being killed I could think of nothing worse happening in prison." (Turner).

116. The Court accepts these opinions and shares its view that rape is one of the most degrading events, short of death, that can occur in prison. It follows that any institutional practices than can minimize its occurrence must be faithfully and consciously followed and observed by all prudent prison administrators. The Court finds that terror stemming from fear of sexual assault cannot be reconciled with the penological philosophy of the American prison system, which "emphasizes a balanced combination of deterrence, incapacitation, rehabilitation, and retribution." [33] Society must not permit prisoners to inflict the sort of punishment on other prisoners that law and common decency forbid the State.

d. THE NATURE AND CONSEQUENCES OF RAPE ENDURED BY PLAINTIFFS AND INMATE WITNESSES

(1) AN ACT OF VIOLENCE

117. The proof reflected, and the Court so finds, that the universal opinion of all witnesses—of both parties—is that rapes in a prison setting such as GCI are acts of violence, as opposed to sexual conduct.[34] (Brierton, Pg. 89) ("An issue of dominance.") ("So the difficulty is when you begin to talk about homosexual rape, you have to look at the rape as an assault."); (Turner) ("An act of violence.") ("An act of violence even if victim has prior consensual relations with other inmates).

118. It follows and the Court finds that due to its very nature as acts of violence, the rapes that occurred are not isolated incidents of sexual conduct, but rather flow directly from the lawless prison conditions at GCI. Acts of inmate assault on inmates; inmate assaults by and upon correctional officers; an environment of free-flowing illegal activity involving extortion, possession of weapons, drugs, alcohol, and staff corruption; and the corollary failure to punish or prosecute inmate-staff violators so that such assailants' and aggressors' conduct was not deterred by the rule of law and threat of punishment, all form the background and climate which in turn, provide a background and climate that preordained homosexual rapes and other inmate assault occurred.

(2) RACE

119. As described in detail, the named plaintiffs in this lawsuit, with the exception of Eddie Cobb, were all whites victimized by black assailants. *See, supra,* ¶¶ 122–190. *See also,* (Swanson, Pg. 287) (High percentages of blacks reported by Plaintiffs were the perpetrators.). Indeed there

---

violent assaults never find their way into the record books."); *Doe v. District of Columbia,* 701 F.2d 948, 966 (D.C.Cir.1983) (Edwards, J., separate statement); *State v. Green,* 470 S.W.2d 565, 569 (Mo.1971) (dissenting opinion) *cert. denied* 405 U.S. 1073, 92 S.Ct. 1491, 31 L.Ed.2d 806 (1972) (Life of inmate of Missouri Training Center for Men who reports a rape not worth "a plugged nickel".)

**33.** Federal Prison System, U.S. Department of Justice, Long Range Plan 1981–1985 (1981), in Bureau of Persons and the U.S. Parole Commission,: Oversight Hearing Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice, 97the Cong. 1st Sess. 45 (1981) (quotation refers to the Federal Prison System.

**34.** Literature and research in the field support these conclusions that rape, at least in this context, is an assaultive and violent act rather than an event emanating from sexual gratification. *See, e.g.,* D. Lockwood, *Prison Sexual Violence* at 105–6 (1980); A. Scacco, *Rape in Prison* at 47 (1975); A. Groth, *Men Who Rape—The Psychology of the Offender,* 126–41 (1981) ("In this study of men who rape men, we found their dynamics to be similar to those of men who rape women. What is immediately apparent about the sexual assailants is that none of them had to rape for sexual gratification.").

was no evidence presented by either party of any assaults by whites upon blacks; the pattern (other than Eddie Cobb) was consistently of black assailants assaulting whites (Swanson, Pg. 291).[35]

120. While one writer has concluded that there are definite "socioracial overtones" in the act of sexual victimization, noting that black aggressors who make whites submit to their sexual advances often comment "now it is their [the blacks] turn," [36]; scholars, however, take pains to point out that "it is not black culture that is behind prison sexual aggression; rather, it is a criminal, male, youthful black subculture of violence." D. Lockwood, *Prison Sexual Violence*, at 105. Whatever the motive, the Court finds that any prisoner, especially one who is white and/or slightly-built, may find himself threatened or raped even during the first day of confinement at GCI.[37]

### (3) THE METHOD AND CIRCUMSTANCES OF PLAINTIFFS' RAPES

121. Additional factors underscore the injury and violation of the rapes of Plaintiffs.

a. Anal as opposed to vaginal rape has the "potential in some respects to do more physiological damage than vaginal rape largely because the anal sphincter isn't able to expand in the same way the vagina is able to expand." (Caddy, Pg. 1254). Hence, the necessity, on a routine basis, for rectal examinations obviously is a standard process utilized in investigating anal rapes. This did not occur at GCI even though the clinic was equipped

with rape kits by the Palm Beach County Sheriff's Office. (Peters and Turner).

b. The use of a weapon by the assailant with the attending threat of possible death if submission does not occur tends to increase the psychological trauma manifested from the rape.[38] (Caddy, Pg. 1253–54)

c. Multiple or gang rapes by numerous assailants elevates the "overall sense of total lack of control" and "almost inevitably will escalate the level of trauma experienced." (Caddy, Pg. 1256).[39]

d. Cross racial rape (i.e., black assailant—white victim), at least as to the research relating to women, tends to cause more trauma and violation than if the victim and assailant is one of the identical race. (*Ibid.* Pg. 1258).

e. Rape occurring in an institution such as GCI provides less positive support services than if the rape had occurred outside of an institution. (Caddy, Pg. 1259–61). This is exacerbated by the negative rather than positive consequences of the reporting of rape within a prison. (Swanson, Pg. 151) ("Admitting of a rape puts at risk the inmate being labeled as involved in homosexual activity which may in fact put him in more jeopardy of the reoccurrence of that event.").

### E. THE INDIVIDUAL PLAINTIFF'S CASES

### 1. DAVID ALDRED

122. David Aldred, 25, was found by Dr. Caddy to be suffering from post traumatic stress disorder as a result of his

---

**35.** *See also*, (Swanson, Pg. 59) ("Glades is hard time for white inmates"); (*Ibid*) ("He [Pryor] describes the pressure of white inmates. In order to pressure white inmates, blacks will sexually assault a white or threaten such assaults. Thereby they can gain money for protection."); (*Ibid*) ("Pryor reports sexual assaults were always black upon white. Never white upon black."); (*Ibid*, Pg. 63) ("He [Eddie Cobb] reported that Glades was easy time for blacks. He reported that the blacks were the aggressors and the whites were pursued.").

**36.** A. Scacco, *Rape in Prison*, at 48.

**37.** Witness Larry Brown was raped the first evening he was transferred to GCI. *See, infra,* ¶ 190. David Aldred was raped the second day at GCI *See, infra,* ¶ 123.

**38.** Each of the following Plaintiffs were raped at knife point: Saunders, *infra,* ¶ 153; Durrance, *infra,* ¶ 133; Aldred, *infra,* ¶ 123; and Harper, *infra,* ¶ 162.

**39.** Each of the following Plaintiffs were gang raped: Saunders, *infra,* ¶ 153; Durrance, *infra,* ¶ 133; and Aldred, *infra,* ¶ 123.

being raped by black inmates at GCI [40] (Caddy, Pgs. 1185–1186). Aldred arrived at GCI July 20, 1984. Immediately upon leaving the van, he saw 150 to 200 mostly black inmates pressing up to the fence and arguing with each other: "He's mine." "No, Nigger, I saw him first." "No, he's mine." (Aldred, Pg. 893). Aldred received no orientation at GCI other than an assignment to B–Dorm (Ibid., Pg. 894).

123. The jeering at the fence presaged Aldred's being raped the second night he was at GCI. As he began to shower by himself, placing the washcloth to his face, he was hit aside the head, fell against the wall, and was thrown to the floor, face down. His arms were stretched out on either side. Someone grabbed Aldred by the hair and raised his head up to stick a knife beneath his throat, and told him in a voice that he recognized as belonging to a black: "If you open your mouth or holler, you will die." Aldred's legs were then spread and he was entered anally by either two or three inmates while the knife was held to his throat (Ibid, Pgs. 808–809). The episode took 15 to 20 minutes (Ibid., Pg. 810). Aldred experienced a burning, excruciating pain. He felt like he was being torn apart (Ibid., Pg. 816). When his attackers had finished with him, they told him not to say anything (Ibid., Pg. 810). Aldred was bleeding from the rectum (Ibid., Pg. 816). For a week, a sensation reminiscent of the rape returned each time Aldred had a bowel movement.[41] (Ibid., Pg. 817).

124. After borrowing two knives and making an unsuccessful 45 minute foray throughout the dormitory looking and listening for any assailant who might be

bragging about what had just happened, Aldred went to the dormitory officer and told him he had been raped (Ibid., Pg. 813). The dormitory officer told Aldred to return to his bunk, that the officer would take care of it. Although Aldred said he had been raped, the officer did not arrange for him to receive a medical or rectal examination (Ibid., Pgs. 812–813). After the shift changed at midnight, Aldred asked a new dormitory officer what was happening about Aldred's reported rape: the officer responded that he did not know what Aldred was talking about (Ibid., Pg. 814). The next day he reported his rape to a lieutenant. He said he did not know the identities of his assailants. He asked for protective custody. The lieutenant refused Aldred protective confinement. He told Aldred words to the effect of, "You got to start being a man sometimes," (Ibid., Pg. 815).

125. Although there is no Superintendent's Monthly Report to Regional Director for July 1984 included among Defendants' Exhibit 14, the one of the preceding month reflect an end-of-June population of 851 inmates and showed that 219 of the 235 authorized and established positions were filled. Superintendent Turner reported: "Inmate and staff morale continues to be good." See, D.Ex. 14. It is unknown whether Aldred's rape was reported as a sex assault on the July report, although it appears unlikely. The Court has been furnished with no written report of the rape by either the Plaintiffs, whose counsel represented that all pertinent documents concerning Aldred were contained in Exhibit 13, nor Defendants.

---

**40.** As with the other plaintiffs who were raped, Aldred was raped by blacks. Dr. Caddy testified that because these were cross-race rapes, they are even more substantial issues because they bear on the propensity of the victims to then come to believe that profound racism is entirely acceptable, which tends to carry with the victims for years afterwards, perhaps never to dissipate. Whatever problems that might create in an everyday world, it may be an even more difficult problem in prison (Caddy, Pg. 1246).

Significantly, Aldred described his arrival at GCI as being greeted by "a tidal wave of niggers

fighting over who would have me" (Swanson, Pgs. 70–71). He characterized the camp in an interview as being "a black camp run by black inmates" and as being 80 per cent nigger."

**41.** Aldred's personality profile contains an elevated hypochondriasis scale. Dr. Caddy testified that this index is at least in part a reflection of the continued reporting that he experiences physical discomfort quite routinely in the rectal area if he has to strain to go to the bathroom, and even when he does not (Caddy, Pgs. 1173–1174).

126. Aldred was transferred to the Reception and Medical Center (RMC) for previously scheduled dental surgery (*Ibid.*, Pg. 817). After the surgery was complete, Aldred said he spoke with a psychologist and told him the best that Aldred could what had happened at GCI, told him that Aldred needed help, and got the response that there was nothing the psychologist could do (*Ibid.*, Pg. 819).[42]

127. Informed he would have to return to Glades, Aldred slashed his wrist with a razor blade. Dr. Caddy, while discounting it as a suicidal gesture that was probably an attempt largely to get attention, characterized it nonetheless as indicating clearly a grave state of distress (*Ibid.*, Pg. 1171).

128. Upon arrival back at GCI, Aldred immediately checked into protective confinement until he was transferred nine days later (*Ibid.*, Pg. 820).

129. As a result of the violent sexual attack that Aldred experienced at Glades, and the general flavor of his emotional state at the time, Aldred reported to Dr. Caddy that today he really doesn't trust anybody. He engages in almost a hyper-vigilant activity much of the time, and there is both a paranoid and phobic quality to his responding with respect to black males. He is very, very angry and continues to carry that anger hardly below the surface today. He goes everywhere that he possibly can with a weapon, which he reports never having done before the rape (Caddy, Pg. 1172). Aldred's sense is one of shame, being violated, almost uncontrolled anger and rage, and it seems to be distributed somewhat generally to black males, not simply specifically to the people who raped him. He classically demonstrates the profile of a rape victim, without any opportunity to engage in a therapeutic process (*Ibid.*, Pg. 1173).

## 2. RONALD LEE DURRANCE

130. Ronald Lee Durrance, a 27 year old father of two, had assumed by March, 1984, a role that Dr. Caddy characterized as "somewhat of a social worker" who informed transient inmates who passed through his dormitory at GCI of dangers of theft that they faced (Caddy, Pg. 1221). Durrance's adopted role at GCI appears especially benign when viewed against the backdrop of his earlier years in prison: he became a member of a gang, "The Omens," at DeSoto Correctional Institution in 1977 (Durrance, Pg. 518); he vended marijuana cigarettes at Florida State Prison in 1977, and was caught with 17 of them (*Ibid*, Pg. 519); he was disciplined at one work release program in 1981 for drinking and at another for lying to a staff member about his paychecks; he was convicted in 1983 of a burglary committed while on work release (D.Ex. 23). Notwithstanding such a past, however, Durrance is a strongly built man whose reporting to Dr. Caddy, as well as his prison file, revealed no difficulties at GCI prior to the incident of March 17, 1984 (*Ibid*), (Caddy, Pg. 1221).

131. Durrance reported to Caddy that he felt that the officers at Glades Correctional Institution seemed to have no control over the inmates or chose to exert none (*Ibid*). The institution at the time had filled 230 of its 235 authorized staff positions (D.Ex. 14, Superintendent's Monthly Reports to regional Director, Report for March, 1984). Defendant R.V. Turner had noted that: "Staff and inmate morale is good. No major problems to report." (*Ibid*).

132. On the night of March 17, 1984 (Durrance, Pg. 444), two black inmates known to Durrance as Willie Dock and Bull told him to cease warning the transients (*Ibid*, Pg. 446). Later that night another black inmate, J.R., said he wanted to speak with Durrance. Durrance walked with J.R. to his bunk, the passageway next to which was obscured by having a blanket hung down from the top bunk. When Durrance stepped between the bunks to talk, Bull grabbed him by the neck (*Ibid*, Pg. 451).

---

42. *See also,* P.Ex. 13, Section C (A medical chart, the second page of which contains an entry dated 7–25–84 that appears to read: "Patient feel (sic) afraid to [illegible] Glades C.I. He came for appointment with Dental Dpt. He request medication for his [illegible] ..." Another entry of the same date reads: "Subject reported to the OPC attempting to elicit help in changing institutional assignment. He was referred to the Class. Dept.").

Willie Dock was there, too, with a knife. So was another inmate called Bone, also with a knife, and a fifth inmate, Bean (*Ibid*, Pg. 452). Willie Dock said, "Pussy cracker, if you holler, I'll cut you." He placed the knife to Durrance's neck and Durrance was dragged from between the bunks and into the shower (*Ibid*, Pg. 453).

133. In the shower, Durrance was thrown to the floor. As Bean knelt on Durrance's left shoulder and J.R. held a knife so that Durrance could see it, the others snatched off Durrance's blue prison pants and his underwear (*Ibid*, Pg. 456). They wrapped Durrance's pants around his neck and face (*Ibid*, Pg. 458). The first of the inmates to rape Durrance entered him forcefully through the rectum. Durrance wanted to scream, both because of the pain and because he could not believe what was happening (*Ibid*, Pg. 459). He was penetrated three times (*Ibid*, Pg. at 460). The ordeal lasted 35 to 40 minutes. When the rape was over, J.R. told Durrance, "Don't go to the wicket, pussy cracker. If you go to the wicket, you're through." (*Ibid*, Pg. 461). Durrance put his underwear back on, though not his pants, stood in the shower and cried (*Ibid*, Pg. 462). Although he flirted with the idea of revenge, Durrance calculated that he could not fight all of his attackers: he climbed back into his bunk, crying (*Ibid*, Pg. at 464). He was afraid to tell the dormitory officer about the rape because he felt that the dormitory officer would not do anything and that the other inmates would have heard Durrance complaining about which inmates had raped him. He felt that he would have to name names to get into protective custody because of what he supposed was the "good cause" requirement (*Ibid*, Pg. 465). He lay awake all night (*Ibid*, Pg. 467). He watched his attackers lay awake on their bunks, smoking marijuana and drinking a prison made wine called "buck" (*Ibid*, Pg. 468).

134. When the shift change came, Officer Dixon came on at midnight (*Ibid*, Pg. 478). Durrance was afraid to tell Dixon because he had seen money passed between inmates and Dixon and had seen Officer Dixon deliver a pint of whiskey to an inmate (*Ibid*, Pg. 471).

135. In the morning, Durrance went to his job at the auto paint and body shop. His rectum was in pain, a burning sensation. He did not have a bowel movement until the next day. Notwithstanding the pain. Durrance was too embarrassed to seek medical attention (*Ibid*, Pg. at 472).[43] The pain, which Durrance described to Dr. Caddy as lasting several weeks, also continues in the form of lower stomach discomfort (*Ibid*, Pg. 1224).

136. Durrance did not return to work that afternoon. Instead, he went to see a lieutenant, but still could not bring himself to admit he had been raped. He was afraid that if he told, other inmates would find out (*Ibid*, Pg. 475). When he sought protective custody without saying why, a Lt. Slater told him, "The Confinement is full. I'm not putting you in confinement, and, look, go out, be a man; go out and learn to be a man." (*Ibid*, Pg. 476). Durrance ceased reporting to his job assignment because he knew that if he did not go to work, eventually he would be locked up in confinement and thereby be off the compound (*Ibid*, Pg. 477).

137. One of Durrance's attackers, Bone, he thinks, approached Durrance several days later and told him that he would either have to choose to be someone's sexual partner or to pay Bone protection money to avoid being raped again. Durrance stalled, continuing to fail to report for his work assignment (*Ibid*, Pg. 478). The unexplained refusal to work resulted in Durrance's receiving a disciplinary report and being locked up in administrative confinement (*Ibid*, Pg. 479). Although it was Durrance's first disciplinary report for refusing to work, the official who reviewed it did not want to hear any explanations (*Ibid*, Pg. 480). At the expiration of his 15 day confinement sentence (*Ibid*, Pg. 481), Durrance was assigned to a bunk in D. dormitory, about which he had heard that there

---

**43.** Heightened embarrassment about the rape still showed through in a sentence completion test administered by Dr. Caddy (Caddy, Pg. 1224).

was a lot of pressure there to engage in homosexual acts; he refused to go and was placed back in confinement (*Ibid*, Pg. 482).[44]

138. While awaiting a hearing on his refusal to go to D dorm, Durrance told acting Major Barrett that he had a problem about owing another inmate money and needed to be locked up in protective confinement. Barrett told him to write out a statement, which he did (*Ibid*, Pg. 484). Notwithstanding the explanation, Durrance lost 45 days gain time for refusing to go to D–Dorm. *See*, D.Ex. 23 (Disciplinary Report reflecting hearing April 13, 1984).[45]

139. Durrance testified that he entered a statement that "I owed out a great deal of money, and I also entered the names of Willie Dock and Bull as the two people I owed, in hopes that maybe by me saying that I owed them, and it was felt that I was in danger, that they may be reprimanded somehow by me doing that." [46]

140. Durrance never was raped prior to this incident, nor afterward. Nor has he engaged in any homosexual activity before or since (*Ibid*, Pg. 487). Nonetheless, and notwithstanding his initial concealment of the rape from prison officials, word of the rape circulated among prisoners and followed him to Polk Correction Institution, to which he was transferred in July, 1984 (*Ibid*). An inmate known as "Black" approached Durrance (*Ibid* Pg. 488) and told him that Durrance would either pay protection money to Black or Black was told to tell other inmates at Polk that Durrance was a "fuck boy" at GCI (*Ibid*, Pg. 489). On November 1, 1984, Durrance checked back into protective confinement at Polk, once again citing money owed as the reason (*Ibid*, Pgs. 490–491).

141. Durrance was transferred to Hendry Correctional Institution where, three weeks after his arrival, Bone, one of the assailants, approached Durrance and told Durrance that he was either going to have to pay Bone money or be somebody's "boy." Once again, Durrance checked into protective confinement (*Ibid*, Pg. 501). He said there was a contract on his life that had been let at Florida State Prison (*Ibid*, Pg. 502).

142. September 27, 1985, Durrance was transferred—back to Glades Correction Institution (*Ibid*). He immediately requested protective custody, which he did not get until being required to go to the mess hall for lunch (*Ibid*, Pg. 503). At this point, he finally told a correction officer at GCI, Lt. Minor, that he previously had been raped (*Ibid*, Pg. 505). Lt. Minor memorialized the complaint in a Report of Administrative Confinement dated September 27, 1985 (D.Ex. 23). He remained in protective custody at GCI until bing transferred in No-

---

**44.** This behavior is consistent with Dr. Caddy's finding that, other than the fear that his son will find out about the rape, Durrance's greatest fear is being raped again (Caddy, Pg. 1225).

**45.** Durrance additionally lost 20 more days gain time that he would have acquired if protective custody inmates were allowed to work (Durrance, Pg. 486).

**46.** Among the documents submitted from plaintiff, Durrance's file as part of Defendants' Composite Exhibit 23, was a handwritten statement dated 4/16/84 and purportedly signed by Ronald Durrance, which read:

Dear Sir:
I'm requesting protective custody because I owe out $60.00 that I have no way of paying. I would rather not give out names, but I have no other choice (sic). Gator in [illegible] dorm Mark in C-dorm and a guy called Willie in B–Dorm. My life [illegible] in danger.
Thank you.
Also in the file submitted by the Defendants is a Report of Administrative Confinement addressing the initial refusal to go to work. Under the section on Classification Team Review and Action, the report reads as follows:

Team # 1 review (sic) inmate at approximately 7:00 a.m. on 4/3/84. Inmate Durrance advises that he owed inmate Stump some money while at U.C.I. three or more years ago and was transferred without paying. When Durrance arrived at G.C.I. he was met by Stump demanding payment. Durrance did not have the money ($40.00). Stump was released and transferred money to Willie Docks. (Sic) Durrance borrowed money from Mark to pay Dock. Inmate is now threating (sic) to collect with interest. Durrance expects to get an I.R.S. return to pay debt but want (sic) to go to Polk C.I.
Team # 1 does not feel this inmate is in fear but rather is engaging in manipulation to get a transfer. Team concurs (sic) with action taken; inmate is to remain in confinement for refusing to work until case is resolved.

vember to Dade Correctional Institution (Durrance, Pg. 505).

143. The residue of the rape for Durrance, in addition to the gain time he has lost, created an adjustment disorder with mixed emotional features (Caddy, Pg. 1225). Emotionally, he reports being essentially closed and more reserved than before. He no longer seeks out people to be friendly, as he did before. He watches everybody and trusts no one. His greatest reported fear is telling his son about the rape (*Ibid*, Pg. 1225).

### 3. STEVE HERMAN BRONSON, JR.

144. Steve Bronson, a white, bisexual transvestite, who answers also to "Nancy Sue," arrived at GCI in November, 1981 (Bronson, Pg. 689) with a Department of Corrections file rife with reference to his sexual preference and affectation. *See*, Plaintiffs' Post Trial Submission of Excerpts from Plaintiffs' Records. Subsequent to his arrival, he encountered a black inmate gang leader named Mack, who trafficked in drugs, protection, gambling, alcohol, and homosexual prostitution. He met Mack while the two of them were in a trailer with others watching a video cassette recording that depicted vaginal and anal intercourse. The movies were shown on weekends as part of the prison recreation program (Bronson, Pg. 691). Mack pushed a knife in Bronson's side and forced him to masturbate Mack (*Ibid*, Pg. 692). Despite Bronson's previous consensual relations with other males, he objected to being forced to masturbate Mack (*Ibid*, Pg. 694). Mack initially demanded that Bronson be one of his "girls," but settled for Bronson's agreement to pay him protection money and serve as a lookout during both card games and sexual encounters between the two other "girls" and guards (*Ibid*, Pg. 692). Bronson thrice observed guards being fellated by the homosexual prostitutes, once in the movie trailer, once in a dorm and once in the equipment shack on the recreation field (*Ibid*, Pg. 693). Another of Bronson's task for Mack was to masturbate inmates who paid Mack (*Ibid*, Pg. 696). To accentuate his femininity for this assignment, Bronson would dress in a tee-shirt rolled up above his midriff, shorts, and sandals (*Ibid*, Pg. 697). The only time he was required to wear his regulation uniform was to go to either the visiting park or the chapel (*Ibid*, Pg. 697) notwithstanding that he had once sued while incarcerated at another Florida prison to set aside a policy against his wearing women's clothes (*Ibid*, Pg. 721).

145. In late June, 1982, one of Mack's two male homosexual prostitutes was transferred out and Mack demanded that Bronson take his place. After Bronson refused, he was waylaid by two men in Mack's company as he was walking across the recreation field at 9 a.m. or so on a sunny Saturday morning. A rag was stuffed in his mouth, his shorts and underwear were removed and the handle of a baseball bat was shoved up his rectum, pushed a couple of times and pulled out. Bronson felt as if his rectum was being torn. When the bat was pulled out it was very painful. Bronson tried to scream, but could not. Mack told Bronson that the baseball bat was only a sample of what he would do if Bronson did not become one of his prostitutes. The rectal bleeding continued for three days (*Ibid*, Pgs. 698–699).

146. Bronson did not go to the clinic. He had been warned that he could be killed if he reported the incident to anybody. He believed that threat whole heartedly (*Ibid*, Pg. 700). He had witnessed guards giving money to inmates, Mack's buying alcohol from guards and Mack's buying drugs from guards (*Ibid*, Pg. 701). The drugs sold to Mack by the guards included marijuana, which Bronson recognized by seeing it as it was packaged for resale (*Ibid*, Pg. 702) and a white, granular substance with lumps that Mack said was cocaine and that Mack sold to other inmates when they asked for cocaine (*Ibid*, Pg. 703). Bronson told Dr. Swanson that black inmates ran GCI, (Swanson, Pg. 77). He also told Swanson that the guards seemed scared of inmates (*Ibid*, Pg. 78). He told Swanson he was scared to ask for protective confinement (*Ibid*, Pg. 79). He did not have the sense that there was anybody that he could go to (Caddy, Pg. 1191). When he finally

did check in, he told Swanson he found it to be extremely punitive (Swanson, Pg. 81).

147. Bronson remained quiet about the incident. To avoid either a repeat or the alternative of forced prostitution, he checked into protective confinement immediately after a July 4, 1982 visit from his wife and daughter. Rather than inform on Mack, he used the ruse of family problems instilling in him an urge to escape (*Ibid*, Pg. 710). He found his one-bed protective custody cell with two other inmates already there (*Ibid*, Pg. 711). The electric light was not working. The only times he was allowed outside was for three, three to five minute showers a week. There was no access to the law library. There were no canteen privileges. There was no smoking. The food was cold and in smaller portions than given to the inmates in population. The screens were either non-existent or had holes (*Ibid*, Pg. 712). Mack would come by the windows and tell Bronson to come out or he would send somebody in to harm Bronson (*Ibid*, Pg. 714). Superintendent Turner, however, never came back to the confinement area during the period that Bronson was there, from July 4, 1982 through August 25, 1982 (*Ibid*, Pg. 715).

148. Bronson was one of 80 persons who entered administrative confinement in July, 1982: the administrative confinement area had 34 inmates at the beginning of the month, 24 at the end. In June, when the baseball bat incident occurred, it appears as if 241 of the 270 authorized and established staff positions were filled.[47]

149. The psychological experiences that Bronson had at GCI simply represented a further extension of his increased sensitivity, his feelings of nervousness and his feelings of powerlessness (Caddy, Pg. 1190). But while Dr. Caddy acknowledged that it would have been equally quite inappropriate to try to tease out the specific elements that relate solely to the incidents surrounding the events at GCI, he did feel it important to observe that at GCI Bronson felt far more vulnerable than at several of the other prisons in which he had been placed, largely because he perceived the facility to be somewhat more lawless (*Ibid*, Pg. 1191). Dr. Caddy's diagnosis of Bronson was as suffering an adjustment disorder with mixed emotional features, together with an atypical personality disorder and a sexual identification disorder; he could not attribute specifically what part of the disorder is a direct function of the incident at Glades (*Ibid*, Pg. 1193).

### 4. MARTIN SAUNDERS

150. Martin Saunders was convicted of sexual battery, for which he got a 35 year sentence; possession of marijuana, for which he got a concurrent 5 year sentence; and aggravated assault, for which he received a consecutive 5 years, for a total of 40 years (Saunders, Pg. 533). He is 5 feet, 7 inches tall and has an obese buttocks, a physiognomy that both he and and Plaintiff Anthony LaMarca, who shares it, say is attractive to imprisoned homosexuals (*Ibid*, Pg. 537), (LaMarca, Pgs. 948–949). How attractive Saunders was to the black inmates at GCI became uncomfortably clear to him as he witnessed a "great multitude" queue up near the area where the prison van unloaded him at GCI in February, 1983; he recalls feeling like being in a meat market (Saunders, Pg. 536). Although he earlier had been derided as a homosexual by one inmate shortly after having arrived at DeSoto Correctional Institution, he attacked that inmate to rid himself of that label (*Ibid*, Pg. 534).

151. Although he received no orientation from the prison administration at GCI (*Ibid*, Pg. 539), he received an aggressive orientation the evening of his arrival in A–Dormitory; blacks approached this young white inmate offering friendship that he felt, based on the time he had spent in prison already, was a prelude to a homosexual advance (*Ibid*, Pg. 540). Two in particular, James Roper and Larry Pryor, were persistent in their advances and struck Saunders wherein he rebuffed them

---

**47.** The monthly report for June appears to have a typographical error in its recitation of "231" jobs being filled: this becomes obvious when the figures for May (243) and July (247) are viewed against the minor turnover during the three-month period. In May, Turner had reported that the "high vacancy rate is down." (D.Ex. 14).

(*Ibid*, Pg. 541). Once, following a visit with his family, Saunders returned to the dorm where Pryor, armed with a knife, demanded that Saunders give Pryor the $5.00 his parents had just given him during the visit. Saunders complied then, as well as on a second occasion when Pryor demanded money (*Ibid*, Pgs. 546–547). On another occasion, Pryor and Roper "creeped" up behind Saunders as he watched television and each punched him on a side of his head (*Ibid*, Pgs. 549–550). They took his property and threw it in the shower (*Ibid*). He knew it was Roper and Pryor because he spotted a towel of his hanging from one of their bunks (*Ibid*, Pg. 551).

152. Saunders complained to a number of correctional officials. The officers took the approach that Saunders should be a man, should deal with his problems and should hit Pryor and Roper so that would leave him alone (*Ibid*, Pg. 548). According to Saunders' unrebutted testimony, one official, William Knight, Saunders' classification officer, took the opportunity of Saunders' first visit to press himself against Saunders from behind and to run his hands down Saunders' arms. Saunders interpreted this as a homosexual advance (*Ibid*, Pg. 544).

153. On or about March, 1983, Saunders was using a small bathroom in the classification building. He was sitting on the commode with his trousers down when Roper and Pryor entered the room (*Ibid*, Pg. 551). The two told Saunders to keep his pants down (*Ibid*, Pgs. 551–552), and that they were going to "get theirs." It is a very narrow bathroom and Saunders was directed to stand over the commode, facing the wall.[48] As Roper lubricated his penis with Vaseline, Saunders attempted to bolt from the room, but was stopped and told that he would be killed if he tried again to escape (*Ibid*, Pg. 552). Roper entered Saunders. Saunders could tell that Roper ejaculated because of the groans he made. When Roper finished, Pryor followed (*Ibid*, Pg. 553). Pryor also ejaculated inside Saunders. The incident took about 25 minutes to a half hour. The two of them left the bathroom laughing about how, "That's some good pussy." (*Ibid*, Pg. 554).

154. After sitting on the recreation field and crying alone for about an hour, Saunders angrily went in search of his rapists. When he found Pryor he began a fight. After the fight was broken up, Saunders, according to his unrebutted testimony, told Lt. Pipta, that Pryor and Roper had raped Saunders (*Ibid*, Pg. 556). Saunders got the impression that Lt. Pipta did not believe him. Although Lt. Pipta had Saunders taken to the clinic for an examination concerning the fight, there was no rectal examination done (*Ibid*, Pg. 557). The officer who was escorting Saunders said, "that's not what we're here for." Saunders was put into administrative confinement. In neither Saunders' file, pertinent excepts of which are include in P.Ex. 29, nor in Pryor's file, pertinent excerpts of which are included in P.Ex. 26, is there any record of either the report of the rape, of the fight, of the physical examination of Saunders, or of Saunders' subsequent confinement. Saunders' unrebutted testimony is that Pryor and Roper were not confined concerning the rape. There were no disciplinary reports concerning the fight (*Ibid*, Pg. 561). Lt. Leo Peters, the institutional investigator, testified that no one informed him of the alleged rape nor instructed him to investigate it.

155. Saunders, who reported experiencing a "very mushy" stool during his first bowel movement after the rape (*Ibid*, Pg. 559), was jailed as the third person in a two

---

48. Lt. Leo Peters, the institutional investigator, testified that the room in which Saunders said he was raped was so small that Peters bumped his head against the opposite wall one day recently while sitting on the commode. Dr. Caddy noted that when Saunders talked about being raped, he did not talk about being thrown to the floor, as had the others (Caddy, Pgs. 1311–1312). Saunders described his position during the penetration as "looking over the toilet, my hands on the wall," (Saunders, Pg. 553). The rapists, then, could have stood facing the commode much as a man would stand in front of it while urinating. In short, there is nothing in any of the testimony that is inconsistent with the conclusion that Martin Saunders was anally raped in the bathroom.

person cell. The cell was roach infested and there was a thick mildew on the walls. Saunders was there for three to four days (*Ibid*, Pg. 561).

156. Upon his release from confinement, Saunders acquired a transfer to C–Dorm by giving up a prestigious inmate job as a steward in the staff dining room (*Ibid*, Pg. 564) and taking a job cutting sugar cane (*Ibid*, Pg. 565). In C–Dorm, however, he encountered an inmate known as Charles Street, who harassed Saunders sexually and kicked him in the groin. *See*, P.Ex. 29, Section B. Street slept next to Saunders and told Saunders that he was going to "get" him one night. Saunders was fearful that Street would succeed in any attack because his bunk was obscured from the view of the dormitory officer (*Ibid*, Pg. 569) by towels that would be draped from the top bunk to form a sort of tent (*Ibid*, Pg. 570). Saunders felt someone who was thinking about killing him at night would feel that they could get away with it and, therefore, would be further motivated to harm him (*Ibid*, Pg. 570). The only way Saunders could see the guard was to hang his head over the bed perimeter (*Ibid*, Pg. 571). If Saunders were in his bed, the guard could not see him (*Ibid*, Pg. 572).

157. Saunders' fear of death upsets him greatly (Caddy, Pg. 1207), and he testified that his nightmares about death always involve a stabbing (Saunders, Pg. 577). Notwithstanding Saunders' being characterized by the Plaintiffs' own expert, Dr. Glenn R. Caddy, Ph.D., as being not only one of the most intelligent, but also most manipulative of the Plaintiffs (Caddy, Pg. 1198), Caddy testified that Saunders reports some of the common experiences of people who have experienced rape: an immediate sense of worthlessness but with extreme anger; a fear that in some respects he was trash for having allowed this to happen (*Ibid*, Pg. 1199). Dr. Caddy, whose experience in dealing with manipulative personalities include numerous clinical encounters with alcoholics and drug users, nonetheless placed credence in Saunders' testimony that he had been raped and felt that Saunders would have been unable to consciously mimic the affect of a rape victim (*Ibid*, Pg. 1313). Dr. Caddy's diagnosis of Saunders is that of post traumatic stress disorder (*Ibid*, Pg. 1207).

158. During his imprisonment at GCI, Saunders told his mother repeatedly that he was in fear of his life (Sally Saunders, Pg. 658). Mrs. Saunders attempted numerous times during Saunders' incarceration at GCI to telephone Superintendent Turner. *See*, P.Ex. 12, Section A. She was only able to get through to him about three times, however (Sally Saunders, Pg. 669). During one of those conversations, subsequent to Saunders having joined as a Plaintiff in this action, Turner laughed and said to Mrs. Saunders, "Do you know how many people have tried to sue me?" (*Ibid*, Pg. 660).

159. Saunders checked back into protective confinement November 10, 1983. *See*, P.Ex. 29, Section B. At the time, 220 of the 233 authorized and established staff positions at GCI were filled; Superintendent Turner wrote that "[s]staff & inmate moral (sic) appears high. Gov. Graham's visit was an important occasion. With overall unemployment down we are beginning to again experience significant staff vacancies." Saunders was one of 76 persons who went into either administrative or protective confinement during the month. His assault by Street, however, does not appear to have been reported as either an Unarmed Assault Where Person Assaulted is Injured, or as an Assault to Commit a Sex Act, no incidents having been reported in either category on the Superintendent's Monthly Report to Regional Director. *See*, D.Ex. 14.

160. Saunders found the conditions the same when he checked into protective confinement as those that existed when he was in confinement following the fight with Pryor (Saunders, Pg. 574). Notwithstanding the strictures of § 33–3.082(4), Florida Administrative Code, and GCI's Institutional Operating Procedure 83–40, which require that treatment of inmates in Protective Confinement be "as near that of the general population as assignment to protective confinement as the housing area will

permit" (P.Ex. 3, Flap F 2), there was no literature, no canteen; in short, no privileges (Saunders, Pg. 574). Saunders never saw Superintendent Turner during Saunders' stay in protective confinement (*Ibid*, Pg. 576). That stay ended when Saunders' was transferred to Avon Park Correctional Institution—at the order of a prison inspector (*Ibid*, Pg. 576).

## 5. BILLY JOE HARPER

161. Billy Joe Harper is an unusually boyish-appearing 25 year-old inmate serving a 15–year sentence for a sexual battery committed in 1985 following an earlier conviction for armed robbery (Harper, Pg. 732). His incarceration within the Department of Corrections has been characterized by incidents in which contemporaneous reports reflect that he had complained of sexual assaults and/or harassment and had requested protective confinement for those and other reasons.[49] The other assaults of which he is quoted as complaining all occurred prior to Harper's arrival at GCI on December 31, 1981.

162. About two weeks after his arrival, Harper was raped at Knifepoint in his top bunk in D–Dormitory about 2:00 a.m. by a man whom he identified as inmate Levy Fisher (Harper, Pg. 736). Fisher held a knife to Harper's throat and told him that if he made a sound, Fisher would cut Harper's throat (*Ibid*, Pg. 738). Fisher pulled off Harper's underwear and lifted Harper's leg so he could enter him anally (*Ibid*, Pg. 739). Harper could not see the correctional officer who was supposed to be on duty (*Ibid*). After Fisher was finished, he told Harper that if Harper told anyone, Fisher would kill him (*Ibid*, Pg. 740).

163. Harper testified that he checked into protective custody the morning after the rape, telling officials that he wished to do so. He said two other inmates checked in with him. One of the inmates was Larry Turly. Larry Turly told the officers that they were checking in to get away from Fisher (*Ibid*, Pg. 741).

164. About three days after the three inmates checked in, Superintendent Turner called them to the office of the confinement area (*Ibid*, Pg. 745). Former inmate Greg Zatler also was called to the meeting (*Ibid*, Pg. 746). Zatler testified that "Superintendent Turner asked us why we were in confinement, and we told them because of Fisher." Turner replied, according to Zatler, "No, you couldn't be in here because of this inmate. This is one of our best inmates." (Zatler, Pg. 795). Harper recalls telling Turner that Fisher had raped him, to which Turner replied that Harper was lying and could rot in his cell (Harper, Pg. 746). Harper could not understand why Turner "wasn't there to get on Levy Fisher, he was there to get on us." (*Ibid*, Pg. 747).

165. No documentary evidence has been introduced to establish that either Harper or Zatler was in protective confinement in January 1982. However, corroborative of their joint testimony that they were concurrently in protective custody are letters written February 21 and 26, Zatler to Carl Kirkland, a prison inspector, concerning property that he had lost upon checking

---

**49.** According to documents contained within D.Ex. 15, Harper sought an obtained protective custody at Brevard Correctional Institution January 12, 1980 because of the presence there of a jail rapist against whom he claimed to have testified in Leon County, Florida, Circuit Court. He told a correctional official at Avon Park Correctional Institutional March 1, 1981, that three black inmates raped him in the shower there February 28, 1981. Harper now does not remember making this allegation (Harper, Pg. 752). There is a notation on a "Page 8" of what appears to be a document from Baker Correctional Institution in which Harper is quoted under the "comments" section as having complained of being raped in the Alachua County Jail in Gainesville by someone who was then at Baker. Harper testified that he never made that statement (Harper, Pg. 750). Page 3 of what appears to be a document from Tomoka Correctional Institution prepared sometime subsequent to his arrival date there of September 13, 1984 alludes to a "prior statement" in which Harper acknowledged "sexually molesting" his own sister. A psychiatric report dated January 31, 1981 at Reception and Medical Center Hospital also noted that, "[a]ccording to his records, the patient practiced incest with his half sisters."

Other documents within Defendants' Exhibit 15 also recite that Harper has sought protective custody on several other occasions on the grounds of owing money and having been identified as a witness against other inmates.

into protective custody February 11, 1982 (P.Ex. 5). Among the papers submitted by Defendants as Composite Exhibit 14 (Page 34) is a Department of Corrections Daily Record of Segregation showing that Billy Joe Harper was in "P.C." March 1, 1982 through March 8, 1982. Page 34 of Defendants' Exhibit 14, is a Disciplinary Committee Visit sheet that reflects a visit to Harper March 2, 1985 by a committee that included "Floyd, Turner, Arline" and resulted in a notation: "Continue A/C—Attitude poor."

166. Harper remained in protective custody until another inmate, Andrew Jackson, enticed him back on the compound with the proposition, voiced through a window of the confinement area, that Jackson would protect Harper on the compound for $10 a week (*Ibid*, Pg. 744). Lt. Leo Peters testified that he later in 1982 sought out Harper as a witness against Jackson in a criminal prosecution for extortion. *See also*, P.Ex. 20, Section B.

167. Dr. Caddy found Harper to be significantly depressed and exceedingly angry (Caddy, Pg. 1229). He diagnosed him as suffering from an adjustment disorder with mixed emotional features (*Ibid*). Knowledge of the earlier purported sexual relations would not have changed the basic diagnosis as to Harper. While such knowledge would influence Dr. Caddy's judgment about the possible apportionment, it would additionally raise the question of preexistent elements that were exacerbated at Glades rather than provoked solely at Glades. Harper's additional, non-rape history did not bear on the legitimacy or veracity that Harper offered with respect to the matter of rape, according to Dr. Caddy. However, it did or could bear on the issue of the extent to which Harper now—in retrospect—seeks to focus much of his experiences in protective custody on the question of rape as opposed to other dynamics that also may have been operating within the man (*Ibid*, Pg. 1291).

168. As to the possibility of Harper's having been raped before Glades, assuming that rape is a statistically remote occurrence, the issue presented by the second rape is not simply an additive probability, but potentially represents even a more substantial issue because of the credibility question that many others would attribute to the individual, as well as the very special problems that the individual, himself, would have faced in the everyday world. Dr. Caddy's view is that a person who has been raped elsewhere, and then is raped at Glades, is in more need of assistance than he would have been if he had been raped on one occasion (*Ibid*, Pgs. 1301–1302).

### 6. EDWIN JOHNSON

169. Edwin Johnson arrived at GCI in February 1983 (Johnson, Pg. 1068). About the fourth week after arriving, Johnson received a visit from his mother. Sensing a large crowd of black inmates who he feared might attempt to rob him since there was only one guard patrolling the compound (*Ibid*, Pg. 1070) Johnson took a detour back to his dormitory, but was accosted 15 feet from the door by a black inmate with a knife who told him that he, Johnson, had one week to either "find you a daddy" or go into protective confinement (*Ibid*, Pg. 1078).

170. When Johnson told his classification officer about the ultimatum, he was told to either go into protective confinement or get a pipe or a knife and fight back. Johnson did not want to fight back because he was nearing parole and was attempting to overcome an earlier eight-year extension he had earned (*Ibid*, Pg. 1079). Johnson chose to check into protective confinement (*Ibid*, Pg. 1084). He shared a one-man protective custody cell with two other men (*Ibid*, Pg. 1085). There were no privileges for inmates in protective custody (*Ibid*, Pg. 1088). During this time there was no gymnasium access for protective confinement inmates (*Ibid*, Pg. 1089). There were no programs, such as education, that could have assisted Johnson toward obtaining a parole (*Ibid*, Pg. 1088). Thus, on the advice of the lawyer representing him in connection with the parole, he checked out of confinement after two and one-half months (*Ibid*).

171. Johnson stayed out of confinement for about two weeks until he was bloodied

in a fight with inmates who stole some of his property; the fight occasioned his being taken to be interviewed by Lt. Lawson (*Ibid*, Pg. 1094). Johnson declined to name his attackers because he was afraid to be a "snitch" (*Ibid*, Pg. 1095). The next day, one of his attackers, who stood at about 6 feet, one inch tall, and weighed 225 pounds again attacked Johnson, who is 5 feet 11 inches tall and weighs 140 (*Ibid*, Pg. 1096). After that fight, Johnson sought a dormitory change from Lt. Lawson, but was denied it. He then checked back into protective confinement for three days (*Ibid*, Pg. 1097).

171a. By this point, Johnson had acquired a reputation as a weakling because he had twice checked into protective confinement (*Ibid*, Pg. 1099). Five inmates in the dormitory to which he was assigned put a blanket over him and beat him. Johnson checked back into protective confinement the next day (*Ibid*, Pg. 1100). The conditions and lack of privileges were the same, except that the confinement inmates were allowed to go to the gym (*Ibid*, Pg. 1101). The gymnasium party was composed of both administrative and protective confinement inmates (*Ibid*, Pg. 1102). As they returned to the confinement area, one of the administrative confinement inmates hit Johnson in the head with a metal stool (*Ibid*, Pg. 881).[50] Johnson received five stitches and was hospitalized for two weeks. He returned to the protective confinement cells where he waited until the prison inspector ordered Johnson and Plaintiff Saunders transferred.

172. The exact dates of Johnson's presence in protective confinement or within the hospital are impossible to pinpoint. No incident reports concerning his alleged injuries, no administrative confinement reports and no medical records have been presented to the Court, notwithstanding Plaintiffs' counsels' having subpoenaed all of Johnson's records and representing to the Court that they had furnished all relevant records. Neither has the Defendants' counsel offered any records that conflict with Johnson's testimony.

## 7. WAYNE JOHN EPPRECHT

173. Wayne Epprecht, who is presently serving a sentence of life plus 130 years at Avon Park Correctional Institution, previously was incarcerated at GCI under an earlier commitment (Epprecht, Pg. 627). In February 1981, after having been visited by his sisters and having received $25.00 in cash from them, he returned to his dormitory, paying off various debts along the way. By the time he arrived, he had paid out all but 26 cents. This paucity angered two black inmates who were waiting in the dorm to rob him (*Ibid*, Pgs. 628–629). One of them hit him in the face with a pipe. Epprecht did not see any correctional officers in the wicket at the time of the assault (*Ibid*, Pg. 629).

174. Epprecht went to a mirror and saw that the left side of his face was stoved in and blood was running out of his nose (*Ibid*, Pg. 630). He encountered an officer outside of the dorm. The officer took him to the prison hospital, where a nurse said Epprecht needed to go to Glades General Hospital (*Ibid*, Pg. 631). After several days at Glades General, Epprecht was transferred in a van with other prisoners to the Reception and Medical Center at Lake Butler. During the eight to ten hour trip he was in pain and given nothing to drink in connection with his liquid diet (*Ibid*, Pgs. 634–635). After surgery, Epprecht was returned to GCI (*Ibid*, Pg. 638), where he saw the two inmates who attacked him (*Ibid*, Pg. 650). They told him they would leave him alone if he would not say anything (*Ibid*).

175. Epprecht was asked several times what had happened to him (*Ibid*, Pg. 633), but he never had identified his assailants to officials because he felt it was safer not to "snitch" (*Ibid*, Pgs. 630–631). Superintendent Turner, however, was not one of those officials who inquired of Epprecht. While at GCI, Epprecht feared for his safety in a different manner than he had while serving time in other Florida prisons (*Ibid*, Pg.

---

**50.** The court reporter transposed volumes of the transcript. The volume beginning with a cover sheet numbered 879 follows that volume beginning with a cover sheet numbered 1001. The citations are to the pages as they appear.

645). At the other prisons, it seemed to Epprecht that an inmate could get help more quickly than at Belle Glade (*Ibid,* Pgs. 645–646).

176. In February, 1981, the time at which Epprecht was attacked, 222 of the 266 established and authorized staff positions were filled. Superintendent Turner reported, "we are currently holding 35 positions vacant at this institution to attempt to keep our salary allocation in good shape." (D.Ex. 7). The prison population ranged from 801 at the beginning of the month to 787 at the end. Superintendent Turner noted that "[t]he increasing number of inmates demanding protective confinement takes up most of the available space." (*Ibid*).

177. Epprecht's psychological scarring was less than some of the other plaintiffs. Dr. Caddy diagnosed him as suffering from an adjustment disorder that was rather moderate in nature, was not severe, with some mixed emotional features (Caddy, Pgs. 1148–1149). However, according to Alan M. Wagshul, M.D., a Board certified neurologist, after examining Epprecht and reviewing his medical charts, Dr. Wagshul reports that Epprecht is suffering both reparable and irreparable injuries. The history of left facial trauma, with a fracture of the zygomatic arch and residual palpable deformity, is consistent with the sensory deficit in the area of the facial trauma. In layman's terms, Epprecht suffers from a numbness that forever will be exacerbated by prolonged chewing or changes in the weather and, while it can be alleviated by non-addictive drugs, cannot be eliminated. Additionally, Epprecht suffers from probably a temporomandibular joint dysfunction that is consistent with his subjective complaints of headaches and pain upon chewing. While Epprecht has complained of suffering these symptoms since the incident, February 14, 1981, they could be eliminated by an office visit to a dentist for a realignment of his bite (Wagshul).

### 8. EDDIE COBB

178. Eddie Cobb, the only black among the named plaintiffs, is a 24 year-old former inmate (Cobb, Pg. 764) who was stabbed in the head and arm (*Ibid,* Pg. 767), January 27, 1984 by fellow inmate Larry Pryor (*Ibid,* Pg. 765). Cobb received 18 stitches in his head and 12 in his arm at the prison hospital (*Ibid,* Pg. 768). His arm carries a visible scar, which the Court saw (*Ibid,* Pg. 767), and there is scar tissue on his head (*Ibid,* Pg. 768). Since the incident, Cobb experiences pounding, migraine headaches and dizziness, sensations about which he complained to prison health officials at Union Correctional Institution (*Ibid,* Pgs. 769–770).

179. Although Cobb had a number of fights at Glades in which he arguably could be cast as the aggressor, Pryor was the attacker in this instance (Deposition of Larry Pryor, Pg. 18), (Testimony of Lt. Peters). Pryor, however, was operating with the protection of Lt. William Barrett (Deposition of Larry Pryor). And after Cobb left the hospital, he was taken to administrative confinement (Cobb, Pg. 769), where he remained until he was transferred to Union Correctional Institution March 15, 1984. *See,* P.Ex. 15, Section C (Department of Correction Daily Records of Segregation for Eddie Cobb from Feb. 6, 1984 to March 15, 1984). Pryor was released before Cobb was transferred (Cobb, Pg. 769), notwithstanding the fact that Lt. Peters' investigation revealed Pryor to have been the aggressor (Testimony of Peters).

180. A review of inmate Pryor's prison file reveals repeated documentation of his assaultive nature. A January 21, 1983 memorandum from the Florida Probation and Parole Commission discusses Pryor's "serious pattern of assaultive-violent behavior." An in-house classification team at GCI November 15, 1983 recommended "transfer of the above-mentioned inmate [Pryor] for security reasons." Although a transfer of Pryor to Union Correctional Institution was sought, the transfer request was withdrawn January 29, 1985. *See, supra,* ¶ 98.

### 9. MICHAEL GORDON

181. Michael Gordon arrived at GCI in late 1983 or early 1984 (Gordon, Pg. 897). He arrived there the least pre-institutionalized of the named plaintiffs. This was the

first permanent assignment within the Florida prison system for Gordon. At the time, Gordon, a 41-year-old jeweler who lived in Plantation, had been sentenced to 25 years in prison for credit card fraud. *See*, P.Ex. 19, Section A. This conviction was subsequently overturned because of incompetence of defense counsel. *Gordon v. State*, 469 So.2d 795 (4th DCA, Fla.1985). Gordon suffered physically at GCI, perhaps less than any of the other named plaintiffs. He was knocked unconscious once while standing in front of the canteen. (Gordon, Pg. 907). According to x-rays taken three days later, there was no fracture from this injury (*Ibid*, Pg. 908). His buttocks were burned when inmates who had been drinking "buck" set his polyester underwear on fire (*Ibid*, Pg. 909); he was hit in the head with a pipe in a robbery in which his mock Rolex watch was stolen (*Ibid*, Pg. 910).

182. Notwithstanding the fact that Gordon's complaints pale next to those of his co-plaintiff rape victims, Gordon's reaction to life at GCI was such that he lost 100 to 150 pounds (Gordon, Pgs. 916–917), (Caddy, Pg. 1159), and reports that it was the only time in his life when he seriously considered suicide (Caddy, Pg. 1163).

183. While at GCI, Gordon overheard the screams of a homosexual rape (Gordon, Pg. 900), found himself in an environment where blacks controlled a camp where the recreation centered on drug use, drinking and homosexuality (*Ibid*, Pg. 901), and was was extorted by a guard who one day appeared at the prison with a photograph of Gordon's wife and children (*Ibid*, Pg. 902). Gordon perceived the entire environment as anarchistic and without any constraints (Caddy, Pg. 1163). His wife reports that he talks in his sleep and yells, that he clearly experiences night terror that awakens him, and that he reports to be dreaming about incarceration at Belle Glade and being attacked and feeling vulnerable (*Ibid*, Pg. 1164). Gordon is suffering from an adjustment disorder with mixed emotional features, some anxiety, and some depression (*Ibid*).

## 10. ANTHONY LaMARCA

184. Although Anthony LaMcarca was never homosexually raped or seriously injured in an assault while he was incarcerated at GCI starting in late 1980 or 1981, his complaints concern the lengths to which he had to go and the conditions he had to endure to avoid such a fate (LaMarca, Pg. 947).

185. First, he escaped on April 13, 1981. According to the Escape and Recapture Report, the reason stated for LaMarca's escape was that he was unable to pay money owed on the compound. LaMarca was threatened by an inmate skilled in the martial arts black belt the morning of his escape that if he didn't begin paying the black belt $25.00 per week beginning that same day, LaMarca "would see St. Peter that afternoon when I come in from work." (*Ibid*, Pgs. 955–966). An additional six months in the Palm Beach County Jail was added to LaMarca's sentence for the escape (*Ibid*, Pg. 957).

186. Homosexual solicitation and harassment began upon LaMarca's arrival at GCI in the form of catcalls from a line of black inmates, LaMarca being referred to as a "fat skinny white boy." This term meant that he was a frail youth (150 pounds) with a large posterior, which was sexually attractive (*Ibid*, Pgs. 948–949). One inmate in particular, Kenneth Storys, informed LaMarca on LaMarca's third day of incarceration at GCI that LaMarca should pick either Storys or someone like him as a "daddy" or he would be unable to live on the compound (*Ibid*, Pgs. 950–951). LaMarca did not seek protective custody for about a year after his arrival because he was embarrassed to be in this vulnerable position (*Ibid*, Pg. 994). When he did seek help and identified three inmates who were harassing him, these three inmates were not locked up for investigation. Indeed, following his meeting with officials, the three inmates came to the back door of the canteen and threatened LaMarca by telling him, "We know you snitched, cracker." (*Ibid*, Pgs. 961–962). Three days later one of the three inmates swung a bat at LaMarca. He complained to Lt. Barrett

about the situation. Lt. Barrett responded by giving LaMarca a pocket knife. When the inmate attempted to steal some marijuana that LaMarca was "breaking down" on the dormitory floor, LaMarca stabbed the inmate in the hand (*Ibid*, Pgs. 964–966).

187. At 2:30 a.m., after LaMarca stabbed the inmate, this same inmate along with two other inmates, came to his bunk demanding sex. They inmates carried a bush axe (*Ibid*, Pgs. 969–971). LaMarca ran to the wicket and sat in front of it all night, clad only in his underwear. No conversation transpired with the guard (*Ibid*, Pg. 972). The next morning, when LaMarca was found bringing a fiberglass sledgehammer into the dormitory for protection, he was given a disciplinary report (*Ibid*, Pg. 973).

188. In July, 1981, LaMarca checked into protective custody (*Ibid*, Pg. 974). Three men occupied a two-man cell. LaMarca had no privileges. When he complained to an officer, he was told to go back to the compound (*Ibid*, Pg. 975). Four months later LaMarca transferred out of protective custody rather than be transferred to Union Correctional Institution (*Ibid*, Pg. 976).

## F. THE LARRY BROWN INCIDENT: BEYOND TURNER

### 1. THE RAPE OF LARRY BROWN—THE CONTINUED LACK OF AN ADEQUATE INVESTIGATION

189. Larry Brown is somewhat of an eleventh Plaintiff in this 10–plaintiff case. The only plaintiffs' witness who presently is incarcerated at GCI, and therefore a member of the class seeking declaratory and injunctive relief, he is the only inmate who testified for Plaintiffs who was not himself seeking damages.

190. Brown arrived at GCI in June, 1985, was assigned to A–Dorm without any orientation (Brown, Pg. 839), and by 2:30 a.m. the next day (*Ibid*, Pg. 840) was ordered at knifepoint by three blacks to get out of his bunk and into one beneath it. He was told to lay down and not to scream (*Ibid*, Pg. 841). As one inmate held a knife to his throat, another removed his blue prison-issue pants and his undershorts, and penetrated him (*Ibid*, Pg. 842). He was anally raped five times, a knife at his throat throughout (*Ibid*, Pg. 843). When it was over, he went to the bathroom, with three of his assailants following him. They told him to say nothing about the rape or they would kill him (*Ibid*, Pg. 844). He returned to his bunk, as did they—one on each side of him and one beneath (*Ibid*, Pg. 845). The three rapists talked, smoked marijuana, and chatted all night long. Brown remained awake (*Ibid*, Pg. 846). Brown told a correctional officer the next morning that he had been raped (*Ibid*, Pg. 847), but the correction officer appeared disinterested (*Ibid*, Pg. 847). For the next few days, one, two, or three of the inmates followed Brown about (*Ibid*, Pg. 848). On the fourth day, Brown was taken to Lt. Minor's office (*Ibid*, Pg. 850) where Minor said, "I heard you had a line as long as a dorm." Brown told him what had happened (*Ibid*, Pg. 851). Minor told him he would put him in protective confinement if Brown would give a written statement, which he did [51] (*Ibid*, Pg. 852).

---

51. Brown testified he arrived at GCI June 10, 1985 (Brown, Pg. 839), was raped during the predawn of the following day (*Ibid*, Pg. 840), and four days later was taken to see Lt. Minor (*Ibid*, Pg. 850). The earliest-dated record of any confinement, however, is the handwritten notation in the Classification Team Review and Action section of a Department of Corrections Report of Protective Confinement Form dated June 25, 1985, stating: "Inmate Brown was placed on A/C status 6–24–85 for bartering. I released him to population, but he wouldn't go. I recommend P/C status for investigation of his story." (D.Ex. 27, Flap B). Brown testified on cross examination that he had been in protective confinement before June 25 (Brown, Pg. 1018). The page in the exhibit immediately preceding the report quoted, *supra*, is a Transfer Order approving the shipment of Brown from the Reception and Medical Center to GCI. The Transfer Order is dated June 19, 1985. The credibility of his recollection of the rape incident, if not its precise day, is enhanced by the demeanor reported by Dr. Caddy during his interview of Brown. "Mr. Brown presented almost all of the testimony surrounding the sexual attack, and his subsequent feelings, both in tears and with such a level of emotional distress that virtually his entire body was constantly shaking for, and in fact continued to do so for a

191. Brown attempted repeatedly to bring the matter to the attention of Superintendent Randall Music. His first communication, dated June 24, 1985, noted: "I would like to speak to you about the reason that I'm in protective confinement, which I'm sure you're well aware of at this particular reason." (*Ibid*, Pg. 859). Two days later, Brown wrote to Music a note that read as follows:

> I am sure that you're aware of what led me into protective custody. I would like to speak to you about this matter. I do not think it's fair for these inmates to escape this kind of incident. I have already tried to contact Classification [52] with no results. I hope that we can get together about this matter. This is my second request about this matter. The first was 6–24–85. (*Ibid*, Pg. 861).

A third and final writing addressed to Music was dated July 1, 1985, and read as follows:

> Good day. I would again like to request your time in a personal interview in your office as soon as possible. I know you're a very busily man and do not have time to spare, but this will only take a little of your time. also, please be aware that I have been trying to get in contact with the Classification Department without any results. Could you please look into this matter for me. I would like to know why there it is so hard to get to these people to talk to them. Please take action on this as soon as possible. Thank you. (*Ibid*, Pg. 863).

192. Brown received no response to any of these requests (*Ibid*, Pg. 864). The only response he has had to his rape is a one-hour meeting with a psychologist at GCI. This is the only psychological counseling this inmate has received subsequent to the rape [53] (*Ibid*, Pg. 864).

193. No investigation by Lt. Peters was made initially of Brown's alleged rape (Peters), despite documentary evidence that the allegation was known to prison officials. A June 28, 1985 notation in the "Remarks Disposition" section of his disciplinary Committee Visit form that reads as follows: "Reviewed Status—Subject forced to commit sex acts and is unable to cope with pressures on the compound. Will rec. transfer and expedite. Continue P/C status. It is essential." (D.Ex. 22).

194. Brown was transferred to Hendry Correctional Institution July 12, 1985 (*Ibid*). Within about 30 days, other inmates who had been transferred from GCI had passed the word that Brown was "good pussy" (Brown, Pg. 866). Brown requested and received protective custody at Hendry August 9, 1985, after telling a guard lieutenant there that "I see (sic) that my life is in danger, because I have been approached by several black inmates about having sex with them, and I feel that if I don't they will attack me." (D.Ex. 22, Department of Corrections Report of Administrative Confinement dated August 9, 1985). Brown remained in protective confinement until September 27, 1985, when he was transferred back to GCI (*Ibid*, Pg. 868). Upon arrival, he immediately checked back into protective confinement. According to a Department of Corrections Report of Protective Confinement form dated September 27, 1985, and included among the papers in Defendants' Exhibit 22, Brown stated to Lt. E.L. Minor:

> [H]e fears for his life here, at Glades Correction. Inmate Brown stated he

---

substantial period after the interview was completed." (Caddy, Pg. 1181).

52. The June 21, 1985 request to Classification reads as follows:

> I'm sure that you're aware of the incident that took place in A Dorm. I would like to have the information on how to file a grievance in this incident. I also need the proper forms to do this. I thank you for assistance in this matter.

53. Although Brown is not a damage plaintiff in this action, Dr. Caddy, the Plaintiffs' expert clinical psychologist, nonetheless examined him and found him to have been terribly emotionally disordered as a result of the experience that he suffered at Glades, describing Brown's condition as one that Dr. Caddy feels Brown is going to have a great deal of trouble ultimately overcoming or resolving, especially in his present environment. His diagnosis of Brown was that Brown, as a result of the rape incident at Glades, suffers from post traumatic stress disorder (Caddy, Pg. 1183).

was sexually molested here a few months ago and was transferred to Hendry where he was also to be put into Protective Confinement due to being sexually harassed by inmates who were housed here and knew about his past ... (*Ibid*).

On November 7, 1985, the Protective Confinement Review Team directed a memorandum to Superintendent Music, which memorandum is also included in Defendants' Exhibit 22, that read as follows:

Inmate Brown, Larry W/M # 477709 was interviewed by the team on 11–1–85 with reference to his protective confinement status which began 9–27–85. He reports that he was sexually assaulted by an undetermined number of black inmates over the course of a week's time. He did not report it because he was afraid, and everywhere he went one of them followed and watched. He sought protective confinement, was traded to Hendry C.I., threatened there and checked in, and finally traded again back to Glades C.I. He states that one of the inmates who assaulted him was Johnny Jones of "A" Dorm. He claims he doesn't know any other names.

We believe his protective confinement should continue, pending investigation of his allegations and possible transfer to another facility. (*Ibid*).

195. Lt. Peters has still not investigated Brown's allegations (Peters). The only transfer that has occurred concerning this inmate was his transfer from GCI to the Dade County Jail immediately before Thanksgiving pursuant to a Writ of Habeas Corpus ad Testificandum issued by this Court. Music's sole reaction to the missives directed to him by Brown was to observe that he wondered how thick Brown's file of copies would grow over the span of this 40 year sentence.

G. A FINAL WORD: THE FACTUAL INTEGRITY OF PLAINTIFFS' CASE

196. While the Court is not unmindful of the Plaintiffs' self interest in testifying, the credibility of Plaintiffs' testimony is evident from various independent reasons. *First,* the integrity of the plaintiffs' evidence is compelled by the dynamics of the way in which this case has developed.

197. These were not plaintiffs who came as a group to attorneys, seeking out counsel to prosecute a lawsuit. Rather, these were individuals who came forward after reading a class action notice posted throughout the prison system by Department of Corrections employees. Scattered throughout Florida's prison system, without the opportunity to converse with each other about their separate, individual experiences at GCI,[54] these inmate plaintiffs did not come together prior to the trial in this action.

198. *Secondly,* while aware of the natural self-interest of any plaintiff in a suit for money damages, the Court is aware of various disincentives for these plaintiffs to

---

**54.** Dr. Richard Swanson, the Plaintiffs' first expert, testified that he had interviewed all of the plaintiffs, as well as Larry Brown, in preparation for the trial.

> I was also impressed by the heterogenity of the inmates I found.
> Recalling how the inmates were constituted into a plaintiff class, as I understand the sequence of events, once the complaint had been filed by the original plaintiff, LaMarca, the class was notified through a notice sent throughout the system.
> These people were then found by the attorney rather than them coming together and agreeing to file suit.
> These inmates, in no way that I am aware, had talked about this case one among the other, so I was impressed that this was independent information that had not been checked one with the other inmates.

> Most of these inmates did not know each other, and if they did, they had had (sic) not seen each other in a significant amount of time. (Swanson, Pg. 120).

Dr. Glenn R. Caddy, a clinical psychologist called by Plaintiffs as an expert, testified similarly:

> Secondly, there is an integrity that comes from a commonality of reporting of incidents where essentially ten people, none of whom either knew each other prior to going to Glades nor who knew each other in Glades, are in a position to provide information about common experiences that provide an internal consistency to the general arguments of the circumstances surrounding the locations of the rape and the nature and the incidence of the rape. (Caddy, Pgs. 1242–1243).

have testified as they did, especially for the rape victims. Not only has their demeanor on the witness stand reflected an obvious discomfort in publicly discussing their anal rapes, but the first of the plaintiffs' two psychological expert witnesses testified that the men were in similar, if not more pronounced, states of turmoil during the times that he interviewed them,[55] while the second characterized their interview behavior and verbalizations as consistent with their having been raped.[56]

199. In sum, this Court is convinced, by a combination of its having been able to view the witnesses and judge their credibility, and of its having heard from the plaintiffs' experts about the integrity that they separately found during their investigations, that the plaintiffs told the truth when they testified about events which occurred while they were incarcerated at GCI.

## 1. CONCLUSIONS OF LAW
### a. THE DAMAGE CLAIMS
#### (1.) OVERVIEW
#### (a) SCOPE OF FEDERAL JUDICIAL INVOLVEMENT

200. At the outset, this Court recognizes that "[t]raditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration." *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). These problems are "complex and intractable ... they are not readily susceptible of resolution by [judicial] decree. Most [prisons] require expertise comprehensive planning, and the commitment of resources, all of

which are peculiarly within the province of the legislative and executive branches of government." *Id* at 405, 94 S.Ct. at 1807.

201. However, this court is also mindful that "[c]ourts certainly have a responsibility to scrutinize claims of cruel and unusual confinement ... When conditions of confinement amount to cruel and unusual punishment, 'federal courts will discharge their duty to protect constitutional rights.'" *Rhodes v. Chapman,* 452 U.S. 337, 352, 101 S.Ct. 2392, 2402, 69 L.Ed.2d 59 (1981) (citing *Procunier* 416 U.S. at 405–06, 94 S.Ct. at 1807–08); *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984) (The Court has "repeatedly held that prisons are not beyond the reach of the Constitution."), *Id.,* ("[W]e have insisted that prisoners be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration.").

#### (b) EIGHTH AMENDMENT PROHIBITIONS

202. The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment"[57]. The former Fifth Circuit (en banc) has explicitly ruled that:

Confinement in a prison where terror reigns is cruel and unusual punishment. A prisoner has a right to be protected from the constant threat of violence and from sexual assault. *Jones v. Diamond,* 636 F.2d 1364, 1373 (5th Cir.1981) (en banc), *citing Withers v. Levine,* 615 F.2d 158 (4th Cir.1980); *Gates v. Collier,* 502 F.2d 1291 (5th Cir.1974); *Woodhous v. Virginia,* 487 F.2d 889 (4th Cir.1973).

---

**55.** Dr. Swanson testified:
> In several occasions, and all of these occasions involved inmates who had reported being raped at GCI, there was obvious emotional tension, anxiety, tearful problems in the inmate reporting the incident.
> I was moved by how difficult it was for many of the inmates to talk about the rape process itself. (Swanson, Pg. 119).

**56.** Dr. Caddy testified:
> These men were raped ...
> Those men that have reported being raped present essentially classic profiles of the consequence of rape.

I have no reason to believe that any of them have anywhere near the sophistication in my discipline to be able to, a priori, construct for themselves the sort of emotional state that would be necessary to maintain the integrity of that argument under circumstances where a person who has had a fair degree of training in this area is confronting them in a relatively confronting interview set about the circumstances of these incidents. (Caddy, Pg. 1242).

**57.** The Eighth Amendment's ban on cruel and unusual punishment was first made applicable to the states by virtue of the Fourteenth Amendment in *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

203. "When prison officials have failed to control or segregate prisoners who endanger the physical safety of other prisoners and the level of violence becomes so high ... it constitutes cruel and unusual punishment." *Jones v. Diamond, supra,* 636 F.2d at 1374 citing *McCray v. Sullivan,* 509 F.2d 1332 (5th Cir.) *cert. denied* 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975).

204. Indeed, in order to comply with the eighth amendment prohibition against cruel and unusual punishment, prison punishment must comport with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (*quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)). Moreover, such punishment must not "involve the unnecessary and wanton infliction of pain." *Rhodes v. Chapman, supra,* 452 U.S. at 346, 101 S.Ct. at 2399 (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (joint opinion)), which includes those punishments that are "totally without penological justification." *Id.* (*quoting Gregg v. Georgia, supra,* 428 U.S. at 183, 96 S.Ct. at 2929).

205. The various Circuit Courts of Appeal have uniformly ruled that "[s]ubjecting prisoners to violent attacks or sexual assaults, or constant fear of such violence, shocks modern sensibilities and serves no legitimate penological purpose." *See, e.g., Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984).

### (c) GENERAL STANDARDS OF LIABILITY

206. In order for prison officials to be liable under a § 1983 action based on a constitutional deprivation resulting from cruel and unusual punishment, there must be a showing that the prison officials' conduct constitutes a reckless or callous indifference to the rights and safety of the prisoners in his charge. *Williams v. Bennett,* 689 F.2d 1370, 1380 (11th Cir.1982) *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983) (Must allege "a conscious or callous indifference to prisoners'

rights"); *Miller v. Salem,* 728 F.2d 1020, 1024 (8th Cir.1984) (Reckless disregard of inmates' right to be free from violent attacks by fellow inmates); *Wade v. Haynes,* 663 F.2d 778 (8th Cir.1981) (Reckless disregard, gross negligence, callous indifference), *aff'd on other grounds sub nom Smith v. Wade,* 461 U.S. 30, 102 S.Ct. 1625, 75 L.Ed.2d 632 (1983) ("Reckless or callous indifference by prison officials sufficient to award of punitive damages."); *Stokes v. Delcambre,* 710 F.2d 1120, 1124 (5th Cir. 1983) (Virtual indifference to the safety of prisoners.)

### (2.) APPLICATION OF THE STANDARDS

207. At the outset, the Court recognizes that in determining whether or not Defendant Turner's conduct rises to a level of "conscious or deliberate indifference to [plaintiffs' need] for reasonable protection from violence," *Williams v. Bennett, supra,* 689 F.2d 1380, a variety of § 1983 liability elements interplay. While those elements or factors overlap to some extent and are otherwise difficult to disentangle, the Court nonetheless will review them for purposes of analysis in isolation. Nonetheless it is the sum of these factors when ultimately considered in totality which convinces this Court that Defendant Turner acted with deliberate indifference to Plaintiffs' needs for reasonable protection from violence. *Williams v. Bennett, supra.*

### (a) ELEMENTS OF LIABILITY

### (1) TURNER'S KNOWLEDGE OF A PERVASIVE RISK OF HARM

208. Somewhat intertwined and perhaps subsumed into the "callous or deliberate indifference standard" of § 1983 prisoner damage liability is the basic notion that the perpetrator (Defendant) knew or should have known of a pervasive risk of harm resulting in victim's (Plaintiffs) injury. *See, e.g., Roberts v. Williams,* 456 F.2d 819, 827 (5th Cir.1971) *cert denied* 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1972) (§ 1983 liability premised upon a "callous indifference to [inmate suffering] at the management level, in the sustained knowing maintenance of bad practices and customs."); *Patterson v. MacDougall,* 506

F.2d 1, 3–4 (5th Cir.1975) (Personal liability of Director of Corrections *both* because of his direct involvement and because of his failure to act when improper prison conditions were brought to his attention.); *Wright v. McMann,* 460 F.2d 126, 134–5 (2nd Cir.1972) (Warden held liable financially for damages to inmate where he failed to take corrective action in light of history of previous similar episodes.).

209. The Court has previously found that Defendant Turner in some instances *knew* and in other instances *should have known* of widespread illegal activities in general and risks of harm to inmates' security in particular.

210. Turner knew of general inmate security problems through: (1) *official documentation,* including (i) Turner's acknowledgement to DOC Secretary Wainwright that GCI was "out of control," *supra,* ¶ 38, and that staffing problems created a danger to the "staff *and* inmate population" (emphasis in original), (ii) the 1980 Palm Beach County Grand Jury presentment which recited "lax security precautions" and referred to a free flow of contraband at GCI including drugs, alcohol, gambling, theft, contraband, and extortion among inmates and personnel, *supra,* ¶ 40, (iii) the 1980 Inspector General Management report evidencing continuing security issues including unattended supervision of dormitories, *supra,* ¶ 42, (iv) the 1983 Inspector General Report evidencing continuing "disregard for established procedures," *supra,* ¶ 45; (2) *major incidents of staff corruption* including (i) the Lt. Barrett incident, *supra,* ¶¶ 46–50, and (ii) the illegal activities of Officer Dixon, *supra,* ¶¶ 51–52; and (3) knowledge of the free flow of contraband as evidenced by the reports of the *official documents* previously discussed; the activities of Lt. Barrett and Officer Dixon; and the general common reporting in other internal documents of inmates' possession of weapons, drugs, alcohol, and extortion activities.

211. It is less clear to distinguish between what Turner actually knew from what he *should have known.* The Court is convinced that a prudent administrator should have known—assuming Turner did not actually know—of: (1) widespread extortion activities of inmates such as Larry Pryor working in complicity with staff officers, *supra,* ¶ 53; (2) widespread rape and physical assaults on inmates given various objective and discernable indices such as (i) the general free flow of contraband, assaults, extortions and violence that permeated GCI prisoner life between 1980–1984, *supra,* ¶ 56, (ii) the consistent and disproportionate number of white inmates who "checked into" protective confinement which itself, due to its punitive conditions, should have—assuming that it did not—constituted a direct signal of inmate violence, *supra,* ¶¶ 73–74, (iii) the general wolfing and cat-calls of aggressive black inmates who were vocally signalling vulnerable whites for future sexual attack, *supra,* ¶ 77, (iv) overt signs of sexual conduct evidenced by hung sheets, inmates groaning in their bunks, and pornographic movies where inmate crying and moaning could be readily heard, *supra,* ¶ 78, (v) direct reporting of rape by certain Plaintiffs (Aldred, Sanders, and Harper) which either were known or should have been known through a normal chain of command to Turner, *supra,* ¶ 79.

### (2) CONDITIONS WERE WITHIN TURNER'S FINANCIAL AND ADMINISTRATIVE CONTROL

212. If full compliance with accepted constitutional practices "is beyond the *control* of a particular individual and that individual can demonstrate that he accomplished what could be accomplished within the limits of his authority, then he cannot be said to have acted with callous indifference." *Williams v. Bennett, supra,* 689 F.2d at 1387–1388 (emphasis added) *citing Scheuer v. Rhodes,* 416 U.S. 232, 247, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974); *Slavin v. Curry,* 574 F.2d 1256, 1262 (5th Cir.1978). *See also, e.g., Chestnut v. City of Quincy,* 513 F.2d 91 (5th Cir.1975); *Madison v. Gerstein,* 440 F.2d 338 (5th Cir. 1971).

213. The element of *"control"* in *Williams v. Bennett, supra,* is measured both from inherent and financial limita-

tions, *Ibid.* at 1387, "One such limitation may have been the funding available to comply with the constitutional norms" as well as more generally matters within an individual's administrative control.

214. The principle of proper management structure employed to reduce the likelihood of the tragedies that have occurred in this case have been aptly described by the Chief Judge of the former Fifth Circuit:

> One of the critical elements is that the official demonstrate that he has employed efficient management principles so as to minimize the chance of error and maximize the likelihood of full satisfaction of constitutional and statutory obligations. *Bryan v. Jones,* 530 F.2d 1210 at 1216 (5th Cir.1976) (en banc) (Brown, C.J.) (concurring).

215. The Court has identified a series of administrative areas within Turner's managerial control which also impose no fiscal limitations as evidenced in part by corrective measures taken by Turner's successors. These include: (1) improper and inadequate staff training evidenced by gross problems with officers' handling of weapons carried to the extreme in the Barrett incident, *supra,* ¶ 46; (2) a staff out of control who did not report rapes, assaults, and illegal activities up through the chain of command, *supra,* ¶ 66; (3) the failure to supervise staff and administer measures which would "minimize the chance of error and maximize the full satisfaction of constitutional protection," *Bryan v. Jones, supra,* in (i) not stationing officers to patrol throughout the dormitories, particularly at night, and leave the wicket cage, and in (ii) permitting the obscuring of vision of the officers in the wicket by allowing inmates to hang sheets, blankets, their personal property, lockers and other materials resulting in the impossibility for officers to maximize the protection of inmates in the dormitory; (4) a shocking failure to employ

any standard procedure to investigate incidents of alleged rapes, *supra,* ¶ 82; (5) the failure to request outside investigative or presecutorial assistance to otherwise make some even *minimal* attempt to deter rapings and assaults, *supra,* ¶ 84; (6) the failure to provide inmate movement controls thus reducing the casual egress and ingress of aggressive assailant wolves within the open dormitories, *supra,* ¶ 89; and (7) the failure to transfer know assailants or inmates who should have been known to be assailants out of GCI, *supra,* ¶ 86.

### (3) NOT A SERIES OF ISOLATED INCIDENTS

216. By the nature of the Court's previous findings and conclusions, *supra,* ¶¶ 208–211 ("Turner's knowledge of a pervasive risk of harm") and ¶¶ 212–215 ("Conditions Were Within Turner's Financial and Administrative Control") the Court by implication already has addressed the matter, consistently urged by Defendants throughout trial [58], that Plaintiffs' claims for damages are merely ten separate isolated incidents. To the contrary, the Court already has discussed in detail the broad "pervasive risk of harm" and "conditions which were within Turner's financial and administrative control."

217. Plaintiffs' claims stem from these far reaching and serious failures of Defendant Turner to properly manage and administer Glades Correctional Institution. *See, Bryan v. Jones, supra* 530 F.2d at 1216; *Donaldson v. O'Lane,* 752 F.2d 817, 828 (3d Cir.1984) (*en banc*) ("When officials with a responsibility to prevent harm, such as prison officials, fail to establish or execute appropriate procedures for preventing serious malfunctions in the administration of justice, such failure would support a claim under § 1983)," citing, *Murray v. City of Chicago,* 634 F.2d 365 (7th Cir. 1980), *cert. dismissed sub nom. Finley v.*

---

**58.** Additionally, Defendants in their Pre-Trial Stipulation maintain as an issue of law which remains for determination by the Court:

> 5. Whether Eighth Amendment protection, cruel and unusual punishment, *extends to isolated incidents of assault, robery and rape as alleged by Plaintiffs.* In absence of a showing

that these Defendants acted in a manner of deliberate indifference to conditions that would shock the conscience of the ordinary person, Plaintiffs cannot recover under the Eighth Amendment. (emphasis added). (Pg. 13, ¶ 5).

*Murray,* 456 U.S. 604, 102 S.Ct. 2226, 72 L.Ed.2d 366 (1982).

218. In sum, Plaintiffs' claims are not isolated incidents. They stem from a far ranging and serious failure of Defendant Turner to properly manager GCI.[59]

### (4) BREACH OF A DUTY IMPOSED BY STATE LAW

219. A "supervisory defendant is subject to § 1983 liability when he breaches a duty imposed by state ... law, and this breach causes plaintiff constitutional injury." *Williams v. Bennett, supra,* 689 F.2d at 1381; *Sims v. Adams,* 537 F.2d 829, 831 (5th Cir.1976); *Beverly v. Morris,* 470 F.2d 1356 (5th Cir.1972); *Hesselgesser v. Reilly,* 440 F.2d 901 (9th Cir.1971); *Scott v. Vandiver,* 476 F.2d 238, 241–42 (4th Cir.1973); *McDaniel v. Carroll,* 457 F.2d 968, 969 (6th Cir.1972); *see generally Roberts v. Williams,* 456 F.2d 819 (5th Cir.), *cert. denied,* 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971).

220. Under Florida law, as Superintendent at GCI, Defendant Turner was required to protect "the offender from victimization within the institution" and to develop "a system of due process and *internal legality* in the institution." 20.315(1)(c), Florida Statutes (1983) (emphasis added).[60]

221. The Florida statutory requirement contained in Section 20.315 provides Plaintiffs with "a clear legal right to be confined in an institution where they are free from victimization by other inmates" and places upon Defendant Turner "an equally clear legal duty to [have provided Plaintiffs] with such incarceration." *Graham v. Vann,* 394 So.2d 180, 183 (Fla. 1st D.C.A.

1981) (Mandamus issued to compel the Department of Corrections to comply with legal duty to confine inmates in an institution where they are not victimized by other inmates).

222. As detailed herein, Defendant Turner breached his statutory duty under Florida law which caused Plaintiffs' constitutional injury.

### (b) CAUSATION

#### (1) GENERAL STANDARDS

223. Our Circuit has clarified the principle that in prison damage actions of this nature, a "[C]ritical causation issue [here] must be whether each individual defendant was in a position to take steps that could avert the stabbing incident at Holman; but, through callous indifference, failed to do so." *Williams v. Bennett, supra,* 689 F.2d at 1384.

224. Of necessity, the Court in detail has reviewed the context of the general operational policies, practices, conditions and events existing at the general time Plaintiffs' claims arose, *supra,* ¶¶ 36–105; traced Defendant Turner's knowledge of these matters which the Court has concluded reflect a "pervasive risk of harm," *supra* ¶¶ 208–211; and reviewed these conditions demonstrating that they were all within a prudent administrator's administrative and financial control.

225. Having faithfully adhered to our Circuit's guideline of resolving the causation issue which "necessarily entails a very individualized approach, taking into account the duties, discretion, and means of each defendant," *Williams v. Bennett, supra,* this court in addition has traced the

---

**59.** Having found that Plaintiffs' claims do not represent ten isolated separate incidents, it is unnecessary to decide whether in *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) the Supreme Court, in affirming an Eighth Amendment violation relating to a single isolated incident has thus, *sub silentio,* repudiated the principle that an "isolated incident," by its very nature could never rise to the level of "callous indifference" rendering a prison official liable for acts that offend the constitution.

**60.** Section 20.315(1)(c) provides as follows:
20.315. Department of Corrections
There is created a Department of Corrections.

(1) Purpose—The purpose of the Department of Corrections is to integrate the delivery of all offender rehabilitation and incarceration services that are deemed necessary for the rehabilitation of offenders and the protection of society. The goals of the department shall be:
(c) To provide an environment for incarcerated persons in which rehabilitation is possible. This *should include the protection of the offender from victimization within the institution* and the development of a system of due process and internal legality in institutions. (emphasis added).

factual details of each Plaintiff which led to their respective injury.

226. Turner's failure to properly and prudently manage GCI matters within his administrative and financial control is a *direct cause* of Plaintiffs' injuries. The exacting causation link required by *Williams v. Bennett,* has been amply proven and documented.

### (2) PERSONAL INVOLVEMENT

227. It is now settled that in § 1983 actions public officials cannot be held vicariously liable for the wrongdoing of others. *Monell v. N.Y. City Dept. of Social Services,* 436 U.S. 658, 692, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Thus Defendants are correct when they assert that misconduct by subordinates or third parties cannot be imputed under § 1983 to an official who played no role in causing a deprivation of constitutional rights.[61]

228. However, this principle cannot be extended in an attempt to insulate public officials from § 1983 liability by requiring that in order to hold a public official responsible for a constitutional deprivation that official must have participated literally and directly, or must have been present at any of the Plaintiffs' rapes/assaults. According to this reasoning, § 1983 would preclude recovery against public officials where those officials directly contribute or cause a deprivation of constitution rights— although not present or directly participating in causing the injury—by merely exercising "callous indifference" in maintaining policies and practices which lead to that designation.

229. Such a proposition is in error; § 1983 only requires that there be a *causal connection* between the officials' conduct and the constitutional tort. It does not require direct personal contact or direct conduct by the Constitutional violation. *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961) (42 U.S.C. § 1983 constitutionally based claims

"should be read against the background of tort liability that makes a man responsible for the natural consequences of his act."); *Williams v. Bennett, supra,* 689 F.2d at 1383 ("[S]ection 1983 plainly requires, a causal connection between the Constitutional deprivation and the defendant's acts or omissions"); *Sims v. Adams,* 537 F.2d 829, 831 ("§ 1983 requires a degree of causation as an element of individual liability, but it does not specifically require personal participation").

230. In sum, all that must be shown based upon these principles is that Defendant's conduct was a proximate cause of the Plaintiffs' injury. Plaintiffs have proved such causation in this lawsuit.

### (3.) DEFENDANT TURNER'S GOOD FAITH DEFENSE AND QUALIFIED IMMUNITY

### (a) THE STANDARDS

231. Even when prison administrators violate an individual's constitutional rights, they may enjoy a good faith immunity defense to § 1983 lawsuits when sued in their individual capacity for damages. *Scheuer v. Rhodes, supra,* 416 U.S. at 247–8, 94 S.Ct. at 1692 (1974); *Procunier v. Navarette,* 434 U.S. 555, 561–62, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978) (Qualified immunity applicable to protect prison officials); *Williams v. Bennett, supra,* 689 F.2d at 1385–86 (11th Cir.1982).

232. The parameters of this defense were clarified by the Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). There, the Court, while reviewing its previous qualified immunity decisions, recognized that the "good faith" defense has both *objective, Harlow v. Fitzgerald, supra,* 457 U.S. at 815, 102 S.Ct. at 2736, 73 L.Ed.2d at 408 ("The objective element involves a presumptive knowledge of and respect for "basic, unquestionable constitutional rights," *citing Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214

---

**61.** Defendants' position is set forth in their Pre-Trial Stipulation as an issue of law which remains for determination by the Court:

    4. Whether Plaintiffs are entitled to recovery against Turner and Music under a theory

of *respondent superior* which is not permissible under actions brought under 42 U.S.C. § 1983. (Pg. 13, ¶ 4).

(1975)), and a *subjective* aspect. *Id.* ("The subjective component refers to 'permissive intentions.'"). In refining these concepts, the Court concluded that government officials are shielded from liability for civil damages "[I]nsofar as their constitutional rights of which a *reasonable person would have known* (emphasis added) (citations omitted). *Harlow v. Fitzgerald, supra,* 457 U.S. at 818, 102 S.Ct. at 2738, 73. L.Ed.2d at 410.

233. *Harlow v. Fitzgerald, supra,* thus refines the qualified immunity defense to a consideration based upon *objective factors.* Our Circuit, in accord, has interpreted *Harlow* in such a manner. *Williams v. Bennett, supra,* 689 F.2d at 1385 ("Thus, objective criteria now govern the evaluation of a good faith defense.").

### (b) BURDEN OF PROOF

234. Determinations as to the availability of the qualified immunity defense almost always will turn on an appreciation and analysis of the facts. *Imber v. Pachtman,* 424 U.S. 409, 419, n. 13, 96 S.Ct. 984, 989, n. 13, 47 L.Ed.2d 128; *Scheuer v. Rhodes, supra,* 416 U.S. at 238–9, 94 S.Ct. at 1687; and *Wood v. Strickland, supra,* 420 U.S. at 320–22, 95 S.Ct. at 1000. As an affirmative defense, the burden in proving the "qualified immunity" defense rests with the Defendant. *Gomez v. Toledo,* 446 U.S. 635, 640–41, 100 S.Ct. 1920, 1923–24, 64 L.Ed.2d 572 (1980).

### (c) APPLICATION OF THE QUALIFIED IMMUNITY DEFENSE

235. There is "no serious question but at the time" these sexual assaults occurred, it was well-settled that a prisoner had a "clearly established" Eighth Amendment right to be protected from constant threats of violence. *Stokes v. Delcambre,* 710 F.2d 1120, 1125 (5th Cir.1983); *Jones v. Diamond, supra,* 636 F.2d at 1374; *Gulatte v. Potts,* 654 F.2d 1007, 1012 (5th Cir.1981) (Unit B); *Withers v. Levine,* 615 F.2d 158 (4th Cir.) *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980);

*Gates v. Collier,* 501 F.2d 1291 (5th Cir. 1974); *Woodhous v. Virginia,* 487 F.2d 889 (4th Cir.1973); *McCray v. Sullivan,* 509 F.2d 1332 (5th Cir.) *cert. denied,* 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975).

236. To the extent that good faith is defined essentially in objective terms, if Defendant Turner knew or should have known that his failure to take reasonable steps to prevent Plaintiffs from being sexually assaulted by other inmates violated Plaintiffs' rights under the Eighth and Fourteenth Amendments, then good faith will be defeated. The Court concludes that the law which requires a prison official with knowledge of a pervasive risk of harm to inmates under his charge to take reasonable steps to prevent that harm was "clearly established."

237. Thus, in the context of this case, the Court finds that Defendant Turner cannot claim that he did not know the constitutional standard since it was a "clearly outlined" right at all times relevant to this action and Defendant Turner's "qualified immunity" defense must fail.

### (4.) DAMAGES

### (a) OVERVIEW

238. Plaintiffs proceed against Defendant Turner in his individual and official capacity and seek monetary damages against this Defendant. Plaintiffs proceed against Defendant Music solely in his official capacity and seek only injunctive relief against this Defendant.

239. Plaintiffs' suit for damages under § 1983 against Defendant Turner in his individual capacity is not barred by the Eleventh Amendment to the United States Constitution.[62] *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (Suit under § 1983 against state officials in their individual capacity not barred by the Eleventh Amendment, but the State official is entitled to defense of qualified immunity; *Ruiz v. Estelle,* 679 F.2d 1115,

---

**62.** The Eleventh Amendment provides:

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state or by citizens or subjects of any foreign state. U.S. Const. amend. XI.

1157 (5th Cir.1982) *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

240. The Court is mindful that the judgment against Defendant Turner in his individual capacity for his actions as Superintendent of GCI will be paid by the State of Florida; in 1979 the Florida legislature enacted a statute in which the State agreed to pay for the full amount of a judgment against an employee of the State in "civil rights actions arising under 42 U.S.C. § 1983, or under similar federal statutes ... unless the officer, employee, or agent has been determined ... to have caused the harm intentionally" Section 111.071(1)(a), Florida Statutes (1983) [63]. *Shinholster v. Graham,* 527 F.Supp. 1318, 1336–1338 (N.D.Fla.1981).

█ 241. However, this statutory provision which provides for the state to pay judgments against state employees arising out of civil rights actions does not constitute a waiver of the State's Eleventh Amendment remedy and thus damages can only be assessed against Defendant Turner in his individual capacity. *See, Williams v. Bennett, supra,* 689 at 1376–1378 (11th Cir.1982) (Similar proviso in Alabama law which indemnifies employees for judgment does not constitute a waiver of Eleventh Amendment Immunity).

242. Accordingly, this Court in assessing whether monetary damages should be awarded to Plaintiffs will limit its consideration to whether damages should be awarded against Defendant Turner in his individual capacity.

### (b) THE STANDARDS

243. The "policies underlying § 1983 include compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law." *Robertson v. Wegmann,* 436 U.S. 584, 591, 98 S.Ct. 1991, 1995, 56 L.Ed.2d 554 (1978) citing *Carey v. Piphus,* 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1977); *Mitchum v. Foster,* 407 U.S. 225, 238–242, 92 S.Ct. 2151, 2159–62, 32 L.Ed.2d 705 (1972); *Monroe v. Pape,* 365 U.S. 167, 172–187, 81 S.Ct. 473, 476–84, 5 L.Ed.2d 492 (1961). Section 1983 was intended to create "a species of tort liability" in favor of persons deprived of federally secured rights. *Carey v. Piphus, supra,* 435 U.S. at 253, 98 S.Ct. at 1046.

244. Under *Carey v. Piphus, supra,* 435 U.S. at 263–264, 98 S.Ct. at 1052, compensible damage may not be presumed but must be proven. However, the "injury in civil rights cases may be intangible" and "need not be financial or physical but may include damages for humiliation and emotional distress." *Stallworth v. Shuler,* 777 F.2d 1431, 1435 (11th Cir.1985) *citing Carey v. Piphus, supra,* 435 U.S. at 263, 264 and n. 20, 98 S.Ct. at 1052, and n. 20.

**63.** Section 111.071, Florida Statutes (1983) provides as follows:

111.071  Payment of judgments or settlements against certain public officers or employees (1) *Any* county, municipality, political subdivision, or *agency of the state* which has been excluded from participation in the Insurance Risk Management Trust Fund *is authorized to expend available fund to pay:*
(a) *Any final judgment including damages, costs, and attorney's fees, a;rising from a complaint for damages or injury suffered as a result of any act or omission of action of any officer, employee, or agent in a civil or civil rights lawsuit described in s. 111.07.* If the civil action arises under s. 768.28 as a tort claim, the limitations and provisions of s. 768.28 governing payment shall apply. *If the action is a civil rights action arising under 42 U.S.C. s. 1983, or similar federal statutes, payments for the full amount of the judgment may be made unless the officer, employee, or* agent has been determined in the final judgment to have caused the harm intentionally.
(b) Any compromise or settlement of any claim or litigation as described in paragraph (a), subject to the limitations set froth in that paragraph.
(c) Any reimbursement required under s. 111.07 for court costs and reasonable attorney's fees when the county, municipality, political subdivision, or agency of the state has failed to provide an attorney and the defendant prevails.
(2) For Purposes of this section, a "final judgment" means a judgment upon completion of any appellate proceedings.
(3) "Agency of the state" or "state agency," as used in this section, includes an executive department, a constitutional officer, the Legislature, and the judicial branch.
(4) This section is not intended to be a waiver of sovereign immunity or a waiver of any other defense or immunity to such lawsuits.

245. The Supreme Court has recently recognized that "once liability is found ... the [court] ... is required to award compensatory damages in an amount appropriate to compensate plaintiff for his loss." *Smith v. Wade*, 461 U.S. 30, 52, 103 S.Ct. 1625, 1638, 75 L.Ed.2d 632 (1983) (§ 1983 action by inmate against prison guard for damages sustained from beatings and sexual assaults by other inmates).

246. Notwithstanding the fact that all of Plaintiffs' damages are not quantifiable with precision," their injuries nonetheless give rise to actual consequential damages. *Cortiz v. Naranjo*, 667 F.2d 892, 898 (10th Cir.1981) (§ 1983 damage award against law enforcement officials). Additionally, "real injury could be inferred from the facts" of each plaintiff's case. *Baskin v. Parker*, 602 F.2d 1205, 1210 (5th Cir.1979) (damages for humiliation and emotional distress appropriate in § 1983 action).

247. Other federal courts have consistently awarded damages to Plaintiff inmates whose Eighth Amendment rights had been violated. *See, e.g., Wade v. Haynes*, 663 F.2d 778 (8th Cir.1981) (plaintiff awarded $25,000 in compensatory damages and $5,000 in punitive damages against correctional officer for damages sustained in beatings and sexual assaults by other inmates), aff'd *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *Thomas v. Booker*, 762 F.2d 654 (8th Cir.1985) (plaintiff entitled to compensatory and punitive damages from defendant jail officials because of defendants'

reckless disregard of plaintiff's right to be free from violent attacks by fellow inmates); *Matzker v. Herr*, 748 F.2d 1142 (7th Cir.1982) (plaintiff stated a claim for compensatory and punitive damages from defendant jail officials because of their failure to reasonably protect him from violent attacks by fellow inmates); *Martin v. White*, 742 F.2d 469 (8th Cir.1984) (Prison officials were liable for compensatory and punitive damages where they acted in reckless disregard of inmates' right to be safe from assaults by other inmates); *Stokes v. Delcambre*, 710 F.2d 1120, 1124 (5th Cir. 1983) (plaintiff awarded $70,000 in compensatory damages and $310,000 in punitive damages against jail officials for damages stemming from a violation of his Eighth Amendment right to be reasonably protected from physical assault by other inmates); *Davis v. Hazen*, 582 F.Supp. 938 (C.D.Il. 1983) (mentally ill inmate's estate held entitled to compensatory and punitive damages from jail officials whose actions led to the decedent being beaten to death by a fellow inmate).

(c) DAMAGES FOR EACH PLAINTIFF

248. Five of the damages plaintiffs are victims of rape. Two of those, David Aldred and Martin Saunders, were diagnosed by Dr. Caddy as suffering from post traumatic stress disorder [64] (Caddy, Pgs. 1185–1186 and 1207). Ronald Durrance, in addition to the gain time he has lost, has suffered an adjustment disorder with mixed emotional features [65] (Caddy,

---

[64] In the category diagnosed as post traumatic stress disorder, which is one of the profound anxiety disorder categories of the Diagnostic and Statistical Manual of Mental Diseases, Vol. 3, the essential feature is the development of characteristic symptoms following a psychologically traumatic event that is generally outside the range of usual human experience. The characteristic symptoms involve re-experiencing the traumatic event, often a numbing of responsiveness to it or an excessive responding to it; a reduced involvement with the external world; and a variety of what is known as autonomic reactions, physiogic reactions, dysphoric mood and cognitive symptoms (e.g., reactions of rage, reactions of humiliation, reactions oriented towards aggression against the perpetrator of a violent act like rape) (Caddy, Pgs. 1238–1239).

[65] The essential features of the adjustment disorder class, according to the Diagnostic and Statistical Manual of Mental Disorders, Vol. 3, is a maladaptive reaction to an identified psychological stressor that occurs within three months after the onset of the stressor. The maladaptive nature of the reaction is indicated by the impairment in social or occupational functioning or symptoms that are in excess of a normal and expected reaction to the stressor. The disturbance is not merely one instance of a pattern of overreaction, or an exacerbation of an already existent disorder. It is assumed that the disturbance will eventually remit after the stressor ceases or if the stressor persists, when a new level of adaptation is achieved. The new level is classically to be achieved only as a result of a natural remission that sometimes occurs in individuals, or alternatively as a result of a re-

Pg. 1225), as was Harper (*Ibid*, Pg. 1229). Bronson, who was penetrated with a baseball bat handle,[66] is suffering an adjustment disorder with mixed emotional features, together with an atypical personality disorder and a sexual identification disorder, although it is impossible to discern specifically what part of the disorder is a direct function of the incident at Glades (*Ibid*, Pg. 1193). Were the five rape victims, as well as the other plaintiffs that Dr. Caddy interviewed, to be treated outside of prison for the emotional distress resulting from the rapes, each would require an estimated $10,000 to $20,000 in therapy (Caddy, Pg. 1271). Four additionally testified as to the intense physical pain each felt upon being anally penetrated and for some time thereafter (Aldred, Pgs. 816–817), (Saunders, Pgs. 558–559), (Durrance, Pgs. 459 and 472), (Bronson, Pgs. 698–699). That each was experiencing extreme emotional distress can be inferred from their decision to check into, and to remain, in protective confinement where conditions can only be described as punitive (Caddy, Pg. 1265). Considering these factors, including that psychiatric and/or psychological services can and should be provided by the Department of Corrections, the Court hereby awards to each of the sexually assaulted plaintiffs a sum of Thirty Thousand Dollars ($30,000) in compensatory damages.

249. A second grouping of plaintiffs were not raped, but suffered physical injuries as a result of assaults. The most severely injured of these is Wayne Epprecht, whose cheek bone was fractured when he was struck with a lead pipe during a robbery. Epprecht, even following surgery, suffers from a probable temporomandibular joint dysfunction, or misallignment of the jaw, which is consistent with the headaches and pain upon chewing of which Epprecht complains (Wagshull). The jaw problem can be remedied by an office pro-

cedure, but has caused Epprecht pain for nearly 5 years—some 1,700 days. Additionally, Epprecht suffers from a permanent sensory deficit in the left cheek that will forever produce sensations of numbness and, upon elongated bouts of chewing, pain (Wagshull). And lastly, Epprecht was diagnosed by Dr. Caddy as suffering from a moderate adjustment disorder with mixed emotional features. Considering all of these factors, and overlaying the permanency of Epprecht's facial injury on the life expectancy of this 33 year old plaintiff, the Court awards Epprecht Seventeen Thousand Dollars ($17,000.00) in compensatory damages.

250. Two other of the plaintiffs, Eddie Cobb and Edwin Johnson, both suffered injuries that appear to have been serious, but less substantial than Epprecht. Cobb was stabbed, requiring 18 stitches in his scalp and 12 on his right arm (Cobb, Pg. 768), has a permanent scar on his right arm (*Ibid*, Pg. 767), and complains of pounding headaches and dizziness that he previously had not experienced. Johnson was hit in the head with a stool and was hospitalized for two weeks after receiving five stitches in his scalp (*Ibid*, Pg. 883). Johnson additionally was diagnosed by Dr. Caddy as suffering from an adjustment disorder with mixed emotional features (Caddy, Pg. 1216). In addition to both their physical, and in the case of Johnson, psychological injuries, Cobb and Johnson were both confined for lengthy periods of time. Cobb was locked in administrative confinement from February 6 through March 15, 1985, notwithstanding the fact that he was the victim, not the aggressor in the fight that preceded his confinement (Peters). *See,* P.Ex. 15, Section C (Department of Correction Daily Records of Segregation for Eddie Cobb from Feb. 6, 1984 to March 15, 1984). Johnson stayed in protective confinement for his own safety. Considering these factors, the Court awards Six Thou-

---

mission or reversal that occurs as a result of therapeutic intervention.

**66.** § 794.011(1)(f), Florida Statutes (1983) provides as follows:

"Sexual battery" means oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by *any other object;* however, sexual battery shall not include acts done for bona fide medical purposes.

sand, Five Hundred Dollars ($6,500.00) in compensatory damages to Cobb and Thirteen Thousand Dollars ($13,000.00) to Johnson.

251. Two plaintiffs were not seriously physically injured. Michael Gordon, however, was injured psychologically, suffering an adjustment disorder with mixed emotional features (Caddy, Pg. 1164) growing out of a period of incarceration that included two incidents of robbery in which he was hit in the face or head (Gordon, Pgs. 907 and 910), one incident in which his buttocks were singed when a drunken inmate lit Gordon's polyester underwear on fire (*Ibid*, Pg. 909), and one incident in which he was extorted by a guard (*Ibid*, Pg. 902). Mr. Gordon is no longer in prison and cannot avail himself of institutional mental health services. [Dr. Caddy testified that some of the inmates could need as much as 80 therapeutic visits (Caddy, Pg. 1271), the cost of which ranges up to as much as $125 an hour (*Ibid*, Pg. 1272)]. Gordon deserves to be compensated for his emotional distress and the experience he suffered; the Court awards Gordon Six Thousand Dollars ($6,000.00) in compensatory damages.

252. LaMarca suffered neither physical injury nor any especially severe psychological damage. He did, however, endure four months in protective confinement and an additional six months in a county jail for escape, an escape this Court interprets as being prompted by the conditions put at issue by this action, an action initiated *pro se* by LaMarca. Those 10 months total some 300 days which, if valued for the loss of privileges that Mr. LaMarca endured while in protective confinement (120 days) and for the loss of what would otherwise have been complete freedom (180 days), provide a basis for an award to LaMarca. The Court awards LaMarca Nine Thousand Dollars ($9,000.00) in compensatory damages.

253. In summary, the Court finds that each Plaintiff is entitled to the following award of compensatory damages for injuries suffered by each Plaintiff as the consequence and direct result of Defendant Turner's violation of each plaintiff's constitutional rights:

| | | |
|---|---|---|
| (i) | Anthony LaMarca | $ 9,000 |
| (ii) | Martin Saunders | 30,000 |
| (iii) | Edwin Johnson | 13,000 |
| (iv) | David Aldred | 30,000 |
| (v) | Steve H. Bronson, Jr. | 30,000 |
| (vi) | Eddie Cobb | 6,500 |
| (vii) | Ron Durrance | 30,000 |
| (viii) | Wayne Epprecht | 17,000 |
| (ix) | Michael Gordon | 6,000 |
| (x) | Billy Joe Harper | 30,000 |

### b. THE INJUNCTIVE CASE

#### (1.) STANDARDS

254. This Court is aware that with respect to several of the allegedly unconstitutional practices of confinement at GCI, the Defendants have instituted changes or improvements. "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform when there is possibility of resumption." *United States v. Oregon State Medical Society*, 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952). As a general proposition, the "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot ... The defendant is free to return to his old ways." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) (footnote omitted). Although Defendants' efforts to ameliorate or correct the alleged deficiencies at GCI are commendable, they do not deprive this Court of the power to order injunctive and/or declaratory relief, where otherwise proper, unless: "(1) it can be said with assurance that 'there is no reasonable expectation' that the alleged violation[s] will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (quoting *United States v. W.T. Grant Co.*, *supra*, 345 U.S. at 633, 73 S.Ct. at 897). Defendants bear a "heavy" burden of showing that both of these conditions have been satisfied in order to render moot any allegedly deficient conditions or practices

of confinement. *County of Los Angeles v. Davis, supra,* 440 U.S. at 631, 99 S.Ct. at 1383.

255. This Court is concerned that the Superintendent of GCI during the trial, Defendant Music, left that position December 13, 1985. Thus, there is no assurance that improvements made by Defendant Music during his tenure at GCI will be continued. Additionally, the Court is of the view that improvements made by Defendant Music did not completely eradicate the unconstitutional conditions of confinement.

### (2.) INJUNCTIVE RELIEF

256. There have been beneficial changes at GCI since the retirement of Defendant Turner as superintendent—e.g., expeditious transferring of known "wolves," the barbed-wiring beneath the fence surrounding the confinement area, and the removal from dormitory bunks of such obstructions as towels and lockers. What happened to witness Larry Brown as recently as June, 1985—and, equally to the point, what has not happened to any of his assailants, despite this Court's having found Brown to be forthcoming witness—makes patent the need for systemic changes.

257. The Court orders that two committees be established, one of penologists and the other of psychologists or psychiatrists, to advise the Court in the formulation of specific injunctive relief.

258. The charter of the committee of penologists shall be to review and develop relevant procedures at GCI. One goal of this committee shall be remedial: to ferret out other rape victims [67] who have not been identified through this litigation, so that they may be provided whatever therapeutic assistance is needed. A second, more far reaching goal will be prospective: to prevent a recurrence of the assaults, extortions, and homosexual rapes that unfortunately—but not inevitably—have characterized life on the compound at Glades Correctional Institution.

259. The charter of the committee of psychiatrists/psychologists shall also be two-pronged. The first mission shall be to prescribe a treatment plan for the plaintiffs and witnesses in this action who remain incarcerated. The second will be to develop an internal mechanism within the prison for providing the male rape victims of Glades Correctional Institution the same kind of support that female rape victims on the outside receive from rape crisis centers.

260. The parties shall nominate one member of each committee, submitting the nominees' names to the District Judge within 30 days of the date of this Order. The Court shall name the third member, who shall be chairman. The committees shall report to the Court within 60 days with an outline of the therapeutic services needed for the instant plaintiffs and witnesses, and with a preliminary plan for the remaining tasks.

### c. A LOOSE END: IDENTIFICATION OF THE CLASS

261. On April 15, 1984, this Court (Paine, J.) ordered that a class be certified consisting of those persons who are or will be incarcerated at GCI, for purposes of injunctive relief. Defendants have moved this Court to decertify this class on the grounds that none of the named plaintiffs are presently at GCI. Defendants' request is denied.

262. While Defendants are correct that none of the named plaintiffs are presently incarcerated at the GCI, that fact does justify the relief sought by Defendants.

263. It is well settled that where the claim on the merits is "capable of repetition yet evading review," the named plaintiff may continue to litigate the action despite the plaintiff's loss of personal stake in the outcome. *Gerstein v. Pugh,* 420 U.S. 103, 110, n. 11, 95 S.Ct. 854, 861, n. 11, 43 L.Ed.2d 54 (1975). Since seven of the named Plaintiffs continue to be incarcerated within the Florida State prison system, there exists a distinct possibility that they

---

**67.** For the reasons discussed, *supra,* in the section on the underreporting of rapes, the Court is of the mind, although it is unnecessary here to so hold, that a number of additional homosexual rapes did occur at GCI.

will again be incarcerated at GCI since inmates are subject to reassignment to various institution within the system.

264. The "capable of repetition, yet evading review" doctrine is clearly applicable "where the named plaintiff does have a personal stake at the outset of the lawsuit, and where the claim may arise again with respect to that plaintiff." *U.S. Parole Commission v. Geraghty,* 445 U.S. 388, 398, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980) citing *Weinstein v. Bradford,* 423 U.S. 147, 148, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975); *Roe v. Wade,* 410 U.S. 113, 123–125, 93 S.Ct. 705, 711–13, 35 L.Ed.2d 147 (1973). The *Geraghty* Court reasoned that "[s]ince the litigant faces some likelihood of being involved in the same controversy in the future, vigorous advocacy can be expected to continue." *Id.*

265. However, notwithstanding this Court's conclusion that the Plaintiffs may continue to prosecute this class action, even though they are no longer incarcerated at GCI, the Court is still required to examine the ability of the named representative "to fairly and adequately represent the interest of the class." Fed.Rule Civ.Proc. 23(a); *Sosna v. Iowa,* 419 U.S. 393, 400, 403, 95 S.Ct. 553, 557, 559, 42 L.Ed.2d 532 (1975); *United States Parole Commission v. Geraghty, supra,* 445 U.S. at 406–407, 100 S.Ct. at 1214.

266. In this action, the named Plaintiffs have and continue to adequately represent the interests of the class. It is unlikely that the named Plaintiffs would have interests in conflict with the class and the interest of the class have been competently represented throughout all these proceedings, the trial and during the post-trial activity. *Sosna v. Iowa, supra,* 419 U.S. at 403, 95 S.Ct. at 559.

267. Finally, prior to decertifying the class on the basis that the named Plaintiffs are no longer class members, this Court would be obliged to provide class members with notice of what has occurred and provide them with an opportunity to come forward as a named Plaintiff class representative. *See, U.S. Parole Commission v. Geraghty, supra,* 445 U.S. at 407, 100 S.Ct. at 1214. In view of the Court's finding that the named Plaintiffs are presently adequately representing the class, the Court need not provide any such notice to class members at this time.

## III. CONCLUSION

268. In summary, for the reasons detailed in this decision, this Court concludes that GCI was run in a manner that violated Plaintiffs' constitutional rights to not be subjected to "cruel and unusual punishment" and that as a consequence of Defendant Turner's indifference to Plaintiffs' rights, each plaintiff suffered injuries for which he shall be compensated.

269. Additionally, in order to avoid any recurrence of the way GCI was operated by Defendant Turner, and to ensure that additional improvements will be implemented to address victims of the unconstitutional practices, the Court has ordered the injunctive relief described herein.

270. Finally, as the prevailing party in this action, Plaintiffs are entitled, pursuant to the Civil Rights Attorney Fees Awards Act of 1976, 42 U.S.C. § 1988, to an award of attorney fees and litigation expense reimbursement.

271. Plaintiffs shall file with the District Judge within twenty (20) days from issuance of this Order appropriate fee/expense submissions and accompanying memoranda as to this issue. Defendants shall respond within twenty (20) days from Plaintiffs' filing. The District Judge may then enter an appropriate Order granting Plaintiffs' attorney fees and litigation expenses consistent with the parties' submissions.

Pursuant to statute, the parties may file and serve, with the District Judge in West Palm Beach, and within ten (10) days of the entry of this Order, their written objections to any portion of these Findings of Fact or Conclusions of Law.